John Heenan
Bishop & Heenan
3970 Avenue D, Suite A
Billings, Montana    59102
(406) 839-9091
john@bishopandheenan.com

Roger Sullivan
McGarvey, Heberling, Sullivan
        & McGarvey, P.C.
745 South Main Street
Kalispell, Montana   59901-5341
(406) 752-5566
RSullivan@McGarveyLaw.com

George E. Hays (*admitted pro hac vice*)
236 West Portal Avenue, #110
San Francisco, CA   94127
(415) 566-5414
georgehays@mindspring.com

David C. Bender (*admitted pro hac vice*)
McGillivray Westerberg & Bender LLC
211 S. Paterson Street, Ste 320
Madison, WI    53703
(608) 310-3560
bender@mwbattorneys.com

Aubrey E. Baldwin (*admitted pro hac vice*)
Earthrise Law Center
Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland, OR      97219
Office: (503) 768-6929
abaldwin@lclark.edu

Counsel for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA

## BILLINGS DIVISION

| | |
|---|---|
| SIERRA CLUB and MONTANA ENVIRONMENTAL INFORMATION CENTER, <br><br> Plaintiffs, <br><br> v. <br><br> PPL MONTANA LLC, AVISTA CORP., PUGET SOUND ENERGY, PORTLAND GENERAL ELECTRIC CO., NORTHWESTERN CORP., and PACIFICORP, <br><br> Defendants. | Case No. 1:13-cv-00032-DLC-JCL <br><br> PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION .............................................................................................1

STATEMENT OF THE CASE .............................................................................1

I. Each Day that it Operates, the Colstrip Power Plant Emits Thousands of Tons of Dangerous Air Pollutants. ....................................................................................1

II. Most of the Violations in this Case Involve Violations of the Prevention of Significant Deterioration ("PSD") Program. ........................................................3

    A. Congress Designed the Prevention of Significant Deterioration Program to Prevent Serious Degradation of Air Quality in Areas Meeting Air Quality Standards. ......................................................................................... 3

    B. The State of Montana Implements the Prevention of Significant Deterioration Program Through its State Implementation Plan. ..................... 5

III. Two Claims in This Case Involve Violations of the Clean Air Act Federal Operating Permits Program. ..................................................................................7

IV. The Complaint is Based, in Large Part, on Twelve Major Modifications at Colstrip Between 1992 and 2012. .........................................................................9

    ARGUMENT .............................................................................................11

I. Because a Montana Air Quality Permit is Required for Each Modification and it is Illegal to Operate Without One, Plaintiffs Have Properly Stated Claims Under 42 U.S.C. § 7604(a)(1)....................................................................................12

    A. The Clean Air Act Citizen Suit Provision Creates Causes of Action Both for Constructing Without a Permit And for Violating Any Requirement to Obtain a Permit as a Condition of Operation................................................. 12

    B. Under the Montana State Implementation Plan, Defendants Must Obtain a Montana Air Quality Permit Each Time They Modify Colstrip, and it is a Violation of the Clean Air Act to Operate Without That Permit................... 14

II. Each Day Defendants Operate Colstrip, They Violate Prevention of Significant Deterioration Permitting Requirements.  Therefore, Plaintiffs' Claims Are Not Time-Barred. .......................................................................................................17

    A. Many Statute of Limitations Decisions Addressing this Issue Have Focused on Whether, Under the Particular State Implementation Plan in

i

Question, it is Lawful to Operate Without a Required Prevention of Significant Deterioration Permit. .................................................................. 18

B.    In Montana, the Permitting Vehicle for the Prevention of Significant Deterioration Program is the Montana Air Quality Permit, and, When Required, a Facility is Prohibited to Operate Without One. ............................ 21

C.    Because Prevention of Significant Deterioration Permits Are Necessary as a Condition of Operation, Plaintiffs' Claims Are Not Time-Barred Even Absent Section 743.1 of the Montana State Implementation Plan. ................. 22

D.    Montana's State Implementation Plan Independently Prohibits Major Modifications from Operating Without Emission Limits Based Upon Best Available Control Technology. Consequently, this Claim Is Not Time-Barred. ...................................................................................................... 23

E.    The Concurrent Remedy Doctrine does not Bar Plaintiffs' Claims for Injunctive and Declaratory Relief ..................................................... 26

III.   Defendants' Argument that Plaintiffs' Best Available Control Technology Claims Should be Dismissed on Rule 12(b)(1) Grounds is Based on a Typographical Error in the Complaint and Should Be Rejected. ................................................. 32

IV.   Plaintiffs' Title V Claims Allege Violations of the Colstrip Title V Permit, Do Not Challenge the Permit's Conditions, and Therefore Defendants' Motion Should Be Rejected. .......................................................................................... 33

V.   Plaintiffs' Claims For Opacity Violations Should Be Dismissed Without Prejudice. ........................................................................................................ 37

CONCLUSION ...................................................................................................... 38

CERTIFICATE OF COMPLIANCE .......................................................................... 39

# TABLE OF AUTHORITIES

## Cases

*A-C Reorganization Trust v. E.I. Dupont De Nemours & Co.*, 968 F. Supp. 423

(E.D.Wis. 1997) ................................................................................30

*Ala. Power v. Costle*, 636 F.2d 323 (D.C. Cir. 1980).................................................4

*Big Cajun U.S. v. La. Generating, LLC,* 2011 WL 6012997 at (M.D. La. Dec. 1,

2011) ................................................................................35

*Coal. for Clean Air v. VWR Intern.*, LLC, 2013 WL 486287 (E.D. Cal. Feb. 6,

2013) ................................................................................23

*Cope v. Anderson*, 331 U.S. 461 (1947) ............................................... 27, 28, 29, 30

*Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561 (2007) ...........................................5

*Fed. Election Comm'n v. Christian Coal.*, 965 F. Supp. 66 (D.D.C. 1997)..... 28, 29

*Fed. Election Comm'n v. Williams*, 104 F.3d 237 (9th Cir. 1996).................. 27, 30

*Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.*, 382 F.3d 743

(7th Cir. 2004)................................................................................37

*Grand Canyon Trust v. Tuscon Elec.*, 391 F.3d 979 (9th Cir. 2004) .....................32

*Holmberg v. Armbrecht*, 327 U.S. 392 (1946)........................................................27

*Idaho Conservation League v. Boer*, CV-04-250-S-BLW, slip op. (D. Idaho Sept.

27, 2004) ................................................................................23

*Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth*., 502 F.3d 1316 (11th Cir. 2007)*, cert. denied* 554 U.S. 917 (2008). ................................................ 20, 26, 29

*Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.*, 480 F.3d 410 (6th Cir. 2007) ...................................................................... 17, 19, 24, 25, 26

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)................................18

*New Jersey v. Reliant Energy Mid-Atlantic Power Holdings, LLC*, 2009 WL 3234438 (E.D. Pa. Sept. 30, 2009) ....................................................................30

*New Jersey v. RRI Energy Mid-A. Power Holdings*, LLC, 2013 WL 1285456 (E.D. Pa. March 28, 2013)................................................................................23

*New York v. Niagara Mohawk Power Corp.*, 2003 WL 23356447 (W.D.N.Y. Dec. 31, 2003). .........................................................................................35

*Ohio Power Co. v. US EPA*, 729 F.2d 1096 (6th Cir. 1984). ...................................2

*Pennsylvania. v. Allegheny Energy, Inc.*, 2006 WL 1509061 (W.D. Pa. Apr. 19, 2006) .........................................................................................35

*Pouncil v. Tilton*, 704 F.3d 568 (9th Cir. 2012)....................................................18

*Romoland Sch. Dist. v. Inland Empire Energy Ctr.,* 548 F.3d 738 (9th Cir. 2008) 36

*Russell v. Todd*, 309 U.S. 280 (1940) ........................................................ 27, 28, 29

*SEC v. First Cal. Capital Markets Group, Inc.*, No CV 97-02761, slip op. (N.D. Cal. Apr. 5, 1999)................................................................................31

iv

*SEC v. Mercury Interactive, LLC*, 2008 WL 4544443 (N.D. Cal. Sept. 30, 2008).31

*SEC v. Rind,* 991 F.2d 1486 (9th Cir. 1993). ...........................................................31

*Sierra Club v. Dairyland Power Co-op*, 2010 WL 4294622 (W.D. Wis. 2010)... 22,

.......................................................................................... 24, 25, 34, 35

*Sierra Club v. Dayton Power & Light, Inc.*, 2005 WL 1972549 (S.D. Ohio Aug 12,

2005) ............................................................................................ 23, 30

*Sierra Club v. Ga. Power Co.*, 443 F.3d 1346 (11th Cir. 2006)..............................7

*Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008 (8th Cir. 2010)......... 20, 26, 29

*Sierra Club v. Portland General Elec. Co.*, 663 F. Supp. 2d 983 (D. Or. 2009). .......

.........................................................................................................25

*Tull v. United States*, 481 U.S. 412 (1987) ..........................................................29

*United States v. Am. Elec. Power Serv. Corp*, 137 F. Supp. 2d 1060 (S.D. Ohio

2001) ............................................................................................ 23, 30

*United States v. Am. Elec. Power Serv. Corp.*, 136 F. Supp. 2d 808 (S.D. Ohio

2001) ...............................................................................................30

*United States v. Campbell Soup Co.*, 1997 WL 258894 (E.D. Cal. March 11, 1997)

.........................................................................................................25

*United States v. Cinergy Corp.*, 397 F. Supp. 2d 1025 (S.D. Ill. 2005) ........... 30, 32

v

*United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619 (M.D.N.C. 2003), *aff'd* 411 F.3d 539 (4th Cir. 2005), *rev'd on other grounds in Envtl. Def. v. Duke Energy Corp.,* 549 U.S. 561 (2007). ........................................................... 21, 30

*United States v. E. Ky. Power Coop., Inc.*, 498 F. Supp.2d 970 (E.D. Ky 2007) ...35

*United States v. La. Generating, LLC*, 2011 WL 6012997 (M.D. La. Dec. 1, 2011) ...................................................................................................................23

*United States v. Marine Shale Processors*, 81 F.3d 1329 (5th Cir. 1996) .............19

*United States v. Murphy Oil USA, Inc.,* 143 F. Supp. 2d 1054 (W.D. Wis. 2001) .22

*United States v. Ohio Edison Co.*, 2003 WL 23415140 (S.D. Ohio Jan. 17, 2003)23

*United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829 (S.D. Ohio 2003)..............9

*United States v. Titanium Metals Corp.*, CV-S-98-682, slip. op. (D. Nev. Sept. 21, 1998) ..................................................................................................................23

*United States v. Westvaco Corp.*, 144 F.Supp. 2d 439 (D. Md. 2001)....................30

## Statutes

1990 Clean Air Act Amendments,104 Stat. 2399 (1990) §§ 501-507, codified at 42 U.S.C. §§ 7661-7661f. ......................................................................................7

28 U.S.C. § 2462 .................................................... 11, 17, 18, 26, 29, 31

42 U.S.C. § 7408 ..................................................................................4

42 U.S.C. § 7409 ..................................................................................4

vi

42 U.S.C. § 7410 ..................................................................................5

42 U.S.C. § 7413 ................................................................................29

42 U.S.C. § 7471 ..................................................................................5

42 U.S.C. § 7473 ..................................................................................4

42 U.S.C. § 7475 ...............................................................................4, 5

42 U.S.C. § 7479 ..................................................................................5

42 U.S.C. § 7602 ................................................................................24

42 U.S.C. § 7604 .............................. 10, 11, 13, 14, 29, 32, 34, 35, 37

42 U.S.C. § 7607 ................................................................................36

42 U.S.C. § 7661a ................................................................................7

## Rules

40 C.F.R. § 51.165 ...............................................................................6

40 C.F.R. Part 70 .................................................................................7

75 Fed. Reg. 64230 (Oct. 19, 2010)......................................................3

Mont. Admin. R. 17.8.740 .................................................................16

Mont. Admin. R. 17.8.743 ............................................... 6, 14, 15, 16, 21

Mont. Admin. R. 17.8.756 .................................................................26

Mont. Admin. R. 17.8.801 ..............................................................7, 24

Mont. Admin. R. 17.8.819 ...................................................................7

Mont. Admin. R. 17.8.827 ........................................................................26

Mont. Admin. R. 17.8.1205 .......................................................................8

Mont. Admin. R. 17.8.1206 .......................................................................8

TENN. COMP. R. & REGS. 1200-3-9-.01 ...................................................25

## Other Authorities

Letter from L. Merchant, Montana Dept. of Envt'l Quality to Barry Bates,

Thompson River Co-gen, LLC (July 23, 2004)...................................16

## INTRODUCTION

Plaintiffs Montana Environmental Information Center and Sierra Club respectfully request that Defendants' Partial Motion to Dismiss be denied.  Below, Plaintiffs explain the nature of this case, the violations alleged, and why, except with respect to Claim 39 (opacity violations), this motion is not well taken.

## STATEMENT OF THE CASE

### I. Each Day that it Operates, the Colstrip Power Plant Emits Thousands of Tons of Dangerous Air Pollutants.

Every day it operates, the coal-fired Colstrip power plant, the second largest west of the Mississippi, burns 12 train cars of coal every hour, one every five minutes.  As a result of burning so much coal, Colstrip releases massive amounts of air pollution, including sulfur dioxide, oxides of nitrogen, and particulate matter (coarse and fine).

The Colstrip plant is the single largest source of sulfur dioxide emissions in Montana, releasing approximately 12,000 tons in 2011.  Compl. ¶ 19.  The plant alone accounted for more than half of Montana's sulfur dioxide emissions and more than five times the amount of sulfur dioxide emitted from the next highest emitting stationary source in Montana.  *Id.*  Sulfur dioxide is "a medically recognized threat to human health, which, when present in high concentrations over a number of days, can kill."  *Ohio Power Co. v. US EPA*, 729 F.2d 1096,

1

1097–98 (6th Cir. 1984). Sulfur dioxide can form into fine particulates causing regional haze. *Id*. Sulfur dioxide also contributes to acid rain that damages forests and crops, changes the makeup of soil, and makes lakes and streams acidic and unsuitable for fish. *Id*. Modern pollution controls at the Colstrip facility would reduce sulfur dioxide emissions by at least 97.5%,[1] compared to the 75% and 95% removal efficiencies currently being achieved at Units 1 and 2 and Units 3 and 4, respectively, according to Defendants.

The Colstrip plant is an even larger emitter of oxides of nitrogen, sending 15,000 tons into the sky in 2011. Compl. ¶ 20. As does sulfur dioxide, oxides of nitrogen form very fine particles that penetrate deeply into sensitive parts of lungs and damage health, causing or contributing to premature death, breathing problems, lung tissue damage, emphysema, bronchitis, and heart disease. *Id*. This gas also forms ground-level ozone, which causes other health problems and damages plants. *Id*. Oxides of nitrogen spoil visibility by contributing to regional haze, excess nitrogen deposition that harms plants and aquatic ecosystems, and acid rain. *Id*. If modern pollution controls for nitrogen oxides (i.e., selective

---

[1] *See* Plant Washington Air Quality Permit 4911-303-0051-P-01-2, initially issued April 8, 2010, remanded and finalized May 31, 2012, available at http://www.georgiaepd.org/air/airpermit/downloads/permits/psd/dockets/plantwashington/permitdocs/3030051final.pdf.

catalytic reduction systems) were installed at Colstrip, nitrogen oxide emissions would be reduced by 80-90% per unit.[2]

In addition to the fine particle pollution created from its emissions of sulfur dioxide and oxides of nitrogen, the Colstrip plant's direct emissions of soot make it a major source of particulate matter pollution.  Compl. ¶ 21.  Breathing particulate pollution causes premature death, heart attacks, strokes, birth defects, asthma attacks, lung damage, Sudden Infant Death Syndrome, and low birth weight.  *Id.*  Particulate pollution also causes haze that impairs visibility, and alters nutrient balances in waters and soils.  *Id.*  The Colstrip units use an old technology, wet venturi scrubbers, to remove particulate matter.[3]

## II.    Most of the Violations in this Case Involve Violations of the Prevention of Significant Deterioration ("PSD") Program.

### A.    Congress Designed the Prevention of Significant Deterioration Program to Prevent Serious Degradation of Air Quality in Areas Meeting Air Quality Standards.

Many of the pollutants emitted by Colstrip, such as sulfur dioxide, oxides of nitrogen, and particulate matter, are regulated through Title I of the Clean Air Act

---

[2] *See, e.g.*, Duke Energy, Selective Catalytic Reduction, at http://www.duke-energy.com/environment/air-quality/selective-catalytic-reduction.asp.
[3] EPA has stated that venturi particle scrubbers have not been installed since 1979 and that these scrubbers have typically been replaced with more effective fabric filter baghouses.  *See* 75 Fed. Reg. 64230 (Oct. 19, 2010).

("the Act").  This title requires the United States Environmental Protection Agency ("EPA") to establish air quality standards adequate to protect public health and welfare for several pervasive pollutants, including the three mentioned above, and to determine whether areas have excessive concentrations of those pollutants.  42 U.S.C. §§ 7408(a), 7409.  Congress wanted to ensure that the concentrations of these pollutants do not seriously degrade air quality in areas that meet the air quality standards or that have not been classified by EPA, and so, in 1977, it amended the Act to create the Prevention of Significant Deterioration program. *Ala. Power v. Costle*, 636 F.2d 323, 346-50 (D.C. Cir. 1980) (codifiying a court-ordered EPA program).

This program focuses on sources in areas that meet the air quality standards, or are unclassified by EPA, that emit or plan to emit at least 100 tons of pollution per year, requiring these sources to have permits containing emission limits providing for continuous emission reduction.  *Id.*  The program limits the degradation of air quality caused by new and modified sources.  42 U.S.C. § 7473.  Before a permit can be obtained, an analysis of air quality at the proposed plant site must occur.  42 U.S.C. § 7475.  The project developer must then demonstrate, among other things, that the project will not significantly worsen air quality or violate air quality standards.  *Id.*

4

The resulting permits then govern the plant's operation.  The permits must contain emission limits that reflect "best available control technology," which Congress defines as the maximum achievable degree of reduction, considering cost and other factors.  42 U.S.C. § 7479(3). Furthermore, the permits may require ongoing air quality monitoring to determine the effect emissions from the facility "may have, or [are] having, on air quality."  42 U.S.C. § 7475(a)(7).  Significantly for this case, the Prevention of Significant Deterioration program applies to new major sources of air pollution and also applies if a major pollution source makes physical or operational changes that increase emissions.  42 U.S.C. § 7479(2)(C); *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 567 (2007).

B.   The State of Montana Implements the Prevention of Significant Deterioration Program Through its State Implementation Plan.

The Clean Air Act's design envisions that states will be the primary permitting authority for the Prevention of Significant Deterioration program.  42 U.S.C. § 7471.  The regulatory vehicle for this state involvement is a set of rules known as the State Implementation Plan or "SIP."  *Id.*  These rules implement all of the requirements related to national ambient air quality standards, including the Prevention of Significant Deterioration program.  42 U.S.C. § 7410.  Once the state's rules are approved by EPA, they become federal law in the state.  *Id.* Montana has prepared, and EPA has approved, state implementation plan rules

5

implementing the Prevention of Significant Deterioration program in Montana.

Compl. ¶ 31.  Montana's rules are modeled upon EPA regulations specifying the

necessary content for Prevention of Significant Deterioration programs in State

Implementation Plans.  *See* 40 C.F.R. § 51.165.  Montana's program has the

following highlights:

First, program requirements apply to "major modifications," which are

physical or operational changes that would result in significant net emissions

increases.  Mont. Admin. R. 17.8.801(20).  Plaintiffs allege that the Colstrip plant

has had twelve major modifications between 1992 and 2012.

Second, as will be discussed more fully below, new major sources or major

modifications can neither be constructed nor operated without a Montana Air

Quality Permit:[4]

> [A] person may not construct, install, modify, or operate any of the
> following without first obtaining a Montana air quality permit.

Mont. Admin. R. 17.8.743 (1).  Defendants acknowledge that this provision applies

to Colstrip.  Dkt. # 37 at 26.

---

[4] Mont. Admin. R. 17.8.101(4)("'Montana air quality permit' means a permit
issued, altered or modified pursuant to subchapters 7, 8, 9, or 10 of this chapter."
Subchapter 8 contains Prevention of Significant Deterioration requirements).

Third, any "major modification shall apply [Best Available Control Technology]."  Mont. Admin. R. 17.8.819(3).   Montana, tracking the federal definition, defines Best Available Control Technology as an "emissions limitation" based on "the maximum degree of reduction" of air pollutants taking into account various factors, including cost.  Mont. Admin. R. 17.8.801(6).

### III.   Two Claims in This Case Involve Violations of the Clean Air Act Federal Operating Permits Program.

Another relevant program in this case is the Federal Operating Permits or "Title V" program.  The "Title V" name comes from the fact that the scheme for these permits was added as part of the fifth title of the Act's 1990 Amendments. 104 Stat. 2399 (1990) §§ 501-507, codified at 42 U.S.C. §§ 7661-7661f.  A Title V permit generally does not impose new air quality requirements.  Instead, it is intended to consolidate into a single document all of the Act's requirements applicable to a particular source of air pollution arising from state and/or federal regulations or permits, among other requirements.  *Sierra Club v. Ga. Power Co.*, 443 F.3d 1346, 1349 (11th Cir. 2006).  Congress designed the federal operating permits program so that the permits, although enforceable through the federal Clean Air Act, would be issued by the states.  *See* 42 U.S.C. § 7661a(b); 40 C.F.R. Part 70.

7

Montana's Title V program provides that if an existing Title V operating permit would prohibit a modification to, or change in operation of, a facility, then the owner or operator must have a revised Montana Air Quality Permit in hand prior to "commencing operation" of the modified facility, and the owner or operator must also obtain a revised Title V operating air permit.  Mont. Admin. R. § 17.8.1205(2)(b).  Any application for a Title V operating permit or permit revision must include sufficient information to allow the permitting agency and the public to determine whether the source is in compliance with all applicable Clean Air Act requirements.  Mont. Admin. R. 17.8.1206 (e), (i) & (n).  All statements in the application must be true, and an incorrect or incomplete application must be revised "promptly" by the applicant.  Mont. Admin. R. 17.8.1206, 1205(4).  The application must also contain a certification by the owner or operator that the source is currently in compliance with all requirements applicable to the source, including permitting requirements.  Mont. Admin. R. 17.8.1206(6).  These conditions are incorporated into the Colstrip Title V permit at Section V.[5]

---

[5] The currently in force Colstrip Title V permit is attached as Exhibit A.  Previous versions of the permit also contained these provisions.

8

**IV.    The Complaint is Based, in Large Part, on Twelve Major Modifications at Colstrip Between 1992 and 2012.**

As the court notes in *United States. v. Ohio Edison Co.*, "[c]oal-fired power plants . . . generate electricity using three major components: the boiler, turbine and generator.  The boiler is a large building-like structure in which coal is burned inside the furnace and the energy from the combustion process is transferred to water to produce steam."  276 F. Supp. 2d 829, 836 (S.D. Ohio 2003).  The steam turns a turbine which drives a generator to produce electricity.  *Id.*  "The walls, roof and floor of the boiler are comprised of tubes, as are the other major components of the boiler, *i.e.,* the economizer, primary superheater, secondary superheater and reheater.  The components are made up of densely packed assemblies of tubes that incrementally raise the temperature of the steam before it leaves the boiler to generate electricity."  *Id.*

Beginning in 1992, Defendants made a number of major modifications centered on some of the fundamental plant components discussed above at each of Colstrip's four units.  First, Defendants replaced or upgraded all or part of the turbines at all four units.  In addition, Defendants replaced the economizer and reheater assemblies at Units 1 and 2, and the reheater pendants and the nose arch at Unit 3.

For each of these major modifications, Plaintiffs have stated three claims for relief.  First, Plaintiffs allege that Defendants constructed and are operating each of the alleged modifications without a Prevention of Significant Deterioration Permit in violation of the Montana State Implementation Plan and the Clean Air Act. These claims are actionable under 42 U.S.C. § 7604(a)(3) and (a)(1). (Claims 1, 4, 7, 10, 13, 16, 19, 22, 25, 28, 31, and 34).

Second, Plaintiffs allege in Claims 2, 5, 8, 11, 14, 17, 20, 23, 26, 29, 32, and 35 that Defendants failed to obtain a Montana Air Quality Permit to operate the modified unit, and each day Defendants operated the modified unit without that permit constitutes a violation of Mont. Admin. R. 17.8.743(1).  These claims are authorized by 42 U.S.C. § 7604(a)(1). This second set of claims is related to the first, but Plaintiffs have separated them to leave no doubt that in Montana, one may not operate without a Montana Air Quality Permit that includes the applicable Prevention of Significant Deterioration requirements.

Third, Plaintiffs allege, in Claims 3, 6, 9, 12, 15, 18, 21, 24, 27, 30, 33, and 36, that Defendants are violating the Montana State Implementation Plan by operating their modified units without complying with Best Available Control Technology emission limitations.  Mont. Admin. R. § 17.8.819(3).  These violations are actionable under 42 U.S.C. § 7604(a)(1).

10

Fourth, Plaintiffs allege that Defendants are violating their Title V operating permit for Colstrip by failing to correct or supplement their Colstrip Title V application with respect to modifications discussed above and by failing to submit complete compliance certifications  (Claims 37 and 38).

Fifth, Plaintiffs allege that Defendants have violated opacity requirements (Claim 39).

## ARGUMENT

Plaintiffs and Defendants agree that the Clean Air Act specifically provides a cause of action, 42 U.S.C. § 7604(a)(3), for commencing construction on a Prevention of Significant Deterioration major modification.  Plaintiffs also agree that the applicable statute of limitations for penalties for violations of the Act is 28 U.S.C. § 2462.  Thus, the limitations period for penalties is five years and sixty days from the filing of the complaint.  Accordingly, Defendants have not moved to dismiss Claims 1, 4, and 7 because construction on those modifications occurred within the limitations period.

Defendants have moved to dismiss Plaintiffs' Prevention of Significant Deterioration claims for modifications that began more than five years ago (Claims 10, 13, 16, 19, 22, 25, 28, 31, and 34) as well as the Best Available Control Technology claims for the same modifications (Claims 12, 15, 18, 21, 24, 27, 30,

33, and 36) on statute of limitations grounds.  Apparently recognizing that the

statute of limitations is unavailable as a defense to Plaintiffs' claims that

Defendants are operating without Montana Air Quality Permits (Claims 2, 5, 8, 11,

14, 17, 20, 23, 26, 29, 32, and 35), Defendants seek dismissal of these claims on

novel grounds.  Defendants argue that, although it may be illegal to commence

construction on a modification without a Montana Air Quality Permit, it is not

illegal to thereafter operate the modified unit without such a permit.

Next, Defendants move to dismiss Plaintiffs' Best Available Control

Technology claims, (Claims 3, 6, 9, 12, 15, 18, 21, 24, 27, 30, 33, and 36), arguing

incorrectly that there is no citizen suit jurisdiction for these claims.  Defendants

then move to dismiss Plaintiffs' Title V claims (Claims 37 and 38) and opacity

claim (Claim 39).   As shown below, except for the opacity claim, which Plaintiffs

request be dismissed without prejudice, Defendants' motion should be denied.

I. **Because a Montana Air Quality Permit is Required for Each Modification and it is Illegal to Operate Without One, Plaintiffs Have Properly Stated Claims Under 42 U.S.C. § 7604(a)(1).**

A. <u>The Clean Air Act Citizen Suit Provision Creates Causes of Action Both for Constructing Without a Permit And for Violating Any Requirement to Obtain a Permit as a Condition of Operation.</u>

Although the basis of Defendants' attack on Plaintiffs' Montana Air Quality

Permit claims is not jurisdictional, to address their argument, it is helpful to

understand the jurisdictional basis for these claims.  The Clean Air Act's citizen

suit provision excerpted below provides that citizens may sue for a violation of

"*any* requirement to obtain a permit as a condition of operation."  42 U.S.C.

§ 7604(f)(4) (emphasis added).  This conclusion is manifest from two key sections

of the citizen suit provision.  First, 42 U.S.C. § 7604(a)(1) provides that:

> Authority to bring civil action; jurisdiction.  Except as provided in
> subsection (b), any person may commence a civil action on his own behalf–
>
>  (1) against any person . . . who is alleged to have violated (if there is
> evidence that the alleged violation has been repeated) or to be in violation of
> (A) *an emission standard or limitation under this Act* or (B) an order issued
> by the Administrator or a State with respect to such a standard or limitation.

 (emphasis added).  The italicized language has a separate definition:

> (f) "Emission standard or limitation under this Act" defined.  For purposes
> of this section, the term "emission standard or limitation under this Act"
> means--                                 . . .
> > (4) any other standard, limitation, or schedule established under any
> > permit issued pursuant to title V [42 USCS §§ 7661 et seq.] or under
> > any applicable State implementation plan approved by the
> > Administrator, any permit term or condition, and ***any requirement to
> > obtain a permit as a condition of operations***.[,]
>
> *which is in effect under this Act . . . or under an applicable implementation
> plan.*

42 U.S.C. § 7604(f) (emphases added).

　　To be sure, the citizen suit provision also explicitly provides that a citizen

can bring an action against anyone "who proposes to construct or constructs any

new or modified major emitting facility without a permit." 42 U.S.C. § 7604(a)(3).

The existence of this provision, however, does not negate subsections (a)(1) and

(f)(4). Thus, this Court has jurisdiction over Plaintiffs' claims that Defendants are

operating without required Montana Air Quality Permits, operating in violation of

a State Implementation Plan requirement (such as Best Available Control

Technology), and operating in violation of a Title V permit.

> B.  Under the Montana State Implementation Plan, Defendants Must
>      Obtain a Montana Air Quality Permit Each Time They Modify
>      Colstrip, and it is a Violation of the Clean Air Act to Operate Without
>      That Permit.

Defendants acknowledge that a Montana Air Quality Permit is required for

each modification made at Colstrip, but they assert that as long as they have some

previously issued Montana Air Quality Permit, they may operate the plant without

a modification-related permit. Dkt. # 37 at 25-28. The plain language of Section

17.8.743(1) of the Montana State Implementation Plan shows that each

modification requires a Montana Air Quality Permit, however, and that a modified

facility cannot be operated without one. Mont. Admin. R. 17.8.743 (1) provides

that:

> (1) Except as provided in ARM 17.8.744 and 17.8.745, a person may not
> construct, install, *modify, or operate* any of the following without first
> obtaining a Montana air quality permit issued by the department:
>      …

> (d) any facility or emitting unit upon which construction commenced, or that was installed, before November 23, 1968, when that facility or emitting unit is modified after that date and the modification increases the potential to emit by more than 25 tons per year of any airborne pollutant, other than lead, that is regulated under this chapter; **or**
> (e) any other facility or emitting unit upon which construction was commenced, or that was installed, after November 23, 1968, that is not specifically excluded under ARM 17.8.744, and that has the potential to emit more than 25 tons per year of any airborne pollutant, other than lead, that is regulated under this chapter.  (Emphasis added).

Defendants argue that because subsection (d) provides that facilities constructed prior to 1968 need not obtain a permit until modified, for facilities such as Colstrip that were constructed after 1968,[6] "Section 743(1)(e) only requires a source to obtain a permit to modify."  Dkt. # 37 at 27.  Defendants' argument does not square with the plain language.

Looking at the main clause in Mont. Admin. R. 17.8.743Section 743(1), it is clear that one may not "*modify* . . . without first obtaining a Montana air quality permit."  It is also clear one may not "*operate* . . . without first obtaining a Montana air quality permit."  Because one needs a Montana Air Quality Permit in order to modify a facility, the permit related to the modification becomes the permit necessary for operation of that facility.  Any other interpretation would make the necessity of a permit for operation superfluous.

_____

[6] Compl. ¶ 18.

This conclusion is supported by the title of subchapter 7 ("Permit, Construction and Operation of Air Contaminant Sources"), and by one of the definitions of "Montana Air Quality Permit" contained in the State Implementation Plan:

> "Montana air quality permit" means a preconstruction permit issued under this subchapter that may include requirements for the construction and subsequent operation of an emitting unit(s) or facility.

Mont. Admin. R. 17.8.740(9). Because these permits can contain requirements governing operation of a facility, a reading of Section 743(1) that allows operation after modification without a permit addressing that modification is simply not plausible.

Review of a recent action by the Montana Department of Environmental Quality demonstrates Defendants' misinterpretation of Section 743(1). *See* Exhibit B, Letter from L. Merchant, Mont. Dept. of Envt'l Quality to Barry Bates, Thompson River Co-gen, LLC (July 23, 2004). In this letter, the State of Montana notes that Thompson River Co-gen holds a valid Montana Air Quality Permit for a boiler, but that the company has constructed a modified boiler other than what was originally permitted, requiring a Montana Air Quality Permit "prior to the construction or operation" of the facility. The Department goes on to state that "because the changes to the facility require a permit before construction or

16

operation, the Department believes that any operation of this facility prior to

obtaining the appropriate permit would constitute a violation." *Id.*

In this case, as in Thompson River, Defendants have made unpermitted

changes, and until Defendants obtain permits for those changes, Defendants are in

violation of the Montana State Implementation Plan and the Act when operating

the modified facility.

## II.   Each Day Defendants Operate Colstrip, They Violate Prevention of Significant Deterioration Permitting Requirements.  Therefore, Plaintiffs' Claims Are Not Time-Barred.

Defendants have not moved to dismiss Plaintiffs' claims regarding

Defendants' lack of required Montana Air Quality Permits on statute of limitations

grounds.  Therefore, Defendants' statute of limitations arguments should be

rejected because in Montana, a Prevention of Significant Deterioration Permit is a

Montana Air Quality Permit.  As the Sixth Circuit explained in a similar Clean Air

Act case, the "violations manifest[] [themselves] each day the plant operates."

*Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.*, 480 F.3d 410, 419 (6th Cir.

2007) (hereinafter "*Nat'l Parks (6th Cir.)*").

The parties agree that the appropriate statute of limitation provision related

to the recovery of civil penalties for violations of the Clean Air Act is 28 U.S.C. §

2462, which provides:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued…

28 U.S.C. § 2462.

To determine when a claim first accrues under this provision, the key is to define the nature of the violation alleged.  As the Ninth Circuit has put it, "an action ordinarily accrues on the date of the injury." *Pouncil v. Tilton*, 704 F.3d 568, 574 (9th Cir. 2012).  For example, if the law makes construction without a permit illegal, then the claim accrues when the construction occurs.  Or, if the law makes operation without an emission limit illegal, a new claim accrues each new day of operation.  *See*, *e.g, Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (In Title VII discrimination cases, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act."); *see also Pouncil*, 704 F.3d at 578-79.

A.   <u>Many Statute of Limitations Decisions Addressing this Issue Have Focused on Whether, Under the Particular State Implementation Plan in Question, it is Lawful to Operate Without a Required Prevention of Significant Deterioration Permit.</u>

The four Courts of Appeal cases that have examined this issue have all focused on whether the permit in question governed operations.  In *United States v. Marine Shale Processors*, the United States brought action for Marine Shale's

failure to obtain a "minor" preconstruction Clean Air Act permit.  81 F.3d 1329,

1352 (5th Cir. 1996).  The court noted that: "the CAA statutory scheme

contemplates at least two different types of air permits unhappily named

'preconstruction permits' and 'operating permits,' with confusion easily resulting

from the fact that preconstruction permits often include limits upon a source's

operations."  *Id*. at 1355-56.  The court then went on to note that while some states

have separate construction and operating permit programs, Louisiana did not.

Ultimately, the court termed the defendant's statute of limitations defense

"frivolous."  *Id*. at 1357.

In *Nat'l Parks (6th Cir.)*, the court focused on whether a PSD permit is a

condition of operation.  480 F.3d at 418.  There, Tennessee had separate

construction and operating permit programs.  That fact appeared to support the

defendant's position, but after examining the language of the regulations, the court

concluded that "the duty to obtain a construction permit containing the proper

emissions limits is ongoing, even post-construction."  *Id*. at 419.

Even in appellate cases relied upon by Defendants, the courts examined the

construction permit/operating permit distinction and found it determinative.  In

*Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.* (hereinafter "*Nat'l Parks

(11th Cir.)*"), a case arising in Alabama, the Eleventh Circuit acknowledged that

"were this case governed by Tennessee's environmental regulations, the Sixth Circuit's decision in *Nat'l Parks (6th Cir.)* indeed would be persuasive authority for [plaintiffs'] position."  502 F.3d 1316, 1322 (11th Cir. 2007)*, cert. denied* 554 U.S. 917 (2008).  Similarly, in *Sierra Club v. Otter Tail Power Co.*, the Eighth Circuit did not read the applicable South Dakota regulations to prohibit operation without a required Prevention of Significant Deterioration permit. 615 F.3d 1008, 1015 (8th Cir. 2010).

District courts examining this issue have also focused on whether the applicable State Implementation Plan makes operating without a Prevention of Significant Deterioration permit a violation.  Recently, in *Sierra Club v. Portland General Electric Co.*, the court relied on the Sixth Circuit's holding, finding that in Oregon, "the PSD program applies to both the construction and the operation of a major source," and therefore "each day a facility operates absent a PSD permit [is] a discrete violation of the CAA."  663 F. Supp. 2d 983, 992-94 (D. Or. 2009). Similarly, in *United States v. Duke Energy Corp.*, the district court found that Section 2462 was no bar in that PSD modification case because "the PSD permitting provisions provide both preconstruction obligations and subsequent obligations on operations."  278 F. Supp. 2d 619, 651 (M.D.N.C. 2003), *aff'd* 411

20

F.3d 539 (4th Cir. 2005), *rev'd on other grounds in Envtl. Def. v. Duke Energy Corp.,* 549 U.S. 561 (2007).

As shown below, an examination of the Montana State Implementation Plan shows that in Montana, as in Oregon, Tennessee, and the Carolinas, operation without a required Prevention of Significant Deterioration permit is prohibited.

B.    <u>In Montana, the Permitting Vehicle for the Prevention of Significant Deterioration Program is the Montana Air Quality Permit, and, When Required, a Facility is Prohibited to Operate Without One.</u>

Defendants acknowledge that in Montana, the substantive Prevention of Significant Deterioration requirements are contained in Subchapter 8 of the Montana regulations, and "[t]o comply with Subchapter 8, a source planning to undertake a major modification must obtain a preconstruction permit by incorporating the substantive PSD requirements into a Montana Air Quality Permit [] issued pursuant to Section 743(1) of the Montana Regulations. Mont. Admin. R. 17.8.743(1)." Dkt. # 37 at 6.

As discussed above in Section I, Montana Air Quality Permits are required for operation.  Accordingly, operating without a Montana Air Quality Permit containing Prevention of Significant Deterioration requirements is a repeated, wrongful act, and Plaintiffs' Prevention of Significant Deterioration permitting claims, Claims 10, 13, 16, 19, 22, 25, 28, 31, and 34, are not time-barred.

21

C.   <u>Because Prevention of Significant Deterioration Permits Are</u>
     <u>Necessary as a Condition of Operation, Plaintiffs' Claims Are Not</u>
     <u>Time-Barred Even Absent Section 743.1 of the Montana State</u>
     <u>Implementation Plan.</u>

Plaintiffs acknowledge that in general, application of the statute of

limitations in Prevention of Significant Deterioration enforcement actions has led

to a split of authority, but because these permits are necessary as a condition of

operation, Claims 10, 13, 16, 19, 22, 25, 28, 31, and 34 are not time-barred even in

the absence of Section 743(1).

For example, the District of Wisconsin recently recognized that the

Prevention of Significant Deterioration program "is not merely a requirement to

obtain a permit before construction, as a building permit might be; rather, it is a

program that attaches ongoing obligations affecting operation of a pollution source

when that source undergoes modification." *Sierra Club v. Dairyland Power Co-*

*op*, 2010 WL 4294622 at *12 (W.D. Wis. 2010).  In ruling that plaintiffs'

modification claims were not time-barred, Judge Crabb found that her prior ruling

on this issue in *United States v. Murphy Oil USA, Inc.,* 143 F. Supp. 2d 1054,

1084–85 (W.D. Wis. 2001), relied on by Defendants in their Brief, Dkt. # 37 at 15-

16, n. 8, "was decided incorrectly with respect to this issue."  *Dairyland* at *12.

Judge Crabb's ruling in *Dairyland* is in line with earlier district court

decisions.  *See United States v. Ohio Edison Co*., 2003 WL 23415140 at *6 (S.D.

22

Ohio Jan. 17, 2003) ("[T]he PSD provisions contemplate not only certain preconstruction obligations but also subsequent operation after modification."); *United States v. Am. Elec. Power Serv. Corp*., 137 F. Supp. 2d 1060, 1066 (S.D. Ohio 2001) (It is "illogical to conclude that a defendant may only be held liable for constructing a facility, rather than operating such facility, without complying with the [PSD] permit requirements.").[7]

      D.    <u>Montana's State Implementation Plan Independently Prohibits Major Modifications from Operating Without Emission Limits Based Upon Best Available Control Technology. Consequently, this Claim Is Not Time-Barred.</u>

In addition to alleging in the complaint that Defendants are violating the Clean Air Act by operating without a Prevention of Significant Deterioration permit, in Claims 3, 6, 9, 12, 15, 18, 21, 24, 27, 30, 33, and 36, Plaintiffs separately allege that Defendants are violating the Act by operating without emission

---

[7] Other cases holding that 28 U.S.C. § 2462 does not bar the imposition of a penalty in the Clean Air Act permitting context include, *United States v. E. Ky. Power Coop., Inc.*, 498 F. Supp. 2d 970, 974–75 (E.D. Ky 2007); *New Jersey v. RRI Energy Mid-A. Power Holdings*, LLC, 2013 WL 1285456 (E.D. Pa. March 28, 2013); *Coal. for Clean Air v. VWR Intern*., LLC, 2013 WL 486287 (E.D. Cal. Feb. 6, 2013); *United .States. v. La. Generating, LLC*, 2011 WL 6012997 (M.D. La. Dec. 1, 2011); *Sierra Club v. Dayton Power & Light, Inc*., 2005 WL 1972549 *5 (S.D. Ohio Aug 12, 2005); *Idaho Conservation League v. Boer*, CV-04-250-S-BLW, slip op. at 15 (D. Idaho Sept. 27, 2004) (attached as Exhibit C); *United States v. Titanium Metals Corp.*, CV-S-98-682, slip op. at 1-2 (D. Nev. Sept. 21, 1998) (attached as Exhibit D).

limitations based upon Best Available Control Technology ("BACT").  The legal

foundation of these claims is found in Mont. Admin. R. 17.8.819(3), the State

Implementation Plan provision that applied at the time of all of the alleged

modifications in this case.  It provides that "[a] major modification shall apply

BACT for each pollutant subject to regulation under the FCAA for which it would

be a significant net emissions increase at the source, excluding hazardous air

pollutants . . . ."

It must be remembered that the Montana's State Implementation Plan

defines Best Available Control Technology to be an "emission limitation," not

technology.  Mont. Admin. R. 17.8.801(6).  Under the Clean Air Act, "emission

limitations" are requirements that "limit[] the quantity, rate, or concentration of

emissions of air pollutants on a continuous basis."  42 U.S.C. § 7602(k).  Given

these provisions, the Sixth Circuit, applying the Tennessee rule analogous to Mont.

Admin. R. 17.8.819(3), concluded that "[t]his provision, by its own terms, creates

an ongoing obligation to apply BACT, regardless of what terms a preconstruction

permit may or may not contain."  *Nat'l Parks (6th Cir.)*, 480 F.3d at 418.  The court

in *Dairyland* agreed, stating:

> Both the Clean Air Act and Wisconsin regulations establish that the
> obligations to apply best available control technology and conduct air
> quality analysis are independent obligations regardless what the PSD permit
> requires. In provisions separate from permitting provisions, the Wisconsin

24

> and federal PSD regulations state that sources undergoing major
> modification "shall apply best available control technology."

*Dairyland* at *5 (citations omitted).  Several other district courts have followed this

sound logic.  *Portland Gen. Elec.,* 663 F. Supp. 2d at 993 (using language

essentially identical to that in the Montana State Implementation Plan, the Oregon

regulation "establishes that the obligation to utilize BACT is ongoing, as the

'owner or operator of the proposed major source or major modification must apply

BACT for each pollutant emitted.'"); *United States v. Campbell Soup Co.*, 1997

WL 258894 * 5 (E.D. Cal. March 11, 1997) (finding that an action for failing to

have emission limits based upon Best Available Control Technology can be

maintained even if a facility has a permit).

    The Sixth Circuit also examined a provision in the Tennessee Prevention of

Significant Deterioration Program and pointed out that:

> [e]ven if [the defendant] had obtained a construction permit that did not
> require BACT, such an approval "shall not relieve any owner or operator of
> the responsibility to comply fully with applicable provisions under [the
> Tennessee SIP] and any other requirements under local, State, or Federal
> law."

*Nat'l Parks (6th Cir.)*, 480 F.3d at 418 (citing Tenn. Comp. R. & Regs. 1200-3-9-

.01(4)(a)(5)).  The Montana State Implementation Plan contains almost identical

language:

> [a]pproval to construct shall not relieve any owner or operator of the responsibility to comply fully with applicable provisions and any other requirements under local, State, or Federal law.

Mont. Admin. R. 17.8.827(1). *See also* Mont. Admin. R. 17.8.756. Neither the Eleventh nor Eighth Circuit cases relied upon by Defendants on this point, *National Parks (11th Cir.),* 502 F.3d at 1324 and *Otter Tail*, 615 F.3d at 1017-18, address this language.

As the Sixth Circuit properly pointed out, operating without emission limits based on Best Available Control Technology is an ongoing violation of the Act. *See Nat'l Parks (6th Cir.)*, 480 F.3d at 418-19. The Sixth Circuit added that, "failing to apply [Best Available Control Technology] is actionable, and this cause of action manifests itself anew each day a plant operates without [Best Available Control Technology] limits on emissions." Consequently, Defendants' motion to dismiss Claims 3, 6, 9, 12, 15, 18, 21, 24, 27, 30, 33, and 36 on statute of limitations grounds should be denied.

E.   The Concurrent Remedy Doctrine does not Bar Plaintiffs' Claims for Injunctive and Declaratory Relief

Even assuming *arguendo* the Court rules that the statute of limitations bars the assessment of penalties for the challenged claims, Plaintiffs' claims for injunctive relief should not be dismissed. By its plain language, 28 U.S.C. § 2462 applies only to claims for penalties. Ignoring the longstanding principle that

26

"statutes of limitation are not controlling measures of equitable relief," *Holmberg*

*v. Armbrecht*, 327 U.S. 392, 396 (1946), Defendants rely on *Cope v. Anderson*, 331

U.S. 461, 464 (1947), and *Fed. Election Comm'n v. Williams*, 104 F.3d 237, 240

(9th Cir. 1996), to argue that "where a party's legal remedies are time-barred, the

concurrent equitable claims are also time-barred." Dkt. # 37 at 19. This overly

simplistic statement misperceives the true holding of *Cope* and flies in the face of

the great weight of Clean Air Act case law to the contrary.

At the outset, the "concurrent remedy doctrine" Defendants describe does

not exist. The actual rule of law, as explained in *Cope* (and its related predecessor

case, *Russell v. Todd*, 309 U.S. 280, 289 (1940)), is actually a "concurrent

*jurisdiction* doctrine." *Cope*, 331 U.S. at 463. Its application is limited to cases in

which the court is presiding over claims arising under law, but where the court

must nonetheless resort to its equity jurisdiction to provide a full, adequate, and

complete remedy under law:

> [W]hen the jurisdiction of the federal court is concurrent with that at
> law, or the suit is brought in aid of a legal right, equity will withhold
> its remedy if the legal right is barred by the local statute of limitations.
> . . . But where the equity jurisdiction is exclusive and is not exercised
> in aid or support of a legal right, state statutes of limitations barring
> actions at law are inapplicable, and in the absence of any state statute
> barring the equitable remedy in like cases, the federal court is remitted
> to and applies the doctrine of laches as controlling.

27

*Russell*, 309 U.S. at 289.  In other words, the concurrent jurisdiction doctrine

provides that a statute of limitations barring a legal remedy also bars jurisdiction

over equitable remedies available to effectuate a legal remedy.

Thus, the Supreme Court's holding in *Cope* is premised on this clear

distinction between "concurrent" and "exclusive" equity *jurisdiction*.  In *Cope*, the

plaintiffs sought a purely legal remedy – "to enforce the statutory double liability

of shareholders of insolvent national banks" – but  sought assistance through the

Court's concurrent equity jurisdiction to effectuate that claim by apportioning the

total judgment among the numerous stockholders in various states.  As the *Cope*

Court noted it was "only the scope of relief sought and the multitude of parties

sued which give equity *concurrent jurisdiction* to enforce the legal obligation here

asserted."  *Cope*, 331 U.S. at 463-64 (emphasis added).  A thoughtful district court

decision has explained the holding:

> Only in such a 'concurrent jurisdiction' situation can the rule of *Cope*
> be read to require a court to withhold relief because a statute of
> limitations bars the legal remedy.   Where the jurisdiction is
> 'exclusive,' *such as where the nature of the remedy is an injunction
> that is independent from the legal relief available*, then the statute of
> limitations applicable to the legal relief is inapplicable to the
> injunctive relief.

*Fed. Election Comm'n v. Christian Coal.*, 965 F. Supp. 66, 72 (D.D.C. 1997)

(emphasis added).

28

This suit asks the court to enjoin Defendants' violations of the Clean Air Act based on the Court's "exclusive" equity jurisdiction. The injunction is not to support or effectuate the *separate* legal claim and legal remedy of an order that Defendants pay civil penalties to the United States treasury. The Act provides these as two separate remedies, and grants the District Courts jurisdiction over both. 42 U.S.C. §§ 7413, 7604(a); *Tull v. United States*, 481 U.S. 412, 425 (1987) (noting that citizen plaintiff could seek an equitable remedy in addition to or independent of the citizen's legal rights and remedies under the analogous Clean Water Act). Therefore, because the equitable remedies available under the Clean Air Act are "independent from the legal relief available" and the Court's jurisdiction to award each type of remedy is distinct rather than concurrent, the statute of limitations does not apply to Plaintiffs' claims for injunctive relief. *Christian Coal.*, 965 F. Supp. at 72.

The Eighth and Eleventh Circuit cases cited by Defendants[8] mistook the limits on concurrent *jurisdiction* in *Cope* and *Russell* for a "concurrent remedies doctrine" that applies 28 U.S.C. § 2462 to remedies exclusive to equity in spite of its plain language limiting its application to claims for civil penalties. However,

---

[8] *See* Dkt. # 37 at 19-21 (citing *Otter Tail*, 615 F.3d at 1018, and *Nat'l Parks (11th Cir.)*, 502 F.3d at 1327).

29

the vast majority of courts in similar cases have not made that mistake.  Most

courts find that Section 2462 does not bar injunctive relief under the Clean Air Act.

*See New Jersey v. Reliant Energy Mid-Atlantic Power Holdings, LLC*, 2009 WL

3234438 *12 (E.D. Pa. Sept. 30, 2009); *United States v. Cinergy Corp.*, 397

F.Supp.2d 1025, 1032 (S.D. Ill. 2005); *Sierra Club v. Dayton Power & Light, Inc*.,

2005 WL 1972549 *4 (S.D. Ohio Aug 12, 2005); *United States v. Duke Energy*

*Corp.*, 278 F.Supp. 2d 619, 653 (M.D.N.C. 2003); *United States v. Westvaco*

*Corp.*, 144 F. Supp. 2d 439, 443 n.2 (D. Md. 2001); *United States v. Am. Elec.*

*Power Serv. Corp*., 136 F. Supp.  2d 808, 811 (S.D. Ohio 2001) (hereinafter "*AEP*

*I"*); *United States v. Am. Elec. Power Serv. Corp*, 137 F. Supp. 2d 1060, 1068

(S.D. Ohio 2001) (hereinafter "*AEP II"*). *See also A-C Reorganization Trust v. E.I.*

*Dupont De Nemours & Co.*, 968 F. Supp. 423, 429 (E.D.Wis. 1997) (declining to

apply concurrent remedy doctrine to citizen suit).

The Ninth Circuit's decision in *FEC v. Williams* also does not control the

outcome here; that case was a government enforcement action seeking penalties

and other relief under the Federal Election Campaign Act, not a Clean Air Act suit.

District Courts within the Ninth Circuit have appropriately limited *Williams'*

application to FEC enforcement cases, noting along the way the Ninth Circuit's

brief analysis of *Cope*.  *See, e.g*, *SEC v. Mercury Interactive, LLC*, 2008 WL

30

4544443 *4 (N.D. Cal. Sept. 30, 2008) (noting that the Ninth Circuit's conclusion

in *Williams* was "stated almost in passing" based upon a single quotation from

*Cope* and declining to apply the statute of limitations "in the face of express

statutory language limiting the application of Section 2462 to actions for 'a civil

fine, penalty, or forfeiture'"); *SEC v. First Cal. Capital Markets Group, Inc.*, No

CV 97-02761, slip op. at 4-5 (N.D. Cal. Apr. 5, 1999) (distinguishing *Williams* on

the grounds that it was an FEC, not an SEC, enforcement case, recognizing that the

*Williams* court applied *Cope* in a "perfunctory" fashion) (attached as Exhibit E).

Here, the equitable remedies sought by Plaintiffs – enjoining Defendants'

violations of the Clean Air Act – are within the Court's exclusive equity

jurisdiction and not a concurrent jurisdiction to effectuate legal remedies.  The

concurrent jurisdiction doctrine does not sanction Defendants' invitation to ignore

the plain language of 28 U.S.C. § 2462, which applies only to claims for civil

penalties.  Plaintiffs' claims for equitable relief are not barred by the statute of

limitations.[9]

---

[9] Contrary to Defendants' assertion that the Ninth Circuit refuses to allow suits for injunctive relief by governmental agencies where a statute of limitations for penalties has run, the Ninth Circuit has explicitly held that an action for injunctive relief brought pursuant to a statutory mandate to enforce federal law and promote the economic and social policies set by Congress is not subject to any limitations period.  *SEC v. Rind,* 991 F.2d 1486, 1490-91 (9th Cir. 1993).  This concept should

**III.  Defendants' Argument that Plaintiffs' Best Available Control Technology Claims Should be Dismissed on Rule 12(b)(1) Grounds is Based on a Typographical Error in the Complaint and Should Be Rejected.**

In their Brief, Defendants seize upon a typographical error in paragraph 57 of the complaint, where Plaintiffs mistakenly cited to 42 U.S.C. § 7604(f)(3) instead of (f)(4), and argue that there is no Citizen Suit jurisdiction for Plaintiffs' claim that Defendants are operating Colstrip without Best Available Control Technology emission limits.  Dkt. # 37 at 23-25.

As discussed above, this Court has jurisdiction to hear claims by citizens for violations of an "emission standard or limitation," 42 U.S.C. § 7604(a)(1), which is defined in 42 U.S.C. § 7604(f)(4) to include "any . . . standard, limitation, or schedule established under . . . any applicable State implementation plan."  The Best Available Control Technology requirement is a free-standing provision of the Montana State Implementation Plan, and it therefore can be enforced under subsection (a)(1).

---

apply equally to citizen suit plaintiffs.  *See, e.g.*, *Cinergy*, 397 F. Supp. at 1032. Defendants also misread *Grand Canyon Trust v. Tuscon Elec.*, 391 F.3d 979 (9th Cir. 2004).   Dkt. #37 at 21.  The *Grand Canyon Trust* court, at 987, expressly made clear that it was *not* deciding that laches could be applied to a citizen suit plaintiff.

In paragraph 57 of the Complaint, Plaintiffs inadvertently cited to subsection (f)(3) instead of (f)(4). The Plaintiffs respectfully ask the court to read the citation in paragraph 57 of the Complaint as a citation to subsection (f)(4), *see* Fed. R. Civ. P. 8(e), or alternatively, seek leave to amend the complaint to make this correction.

## IV.   Plaintiffs' Title V Claims Allege Violations of the Colstrip Title V Permit, Do Not Challenge the Permit's Conditions, and Therefore Defendants' Motion Should Be Rejected.

Plaintiffs Title V claims, Claims 37 and 38, state proper claims for relief under the Clean Air Act, and are not "fabricated" or "dressed-up" challenges to the permit itself, as Defendants claim. As noted in Section III above, Title V permits collect all applicable provisions including requirements in Montana Air Quality Permits. The Colstrip facility has a Title V permit, which includes requirements to 1) seek a new Title V permit or permit revision when changes are made to the facility that require the permittee to obtain a Montana Air Quality Permit; and 2) make various reports and compliance certifications that are themselves certified as "true, accurate and complete" based on information and belief formed after reasonable inquiry. Title V Permit No. OP0513-08, Conditions V.K.2, and V.B.1. Plaintiffs' Complaint alleges that Defendants violated these conditions of its Title V permit. *See* Compl. ¶¶ 3(c), 73, 75, 267-282. Plaintiffs' action to enforce the conditions of the Title V permit is unambiguously authorized by the Act's citizen

33

suit provision, 42 U.S.C. § 7604(a)(1).  *Dairyland* at *16-17.  Specifically, the

Clean Air Act defines an emissions standard or limitation enforceable through a

citizen suit to include "any... standard, limitation, or schedule established under

any permit issued pursuant to subchapter V of this chapter..."  42 U.S.C. § 7604(f).

The plain language of the Clean Air Act, the allegations in the Complaint, and the

clear requirements of the Title V permit prove false Defendants' assertion that this

Court lacks jurisdiction to hear these claims.

    The Complaint alleges that Defendants violate the Colstrip Title V permit

each day they fail to submit a correct and complete Title V permit application with

respect to modifications that require a Montana Air Quality Permit.  Defendants'

Title V permit only allows Defendants to make some changes to Colstrip that "do

not require the permittee to obtain a Montana Air Quality Permit."  Title V Permit

No. OP0513-08, Condition V.J.1.a.  For changes to Colstrip that do not qualify for

the exemption in Condition V.J.1.a, Defendants must apply for a new or revised

Title V permit.  The Title V Permit then requires compliance with the significant

permit modification requirements in Condition V.K.2.  Thus, when Defendants

made changes at Colstrip that required a Montana Air Quality permit, but failed to

obtain a new Title V permit or permit revisions, Defendants violated the Title V

permit.  These claims are actionable in a citizen suit brought pursuant to 42 U.S.C.

§ 7604(a)(1), as several U.S. District Courts have explicitly recognized. *See, e.g.,*
*Big Cajun U.S. v. La. Generating, LLC,* 2011 WL 6012997 at *14 (M.D. La. Dec.
1, 2011); *Dairyland* at *16-17; *E. Ky. Power Coop.*, 498 F. Supp. 2d at 1017;
*Pennsylvania. v. Allegheny Energy, Inc.*, 2006 WL 1509061 at *9 (W.D. Pa. Apr.
19, 2006); *New York v. Niagara Mohawk Power Corp.*, 2003 WL 23356447 at *3
(W.D.N.Y. Dec. 31, 2003).

The Complaint also adequately states a claim for relief with regard to the
false Title V compliance certifications submitted by Defendants.  The Title V
permit requires that Defendants submit a variety of reports and certifications and
that each of those be certified as "true, accurate and complete" based on
information and belief formed after reasonable inquiry.  Title V Permit No.
OP0513-08, Condition V.B.1 (citing Mont. Admin. R. 17.8.1207).  Several courts
have recognized that failure to properly certify the compliance of the facility under
a Title V permit is an actionable violation of the CAA.  *See Dairyland* at *16-17
(allowing case to proceed where plaintiff alleged false compliance certifications);
*Big Cajun* at *13 (stating "whether or not LaGen performed a reasonable inquiry is
a question of fact, [thus] summary judgment is inappropriate on this issue.").  As in

*Dairyland* and *Big Cajun*, Plaintiffs have alleged that Defendants did not properly

certify compliance with all applicable law. Dkt. # 1 ¶¶ 3(c), 75, 275-282.[10]

In the face of these specific allegations, Defendants, citing *Romoland*

*School District v. Inland Empire Energy Center,* 548 F.3d 738 (9th Cir. 2008), try

to create a false jurisdictional distinction between Title V and PSD requirements,

arguing that Title V claims are actionable only through the permitting process

leading to judicial review under 42 U.S.C. § 7607.  *Romoland* itself, however,

recognizes that violations of an existing Title V permit's conditions – as alleged in

Plaintiffs' Complaint – are properly subject to citizen suit.  *Id.* at 754 (stating "if

[defendant] had violated a term or condition of the permit … those alleged

violations would have been grounds for a citizen suit in district court …").  In

*Romoland*, plaintiffs alleged that the Title V operating permit issued to a power

plant authorized the plant to emit more particulate matter than a California SIP

provision allowed, rendering the permit itself illegal.  *Id.* at 745.  In contrast,

Plaintiffs here are not challenging the *sufficiency* of the conditions of the Title V

---

[10] Plaintiffs' Claim 38 is entitled, "Incomplete Title V Compliance Certification."
Dkt. # 1 at 55.  Nevertheless, in the event that Plaintiffs' allegations are unclear,
Plaintiffs in the alternative seek leave to amend the complaint to clarify that they
allege Defendants falsely certified compliance.

permit, but rather alleging that Defendants *violated* the conditions of the Title V permit.

Contrary to Defendants' assertions, Claims Thirty-Seven and Thirty-Eight are not fabrications that fancifully attack the conditions of the Title V permit. Rather, Plaintiffs allege violations of the terms of the Title V permit and the Montana SIP that are emission limitations actionable under the citizen suit provision.

## V.   Plaintiffs' Claims For Opacity Violations Should Be Dismissed Without Prejudice.

Defendants move to dismiss Plaintiffs' claims for opacity violations.  Dkt. # 37 at 32-35.  Plaintiffs do not disagree that if the State of Montana's suit seeks to enforce the same opacity standards and the state diligently prosecutes its case, Plaintiffs' claims for opacity violations would be prohibited.  42 U.S.C. § 7604(b). However, the State's case has only just been filed.  There has been no substantive litigation.  It is impossible to know at this time whether or not the State's prosecution is and will continue to be "diligent."  *See e.g., Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.*, 382 F.3d 743, 760 (7th Cir. 2004). Therefore, Plaintiffs request that the Court dismiss their claims for violation of the opacity standard without prejudice so that, in the event that further developments

in the State's enforcement case indicate a lack of diligence, Plaintiffs may refile their opacity claims.

## CONCLUSION

For the reasons set forth above, Defendants' Partial Motion to Dismiss should be denied, except with respect to Claim 39, which Plaintiffs request be dismissed without prejudice and with leave to refile.

Dated this 31st day of May, 2013

Respectfully submitted,
/s/ Roger Sullivan
Roger Sullivan

/s/ John Heenan
John Heenan

/s/ George Hays
George E. Hays

/s/ David Bender
David C. Bender

/s/ Aubrey Baldwin
Aubrey E. Baldwin

*Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this Brief complies with the requirements of Rule 7.1(d)(2), as modified by the Court's April 29, 2013 Order. The lines in this document are double spaced, except for footnotes and quoted and indented material, and the document is proportionately spaced with Times New Roman font typeface consisting of 14 characters per inch. The total word count is 8494 excluding caption, certificate of compliance, signature block, tables of contents and authorities, and exhibit index. The undersigned relies on the word count of the word processing system used to prepare this document.

/s/ Roger Sullivan
Roger Sullivan

39