William Bumpers (admitted *pro hac vice*)
Joshua B. Frank (admitted *pro hac vice*)
Megan H. Berge (admitted *pro hac vice*)
Christine G. Wyman (admitted *pro hac vice*)
Baker Botts L.L.P.
1299 Pennsylvania Avenue, NW
Washington, DC  20004
Telephone: (202) 639-7700
Fax: (202) 639-7890

**COUNSEL FOR DEFENDANTS**

Stephen R. Brown
Garlington, Lohn & Robinson, PLLP
350 Ryman Street
Missoula, Montana  59802
Telephone:  (406) 523-2500
Fax: (406) 523-2595

**COUNSEL FOR AVISTA
CORPORATION
AND PACIFICORP**

William W. Mercer
Michael P. Manning
Holland & Hart LLP
401 North 31st Street, Suite 1500
P.O. Box 639
Billings, Montana  59103-0639
Telephone:  (406) 252-2166
Fax:  (406) 252-1669

**COUNSEL FOR PPL MONTANA, LLC,
PUGET SOUND ENERGY AND
PORTLAND GENERAL ELECTRIC
COMPANY**

Stephen D. Bell
Dorsey & Whitney LLP
Millennium Building
125 Bank Street, Suite 600
Missoula, Montana  59802-4407
Telephone: (406) 721-6025
Fax: (406) 543-0863

B. Andrew Brown (admitted *pro hac vice*)
Dorsey & Whitney LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota  55402
Telephone: (612) 340-2600
Fax: (612) 340-2868

**COUNSEL FOR
NORTHWESTERN CORPORATION**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | | |
|---|---|---|
| SIERRA CLUB and MONTANA ENVIRONMENTAL INFORMATION CENTER, | ) ) ) ) | CV 13-32-BLG-DLC-JCL |
| Plaintiffs, | ) | |
| vs. | ) ) | |
| PPL MONTANA LLC, AVISTA CORP., PUGET SOUND ENERGY, PORTLAND GENERAL ELECTRIC COMPANY, NORTHWESTERN CORP., PACIFICORP, | ) ) ) ) ) | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' FIRST MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| Defendants. | ) ) | |

## TABLE OF CONTENTS

I.    BACKGROUND..................................................................................3

II.   STANDARD OF REVIEW ...............................................................6

III.  ARGUMENT....................................................................................8

   A.  The Language Of The 1980 PSD Regulations Cannot Be Read As Requiring
       Application Of The Actual-To-Potential Test To All Alleged Physical
       Changes to Existing EGUs. ..........................................................11

      1.  Plaintiffs' interpretation is inconsistent with the purpose and structure of
          the PSD program..................................................................13

      2.  Plaintiffs' interpretation renders the phrase "which has not begun normal
          operations" superfluous. .......................................................14

      3.  Plaintiffs' interpretation eviscerates the PSD program's causation
          requirement. ........................................................................16

   B.  Plaintiffs' Regulatory Interpretation Was Long Ago Rejected, Abandoned
       And Superseded.........................................................................18

      1.  Rejected:  The Seventh Circuit rejected Plaintiffs' regulatory
          interpretation in the 1990 WEPCO decision. ............................19

      2.  Abandoned and Superseded:  EPA abandoned Plaintiffs' regulatory
          interpretation and definitively replaced it in a regulatory preamble in
          1992......................................................................................23

      3.  Montana does not require a SIP revision to apply the actual-to-projected
          actual test to existing EGUs....................................................27

      4.  The EPA statements cited by Plaintiffs do not support application of the
          actual-to-potential test to EGUs...............................................30

   C.  Plaintiffs Misstate the Method for Determining Pre-Project Baseline Actual
       Emissions................................................................................33

IV.   CONCLUSION................................................................................35

i

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Ala. Power Co. v. Costle*,
  636 F.2d 323 (D.C. Cir. 1979)............................................................14

*Auer v. Robbins,*
  519 U.S. 452 (1997)............................................................14, 31

*Bowen v. Georgetown Univ. Hosp.*,
  488 U.S. 204 (1988)............................................................31

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)............................................................6

*Christopher v. Smithkline Beecham Corp.*,
  132 S. Ct. 2156 (2012)............................................................22, 33

*Christopher v. SmithKline Beecham Corp.*,
  635 F.3d 383 (9th Cir. 2011) ............................................................8

*Commodity Futures Trading Comm'n v. Schor*,
  478 U.S. 833 (1986)............................................................31

*E.piphany, Inc. v. St. Paul Fire & Marine Ins. Co.*,
  590 F. Supp. 2d 1244 (N.D. Cal. 2008)............................................................6

*Gen. Elec. Co. v. EPA*,
  53 F.3d 1324 (D.C. Cir. 1995)............................................................10

*Geschke v. Astrue*,
  393 F. App'x 470 (9th Cir. 2010) ............................................................14

*Helm v. State of Cal.*,
  722 F.2d 507 (9th Cir. 1983) ............................................................6

*In re Tenn. Valley Auth.*,
  9 E.A.D. 357 (E.A.B. 2000) ............................................................29

*Indep. Training & Apprenticeship Program v. Cal. Dep't of Indus. Relations,*
  730 F.3d 1024 (9th Cir. 2013) ...........................................................33

*Lal v. I.N.S.,*
  255 F.3d 998, *amended on reh'g*, 268 F.3d 1148 (9th Cir. 2001).......................7

*Long Island Care at Home, Ltd. v. Coke,*
  551 U.S. 158 (2007).................................................................18, 26

*Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth.,*
  3:01-CV-71, 2010 WL 1291335 (E.D. Tenn. 2010) ......................................1, 20

*New York v. EPA,*
  413 F.3d 3 (D.C. Cir. 2005).........................................................3, 32

*Ober v. EPA,*
  84 F.3d 304 (9th Cir. 1996) ............................................................26

*Price v. Stevedoring Servs. of Am.,*
  697 F.3d 820 (9th Cir. 2012) .................................................23, 26, 31

*Puerto Rican Cement Co. v. EPA,*
  889 F.2d 292 (1st Cir. 1989)......................................................21, 22

*Rainsong Co. v. FERC,*
  151 F.3d 1231 (9th Cir. 1998) ...........................................................15

*Resident Councils of Wash. v. Leavitt,*
  500 F.3d 1025 (9th Cir. 2007) ..........................................................26

*Smith v. Califano,*
  597 F.2d 152 (9th Cir. 1979) ..............................................................6

*United States v. Ala. Power Co.,*
  372 F. Supp. 2d 1283 (N.D. Ala. 2005).............................................9, 21

*United States v. Cinergy Corp.,*
  384 F. Supp. 2d 1272 (S.D. Ind. 2005) *aff'd* 458 F.3d 705 (7th Cir. 2006)... ........................................................17, 21, 30

*United States v. Cinergy Corp.,*
  458 F.3d 705 (7th Cir. 2006) ...........................................................13

iii

*United States v. DTE Energy Co.*,
711 F.3d 643 (6th Cir. 2013) ..........................................................................4, 14

*United States v. Duke Energy Corp.*,
278 F. Supp. 2d 619 (M.D.N.C. 2003) *aff'd* 411 F.3d 539 (4th Cir. 2005)
*vacated sub nom. Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561 (2007)...9, 28

*United States v. Ohio Edison Co.*,
276 F. Supp. 2d 829 (S.D. Ohio 2003) ...............................................1, 16, 20, 29

*Wards Cove Packing Corp. v. Nat'l Marine Fisheries Serv.*,
307 F.3d 1214 (9th Cir. 2002) ............................................................................7

*Wisconsin Electric Power Co. v. Reilly*,
893 F.2d 901 (7th Cir. 1990) ("*WEPCO*") .......... 8, 16, 18, 19, 20, 22, 23, 24, 28

## FEDERAL STATUTES

42 U.S.C. §§ 7401-7642 ....................................................................................3

42 U.S.C. § 7410 ...............................................................................................4

42 U.S.C. § 7475(a) ........................................................................................4, 5

42 U.S.C. § 7479(2)(C) ......................................................................................4

## FEDERAL RULES AND REGULATIONS

40 C.F.R § 51.166(a)(7) .....................................................................................4

40 C.F.R. § 52.21 ..............................................................................................4

40 C.F.R. § 52.21(b) ............................................................................3, 5, 33, 35

40 C.F.R. § 52.21(i) .........................................................................................5, 6

45 Fed. Reg. 52,676 (Aug. 7, 1980)...................................................................13

48 Fed. Reg. 20,231 (May 5, 1983) .....................................................................4

56 Fed. Reg. 27,630 (June 14, 1991) .................................................................25

57 Fed. Reg. 32,314 (July 21, 1992)..............................................1, 16, 24, 25, 34

60 Fed. Reg. 36,715 (July 18, 1995)...............................................................5, 28

71 Fed. Reg. 3,776 (Jan. 24, 2006) .......................................................5, 28

Fed. R. Civ. P. 56 ...............................................................................6

### STATE REGULATIONS

7 Mont. Admin. Reg. 645 (April 10, 2003) .........................................5, 28

16 Mont. Admin. Reg. 2285 (Aug. 22, 1996)...........................................5

23 Mont. Admin. Reg. 2919 (Dec. 9, 1993) ........................................4, 27

24 Mont. Admin. Reg. 3468 (Dec. 26, 2002) ..........................................5

ARM 16.8.921.....................................................................................34

ARM 17.8.801................................................5-7, 9, 11, 12, 16, 18, 33-35

ARM 17.8.818.......................................................................................5

Mont. Code Ann. § 75-2-112 ...............................................................4

Mont. Code Ann. § 75-2-207 ..............................................................28

Mont. Code Ann. §75-2-401 .................................................................4

### OTHER AUTHORITIES

*United States v. Okla. Gas & Elec.*,
     No. 5:13-CV-00690 (W.D. Okla.) ...................................................29

## <u>ATTACHMENT INDEX</u>

A - 23 Mont. Admin. Reg. 2919 (Dec. 9, 1993)

B - 16 Mont. Admin. Reg. 2285 (Aug. 22, 1996)

C - 24 Mont. Admin. Reg. 3468 (Dec. 26, 2002)

D - 7 Mont. Admin. Reg. 645 (April 10, 2003)

E - Letter from William Rosenberg, Assistant Administrator for EPA's office of
        Air and Radiation, to John Boston, President of WEPCO
        ("WEPCO Remand Letter")

F - United States' Br. in Support Mot. for Summ. J. & Decl. Relief (Aug. 30,
        2013), *United States v. Okla. Gas & Elec.*, No. 5:13-CV-00690
        (W.D. Okla.)

G - ARM 16.8.921 (1983)

## DEFENDANTS' OPPOSITION TO
## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

"…the actual to potential to emit test is not legally supportable." [1]

"…the Court finds no compelling legal basis for the 'actual-to-potential'
methodology propounded by plaintiffs." [2]

"…the actual-to-potential test is impermissible." [3]

\* \* \*

Plaintiffs argue that the actual-to-potential test must be applied in Montana to evaluate emissions increases for every non-routine project undertaken at an existing electric generating unit ("EGU") instead of the actual-to-projected-actual test. Plaintiffs are wrong. The actual-to-potential test, which applies only to units that "have not begun normal operations," compares a unit's actual pre-project emissions to a unit's maximum potential emissions, which assumes constant, full load operation (24 hours a day, 7 days a week at the maximum emissions rate). In contrast, the actual-to-projected-actual test compares an EGU's actual pre-project emissions to a projection of what the emissions would be after the project based on an EGU's actual operating parameters. Plaintiffs' position that only the actual-to-

---

[1] *United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 863 (S.D. Ohio 2003) (applying the 1980 EPA PSD regulations).

[2] *Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth.*, 3:01-CV-71, 2010 WL 1291335, at \*4 (E.D. Tenn. 2010).

[3] 57 Fed. Reg. 32,314, 32,317 (July 21, 1992) (interpreting 1980 PSD rules in preamble to 1992 PSD regulations) (the "WEPCO Rule").

potential test can apply has been rejected, as demonstrated by the EPA and judicial statements above.

Plaintiffs' motion must be denied because it rests on two incorrect premises. First, Plaintiffs claim that the applicable regulatory language in the Montana State Implementation Plan, based on EPA's 1980 Prevention of Significant Deterioration regulations, may *only* be interpreted as requiring the actual-to-potential test. Yet both the courts and EPA have come to the opposite conclusion and have applied the actual-to-projected-actual test to existing EGUs under the 1980 regulations. Second, Plaintiffs claim that EPA's prior interpretation of the 1980 regulations, allowing only the actual-to-potential test, endures in States that have not adopted EPA's 1992 PSD regulations. Yet Plaintiffs ignore significant subsequent history, most notably EPA's re-interpretation of the 1980 regulatory language in the preamble to the 1992 regulations following the Seventh Circuit's rejection of Plaintiffs' interpretation in *Wisconsin Electric Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990) ("*WEPCO*"). Every other court asked to apply the actual-to-potential test to existing EGUs under the 1980 regulations also has rejected it. Plaintiffs ask this Court to disregard this history and precedent and become the first court to adopt their extreme position. The Court should not accept their invitation.

## I.    BACKGROUND

The Colstrip Steam Electric Station ("Colstrip" or "the Plant") is a coal-fired power plant in Rosebud County, Montana, with four EGUs.[4]  Units 1 and 2 began commercial operation in 1975 and 1976, respectively, and Units 3 and 4 began commercial operation in 1984 and 1986, respectively.  Am. Compl. ¶ 19 (Doc. 67).

Plaintiffs allege that approximately 64 individual equipment repair and replacement projects performed at Colstrip during nine separate "overhauls"[5] on Units 1-4 from 2001 through 2012 were "major modifications" under the Clean Air Act's ("CAA") prevention of significant deterioration ("PSD") program.  *See id.* ¶¶ 53-61.

The PSD program was codified in the 1977 Amendments to the CAA as part of the New Source Review Program.  42 U.S.C. §§ 7401-7642 (1982).  Because "Congress provided numerous other tools for assuring that emissions from existing sources [would be] controlled," the PSD program "was designed by Congress to focus particularly on sources that are newly constructed or that make major modifications."  *New York v. EPA*, 413 F.3d 3, 28 (D.C. Cir. 2005) (quoting New

---

[4] This case involves electric utility steam generating units, which are generating units capable of supplying more than one third of their electric output and more than 25 megawatts of electricity to a distribution system for sale.  40 C.F.R. 52.21(b)(31).

[5] Typically, each Colstrip unit is shut down for 6-10 weeks every three years to perform "overhaul" work that cannot be done while the units are operating (*e.g.*, equipment maintenance, repair and replacement).

3

Source Review Report to the President (2002)).  To achieve "a proper balance between environmental controls and economic growth," Congress "grandfathered" existing sources, which "do not have to obtain a [PSD] permit unless and until" they are modified to increase emissions.  *United States v. DTE Energy Co.*, 711 F.3d 643, 645 (6th Cir. 2013) (quotation omitted); 42 U.S.C. §§ 7475(a)(1), 7479(2)(C).

EPA published final PSD regulations in 1980, and amended those regulations in 1992 and 2002.  40 C.F.R. § 52.21.  Each state is required to adopt and submit to EPA for approval a State Implementation Plan ("SIP") that includes regulations implementing the PSD requirements.  States may choose to adopt the federal PSD permitting program or implement their own, so long as the state program conforms to the minimum standards in the federal program. 42 U.S.C. § 7410; 40 C.F.R § 51.166(a)(7).

Montana issued its own PSD regulations, which track EPA's 1980 regulations.  EPA approved Montana's regulations in 1983.  48 Fed. Reg. 20,231 (May 5, 1983).  MDEQ administers and enforces the state PSD program.  Mont. Code Ann. §§ 75-2-112, 401.  In 1993, Montana repealed its prior PSD regulations and promulgated revised regulations to conform to certain updated federal requirements.  23 Mont. Admin. Reg. 2919 (Dec. 9, 1993) (repealing Admin. R. Mont. ("ARM") 16.8.921-943; promulgating 16.8.945-963) (Attachment A).  EPA

approved the revised PSD regulations as "consistent with the Federal PSD permitting requirements."  60 Fed. Reg. 36,715, 36,719 (July 18, 1995).[6]  Since then, Montana has made several revisions to part of its PSD regulations.  *See, e.g.,* 24 Mont. Admin. Reg. 3468 (Dec. 26, 2002) (proposing minor revisions to the definition of "actual emissions") (Attachment C); 7 Mont. Admin. Reg. 645-47 (April 10, 2003) (approving revision) (Attachment D); 71 Fed. Reg. 3,776 (Jan. 24, 2006) (incorporating revisions into the SIP).

Under the EPA and Montana regulations, PSD applies to an existing source, like the Colstrip units, only if the source undertakes a "major modification."  ARM 17.8.818(1); 40 C.F.R. § 52.21(i) (1981).  A "major modification" is "any physical change in, or change in the method of operation of, a major stationary source that would result in a significant net emissions increase" of any regulated pollutant.  ARM 17.8.801(20); 40 C.F.R. § 52.21(b)(2)(iii) (1981).  By definition, certain changes, including "routine maintenance, repair and replacement" ("RMRR"), are not "physical changes."  ARM 17.8.801(20)(b)(i); 40 C.F.R. § 52.21(b)(2)(iii) (1981).  If a source intends to proceed with work that it determines to be a "major modification," the source must seek a PSD permit before the work begins.  *See* 42 U.S.C. § 7475(a); ARM 17.8.818(1); 40 C.F.R. § 52.21(i) (1981).  Conversely, if

---

[6]  In 1996, Montana transferred its PSD regulations from Title 16 of the Administrative Rules of Montana to Title 17, resulting in the rule numbers currently in use today.  16 Mont. Admin. Reg. 2285-86 (Aug. 22, 1996) (transferring 16.8.945-963 to 17.8.801-828) (Attachment B).

the source determines that the work will not be a "major modification," either because it is not a physical or operational change or is not expected to "result in" a significant net emissions increase, then PSD does not apply.   *See* ARM 17.8.801(20); 40 C.F.R. § 52.21(i) (1981).

## II.   STANDARD OF REVIEW

Summary judgment only is appropriate when there is no genuine issue of material fact and, viewing the evidence in the light most favorable to the opposing party, the movant is clearly entitled to prevail as a matter of law.   Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Helm v. State of Cal.*, 722 F.2d 507, 509 (9th Cir. 1983).   The Court may grant partial summary judgment "to isolate and dispose of factually unsupported claims or defenses." *E.piphany, Inc. v. St. Paul Fire & Marine Ins. Co.,* 590 F. Supp. 2d 1244, 1250 (N.D. Cal. 2008) (quoting *Celotex,* 477 U.S. at 323-24).   Where there are no disputes of material fact, the court may resolve the proper interpretation of statutes and regulations.   *Smith v. Califano*, 597 F.2d 152, 155 n.4 (9th Cir. 1979) (where the parties agree on the material facts, the court may resolve a "dispute involving the proper interpretation of relevant statutes and regulations" as a matter of law); *Helm,* 722 F.2d at 509 (when there are no material issues of fact the court may

resolve a question of statutory interpretation to determine whether the statute applies to the facts at hand).[7]

Where, as here, courts are asked to interpret regulations they follow familiar rules of interpretation. Courts start with the plain meaning. *Wards Cove Packing Corp. v. Nat'l Marine Fisheries Serv.*, 307 F.3d 1214, 1219 (9th Cir. 2002). If the regulations are ambiguous, courts defer to reasonable interpretations given by the agencies responsible for implementing and enforcing the regulations. *Lal v. I.N.S.*, 255 F.3d 998, 1004, *amended on reh'g*, 268 F.3d 1148 (9th Cir. 2001) ("When the meaning of regulatory language is ambiguous, the agency's interpretation of the regulation controls 'so long as it is reasonable, that is, so long as the interpretation sensibly conforms to the purpose and wording of the regulations.'") (quoting

---

[7] Plaintiffs' motion does not seek to resolve any claim or defense in this action. Rather, Plaintiffs ask the Court to resolve a question of regulatory interpretation in the abstract, in the absence of material facts. Specifically, Plaintiffs request that the Court adopt the "actual-to-potential" test as applicable to all alleged modifications at EGUs. As set forth herein, Plaintiffs' regulatory interpretation is wrong. Nevertheless, even if this faulty interpretation were adopted, Plaintiffs still would need to demonstrate that the actual projects at issue caused an emissions increase. Furthermore, at the appropriate time, Defendants will assert that the projects at issue were RMRR. *See* ARM 17.8.801(20)(b)(i). Where projects fall into that regulatory exclusion, PSD does not apply and no emissions increase calculation is needed. Thus, the Court may never need to apply an emissions test to the projects at issue. In any event, while Plaintiffs' motion is baseless and must be denied, the resolution of this motion will not dispose of any of the claims or defenses in the case. Plaintiffs have not filed a Statement of Undisputed facts, nor do they allege any. Accordingly, Defendants have not filed a Statement of Disputed Facts under Local Rule 56.1(d). Defendants do not concede that there is agreement as to any material fact in this case.

*Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 150–51 (1991)).  When an agency's interpretation is unreasonable, courts are responsible for following the most reasonable and lawful interpretation that the regulations can be given.  *See Christopher v. SmithKline Beecham Corp.*, 635 F.3d 383, 395 (9th Cir. 2011) ("Absent an agency-determined result, it is the province of the court to construe the relevant statutes and regulations.") (citing *N. Cal. River Watch v. Wilcox*, 620 F.3d 766, 780-81 (9th Cir. 2010)).

## III.   ARGUMENT

To establish a PSD violation, Plaintiffs bear the burden of proving, among other requirements, that the alleged physical change caused a significant emissions increase.  Plaintiffs seek to shirk that substantial burden by asking the Court to automatically impose an impermissible "actual-to-potential" emissions increase test that presumes the very conclusion Plaintiffs must demonstrate.  *See WEPCO*, 893 F.2d at 917 ("[W]e cannot defer to agency interpretations that, as applied here, appear to assume what they seek to prove.").

Specifically, Plaintiffs ask the Court to adopt a regulatory interpretation under which the Colstrip EGUs, which have been operating for decades, are forced to use an emissions test that applies only to units that have "not begun normal operations."  Under Plaintiffs' interpretation, "actual emissions" following any "physical change" at an existing EGU always must be deemed equal to the unit's

"potential to emit,"[8] and the unit must compare pre-project baseline emissions to the unit's future potential to emit to assess whether the project (*i.e.*, alleged physical change) "would result in" "a significant net emissions increase."  *See* Pls.' Br. at 14-15 (Doc. 64). This requires the assumption that the unit will operate 24 hours a day, 365 days per year at full capacity and maximum emission rate after each project, regardless of whether it has ever operated that way in the past or may operate that way in the future.  *See United States v. Ala. Power Co.*, 372 F. Supp. 2d 1283, 1299 n.30 (N.D. Ala. 2005); *United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619, 640 n.17 (M.D.N.C. 2003) *aff'd* 411 F.3d 539 (4th Cir. 2005) *vacated sub nom. Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561 (2007) and *vacated in part on other grounds*, No: 1:00CV1262, 2010 WL 3023517 (M.D.N.C. July 28, 2010).

Plaintiffs' desired outcome in pressing for this "actual-to-potential test" is to virtually guarantee a projected emissions increase for existing EGUs.  Not surprisingly, Plaintiffs' self-serving interpretation has been rejected by multiple courts and abandoned by EPA as inconsistent with the PSD regulatory language and structure.[9]  EPA and the courts have applied a different test under the 1980

---

[8] "Potential to emit" "means the maximum capacity of a stationary source to emit a pollutant under its physical and operational design . . . ."  ARM 17.8.801(25).

[9] Plaintiffs' interpretation is plainly erroneous.  Nevertheless, should this Court conclude otherwise, Defendants will pursue an affirmative defense contending that they did not have fair notice of the meaning of the regulations and that liability

rules for existing EGUs – the "actual-to-projected-actual" test[10] – that compares pre-project baseline emissions to a projection of future emissions grounded in the EGU's operating experience.

Though EPA has abandoned the position advanced by Plaintiffs, they contend that Montana is stuck with the actual-to-potential test in all circumstances because Montana did not adopt EPA's 1992 revisions to the PSD regulations clarifying the appropriate test for existing EGUs.  Pls.' Br. at 22-23 (Doc. 64). Plaintiffs' argument ignores that the Seventh Circuit rejected Plaintiffs' interpretation in 1990 in *WEPCO*, and EPA abandoned it in response to that decision, *before* EPA adopted the 1992 WEPCO Rule.  EPA expressly recognized in the 1992 WEPCO Rule preamble that the actual-to-projected-actual test may be applied to EGUs that have begun normal operations under the 1980 rules on which Montana's rules are based.  Plaintiffs have not demonstrated any reason that Montana must be constrained to follow a prior regulatory interpretation that has been rejected, abandoned and superseded.  Plaintiffs' motion should be denied.

---

therefore may not be imposed.  *See, e.g., Gen. Elec. Co. v. EPA*, 53 F.3d 1324 (D.C. Cir. 1995).

[10] Defendants agree with Plaintiffs' assertion that, for the purposes of this motion, the terms "actual-to-actual," "actual-to-representative actual" and "actual-to-projected actual" can be used interchangeably.  *See* Pls.' Br. at 10 (Doc. 64)

A.     **The Language Of The 1980 PSD Regulations Cannot Be Read As Requiring Application Of The Actual-To-Potential Test To All Alleged Physical Changes to Existing EGUs.**

Under EPA's 1980 PSD regulations and Montana's corresponding PSD regulations, Plaintiffs must show that each alleged project was a "major modification."  "Major modification" is defined as (1) "any physical change in, or change in the method of operation of, a major stationary source"; (2) that "would result in a significant net emissions increase" of any regulated pollutant.  *See* ARM 17.8.801(20).  By definition, certain changes, including routine maintenance, repair and replacement ("RMRR"), are not "physical changes."  ARM 17.8.801(20)(b)(i).  If a project does not fall within the definition of physical change, no emissions increase analysis is required and no PSD obligations apply.[11]  ARM 17.8.801(20)

For projects that are not RMRR, a source must assess whether the project would result in a significant net emissions increase.  ARM 17.8.801(20), 818.  The applicable regulations define "net emissions increase" as "any increase in *actual emissions* from a particular physical change or change in the method of operation . . . . "  ARM 17.8.801(24) (emphasis added).  Thus, determining whether an emissions increase would result from a project involves a comparison between pre-project ("baseline") actual emissions and post-project actual emissions.  Because

---

[11] Defendants contend that the projects at issue were RMRR.  However, as Plaintiffs note, this issue will be addressed at later stages of the case.  *See* Pls.' Br at 8 n.2 (Doc. 64.)

11

this evaluation occurs before a project is performed, it requires the source to make a projection of anticipated future actual emissions.

The regulatory language does not provide express guidance regarding how to project future emissions in all circumstances. Rather, the regulations define "actual emissions" as follows:

(1) "Actual emissions" means the actual rate of emissions of a pollutant from an emissions unit, as determined in accordance with (1)(a) through (c).

(a) Actual emissions as of a particular date shall equal the average rate, in tons per year, at which the unit actually emitted the pollutant during a two-year period which precedes the particular date and which is representative of normal source operation. The department may determine that a different time period is more representative of normal source operation. Actual emissions shall be calculated using the unit's actual operating hours, production rates, and types of materials processed, stored, or combusted during the selected time period.

(b) The department may presume that source-specific allowable emissions for the unit are equivalent to the actual emissions of the unit.

(c) For any emissions unit which has not begun normal operations on the particular date, actual emissions shall equal the potential to emit of the unit on that date.

ARM 17.8.801(1).

Notwithstanding the regulatory focus on "actual" emissions that result from the physical change, Plaintiffs rely on subsection (c) to contend that the *only* permissible "projection" for post-project emissions under this provision is to deem

12

future emissions equal to the unit's potential to emit.  Their interpretation conflicts

with the structure and purpose of the PSD regulations and fails to give meaning to

the critical language in the regulatory definition that subsection (c) only applies to

a unit "which has not begun normal operations."   This Court should reject

Plaintiffs' position as a matter of law, consistent with other courts facing this same

issue.

> ### 1.      Plaintiffs' interpretation is inconsistent with the purpose and structure of the PSD program.

The PSD program, as reflected in the 1980 rules, focuses on reviewing

actual emissions increases from new and modified sources that could have real

impacts on existing air quality.  *See, e.g.*, 45 Fed. Reg. 52,676, 52,700 (Aug. 7,

1980) (explaining that EPA shifted "the focus of the regulatory definitions from

'potential to emit' to 'actual emissions' . . . [f]or PSD purposes" in the 1980 final

rule because linking "major modification" to a change in a source's actual

emissions was more consistent with the CAA and better served the purpose of the

PSD program); *United States v. Cinergy Corp.*, 458 F.3d 705, 708 (7th Cir. 2006)

("[T]he [PSD] regulation is concerned with the increase in *actual* emissions rather

than with a *potential* increase in emissions.") (citation omitted).  Indeed, as the

Sixth Circuit recently confirmed, existing sources may "replace parts indefinitely

without losing their grandfathered status so long as none of those changes cause" a

significant emissions increase.[12]  *DTE Energy*, 711 F.3d at 651.  By contrast, Plaintiffs' interpretation would require the use of a potential to emit that has no relationship to the EGU's historical or planned *actual* emissions, in place of a projection that actually takes into account the unit's operating history.  *Cf. Ala. Power Co. v. Costle*, 636 F.2d 323, 379 (D.C. Cir. 1979) ("If, however, the source is an established operation, a more realistic assessment of its impact on ambient air quality levels is possible, and thus is directed.").  This Court should reject Plaintiffs' interpretation as inconsistent with the purpose and structure of the PSD program.  *See Geschke v. Astrue,* 393 F. App'x 470, 472 (9th Cir. 2010) (regulatory language "must be viewed in light of the overall structure and purpose of the statutory or regulatory scheme"); *Auer v. Robbins,* 519 U.S. 452, 457, 461-62 (1997) (regulatory interpretations must be consistent with the regulation and based on a permissible construction of the governing statute).

> ### 2.    *Plaintiffs' interpretation renders the phrase "which has not begun normal operations" superfluous.*

Plaintiffs ask the Court to read the definition of "actual emissions" as *always* requiring post-project "actual" emissions to be equal to the potential to emit of a unit.  Pls.' Br. at 14-15 (Doc. 64).  Plaintiffs reach that conclusion by focusing

---

[12] "Grandfathered" does not mean unregulated.  A host of CAA programs regulate emissions from existing EGUs, including SIP requirements, hazardous air pollution standards, 42 U.S.C. § 7412, visibility protection programs, 42 U.S.C. § 7491, the acid rain control program, 42 U.S.C. §§ 7651-7661f, and others.

solely on ARM 17.8.801(1)(c), which provides that actual emissions shall equal the unit's potential to emit, but only for a "unit which has not begun normal operations."

In a dramatic leap of logic, Plaintiffs contend that all existing units that undergo a non-routine physical or operational change must therefore be units that have "not begun normal operations" under ARM 17.8.801(1)(c).  Pls.' Br. at 16 (Doc. 64).  Not only does this depart from reality for EGUs, like the Colstrip units, that have decades of operating experience, but the sweeping nature of Plaintiffs' presumption also would impermissibly render the whole clause "which has not begun normal operations" superfluous.  *See Rainsong Co. v. FERC*, 151 F.3d 1231, 1234 (9th Cir. 1998) (holding that "constructions which render regulatory provisions superfluous are to be avoided") (citation omitted).

While the regulatory language is ambiguous as to how emissions should be projected for sources that *have begun* normal operations at the time of the change, any reasonable reading of that language must treat those units separately from units that *have not* begun normal operations.  *See Rainsong,* 151 F.3d at 1234 ("[I]t is presumed that every phrase [of a regulation] serves a legitimate purpose.") (citation omitted).  Given the availability of historical operating data for units that have begun normal operation, future projected emissions can and should be based on that operating history, reserving the actual-to-potential test only for units that

15

have not begun normal operations. *See WEPCO*, 893 F.2d at 917 ("[W]e find no support in the regulations for the EPA's decision wholly to disregard past operating conditions for the plant."); *see also Ohio Edison*, 276 F. Supp. 2d at 863 ("It is clear that [the] Sammis [plant] was operational at the time the activities were proposed. Thus, any use of the actual to potential to emit test is not legally supportable.").

### 3. *Plaintiffs' interpretation eviscerates the PSD program's causation requirement.*

Plaintiffs' proposed reading of the PSD regulations also would effectively eliminate the requirement that a physical or operational change "result in*," i.e.* cause, "a significant net emissions increase." ARM 17.8.801(20). Plaintiffs contend that a change in emissions should be evaluated by comparing a source's historical actual pre-project emissions against its post-project potential to emit. Pls.' Br. at 2, 12 (Doc. 64). This test would invariably show an emissions increase for an existing EGU because it compares pre-project emissions calculated from normal operating conditions — which do not include operation at full capacity all the time[13] —with maximum emissions assumed from constant, full load operation untethered to the unit's actual operating history.

---

[13] EGUs do not operate at their full capacity all the time. *See, e.g.,* 57 Fed. Reg. at 32,325 ("[A]s a system[,] a utility's 'normal' operations means directly responding to a demand for electricity.")

The difference between the actual-to-potential test and the actual-to-projected-actual test is best illustrated through an example. Assume that an EGU has run for 20 years without ever exceeding 85% of its potential capacity and that EGU undertakes a preventive maintenance project to replace a set of aging boiler tubes with new tubes of the same type and function. Under Plaintiffs' actual-to-potential test, the EGU would be required to assume that, after the replacement, it would run at 100% of its potential capacity 24 hours a day and 365 days per year, instead of the 85% it has run over the course of its history. This presumption of increased operation will translate into a presumption of increased emissions over historical levels, even though the boiler work may provide no factual basis for predicting a change in the EGU's actual performance. In contrast, under the actual-to-projected-actual test, the EGU would predict post-project emissions based on the unit's actual operational history and the expectations for its actual use in the future. *See, e.g., United States v. Cinergy Corp.*, 384 F. Supp. 2d 1272, 1277 (S.D. Ind. 2005) *aff'd* 458 F.3d 705 (7th Cir. 2006) ("Consistent with the 1980 rule defining 'actual emissions,' in an actual-to-projected-actual comparison, the projected actual emissions would be measured using projected actual operating hours and projected actual production rates."). Under the actual-to-projected-actual test, the facts—not an unrealistic assumption—will dictate whether the project would be expected to cause an emissions increase.

17

In sum, because the predicted "emissions increase" arising from the actual-to-potential test is hypothetical, and not grounded in facts, the causal link required under the PSD program is presumed rather than demonstrated.  This presumption of causation directly contradicts the requirement that Plaintiffs actually prove that a physical change "result in" an increase in actual emissions.  *See* ARM 17.8.801(20); *WEPCO*, 893 F.2d at 918 ("EPA's reliance on an assumed continuous operation as a basis for finding an emissions increase is not properly supported.").  Plaintiffs' attempt to impose an emissions test that would side-step their causation burden should be rejected.

### B.  Plaintiffs' Regulatory Interpretation Was Long Ago Rejected, Abandoned And Superseded.

When EPA first implemented its 1980 PSD regulations, it promoted an interpretation similar to the one Plaintiffs seek to implement here; *i.e.*, that the actual-to-potential test applies to all alleged modifications.  However, long before the first projects at issue in this case were performed in 2001, EPA's (and Plaintiffs') interpretation was (1) rejected by the Seventh Circuit Court of Appeals, (2) abandoned by EPA as a matter of policy, and (3) superseded by EPA with a new regulatory interpretation that is entitled to deference.  *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170 (2007) (changes to prior interpretations of regulations are entitled to deference as long as they do not create an "unfair

surprise").   This Court should not take up Plaintiffs' invitation to revive an interpretation that has been so thoroughly rejected by EPA and the courts.

1.    *Rejected: The Seventh Circuit rejected Plaintiffs' regulatory interpretation in the 1990 WEPCO decision.*

In *WEPCO*, the Seventh Circuit rejected EPA's application of the actual-to-potential test to an existing EGU because it was "in contravention of its own statutory regime."   893 F.2d at 917-19.   In 1987, Wisconsin Electric Power Company ("WEPCO") initiated plans to implement a $70.5 million project to renovate the generating units at its Port Washington power plant.  *Id*. at 906, 912. EPA determined that the project required a PSD permit after applying the actual-to-potential test.   *Id.* at 917. [14]   WEPCO challenged EPA's determination by filing a petition for review with the court.  *Id.*

EPA argued, as Plaintiffs do here, that the actual-to-potential test should apply to all alleged modifications at EGUs, because any unit making a non-routine change should be considered to have not begun normal operations.  *Id.* at 917.  The Seventh Circuit rejected EPA's circular reasoning in applying the actual-to-potential test to the existing WEPCO units:

---

[14] EPA calculated the Port Washington plant's post-project emissions based on "round-the-clock operations (24 hours per day, 365 days per year [at its maximum emissions rate]) because WEPCO *could potentially* operate its facility continuously, despite the fact that WEPCO has never done so in the past."  *Id.* at 916.

> EPA's analysis here seems circular:  in order to demonstrate that [the project] constitutes a modification, the EPA applies the potential to emit concept . . . .  And in order to apply the potential to emit concept to [the project], the EPA assumes that the plant is a "modified" unit. . . .  [W]e cannot defer to agency interpretations that, as applied here, appear to assume what they seek to prove.

*Id.* at 917.  Plaintiffs engage in the same circular reasoning.  *See* Pls.' Br. at 15 (Doc. 64) ("the potential-to-emit . . . is the appropriate projection of post-project emissions at a *modified* unit") (emphasis added); *see also id.* ("non-routine changes are subject to the actual-to-potential test because 'normal operations' cannot be said to have 'begun' prior to the project.").  The Seventh Circuit rejected this circular reasoning and so should this Court.[15]

Since *WEPCO*, every single court that has considered these issues with respect to existing EGUs has *rejected* the actual-to-potential test under the 1980 PSD regulations.  *See Ohio Edison,* 276 F. Supp. 2d at 863 (holding in a case involving projects dating as far back as 1984 that "in light of the Seventh Circuit's decision as well as the . . . WEPCO Rule . . . any use of the actual to potential test is not legally supportable."); *Nat'l Parks,* 2010 WL 1291335, at *4 (holding in a

---

[15]  The *WEPCO* Court also rejected Plaintiffs' argument, Pls.' Br. at 16-17, that a source may avoid any difficulties associated with the actual-to-potential test by accepting a future emissions limit that would be used in the projection of future emissions, but still assuming operation 24 hours a day for 365 days per year.  *Id.* at 918 n.13 ("EPA has not brought to our attention a clear regulatory basis for its conclusion that the provision of this alternative justifies the assumption of continuous operation if the utility refuses to consent.  And WEPCO may have legitimate reasons for declining to submit to federally enforceable emission limits….").

case involving projects dating as far back as 1988 that there was "no compelling

legal basis for the 'actual-to-potential methodology propounded by plaintiffs.");

*Ala. Power Co.*, 372 F. Supp. 2d at 1315-16 (N.D. Ala. 2005) (requiring the

"calculat[ion of] post-project emissions" under the 1980 regulations using

historical data rather than potential to emit); *see also United States v. Cinergy*, 384

F. Supp. 2d at 1277 *aff'd* 458 F.3d 705 (7th Cir. 2006) ("Consistent with the 1980

rule defining 'actual emission,' in an actual-to-projected-actual comparison, the

projected actual emissions would be measured using projected actual operating

hours and projected actual production rates.").  Plaintiffs have not provided any

basis for this Court to deviate from this uniform and established precedent.

Plaintiffs try unsuccessfully to downplay the importance of the Seventh

Circuit's rejection of their position in *WEPCO*.  Plaintiffs direct the Court to the

First Circuit's 1989 decision in *Puerto Rican Cement Co. v. EPA,*  889 F.2d 292,

297 (1st Cir. 1989), even suggesting that it creates a circuit split with *WEPCO*.

*See* Pls.' Br. at 15, 17-19 (Doc. 64).  But *Puerto Rican Cement* did not evaluate

application of EPA's regulations to changes at existing EGUs like those at issue in

*WEPCO* and in this case.  That case involved the replacement of two ancient

cement kilns with a new kiln that had significantly greater production capacity.

*Puerto Rican Cement,* 889 F.2d at 292.  The court determined that the actual-to-

potential test was reasonable under those circumstances to evaluate the "new

machinery." *Id.* at 297.   However, the *Puerto Rican Cement* Court explicitly

distinguished its holding from situations involving existing EGUs.

> One can imagine circumstances that might test the reasonableness of EPA's regulation.  An electricity company, for example, might wish to replace a peak load generator — one that operates only a few days per year — with a new peak load generator that the firm could, but almost certainly will not, operate every day . . . Whatever the arguments about the "irrationality" of EPA's interpretation in such circumstances, however, those circumstances are not present here.

*Id.* at 297-98.   Indeed, the Seventh Circuit in *WEPCO* saw no conflict,

distinguishing *Puerto Rican Cement* as addressing the construction of a *new*

emissions unit at an existing source.  *WEPCO*, 893 F.2d at 917 n.12.

Plaintiffs' assertion that "subsequent cases have undermined the Seventh

Circuit's holding," is equally erroneous.  Pls.' Br. at 21 (Doc. 64).  Plaintiffs first

contend that *WEPCO* failed to afford EPA appropriate deference commensurate

with the subsequent Supreme Court decision in *Auer v. Robbins*.  *Id.* at 21.

However, the Seventh Circuit expressly acknowledged that EPA is afforded the

greatest degree of deference when "interpreting its own complex regulations."

*WEPCO*, 893 F.2d at 917.   The court simply refused to defer to "agency

interpretations that. . .appear to assume what they seek to prove."  *Id.* This refusal

to defer to an Agency's interpretation that is "inconsistent with the regulation" is

fully consistent with *Auer* and its progeny.  *See, e.g., Christopher v. Smithkline*

*Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012) (citation omitted); *Price v. Stevedoring Servs. of Am.*, 697 F.3d 820, 828 (9th Cir. 2012).

Next, Plaintiffs argue that the Seventh Circuit in *WEPCO* exceeded its jurisdiction by allegedly evaluating the validity of EPA's rules, rather than the application of these rules.  Pls.' Br. at 21 (Doc. 64).  This argument is directly refuted by *WEPCO*: "[W]e cannot defer to agency interpretations that, *as applied here*, appear to assume what they seek to prove."  893 F.2d at 917 (emphasis added).  Indeed, in *Environmental Defense v. Duke Energy Corp.*, which Plaintiffs cite in support of their argument, the Supreme Court specifically identified *WEPCO* as a case in which review was appropriately limited to whether EPA properly applied its regulations.  *See* 549 U.S. at 581 (citing *WEPCO*, 893 F.2d at 914 n.6).

### 2.   *Abandoned and Superseded:  EPA abandoned Plaintiffs' regulatory interpretation and definitively replaced it in a regulatory preamble in 1992.*

Plaintiffs assert that the Colstrip units are still governed by EPA's original interpretation of the 1980 PSD rules because Montana did not adopt EPA's 1992 revised regulatory language.  Pls.' Br. at 22-23 (Doc. 64).  But that flawed premise ignores EPA's express recognition that an actual-to-projected-actual test may be applied to existing EGUs *under the 1980 regulations*.

On remand from *WEPCO*, EPA "decided to acquiesce in the court's holding rather than seek rehearing" and to "employ an 'actual-to-actual' method to calculate emissions increases for WEPCO's proposed renovations to its Port Washington power plant." Letter from William Rosenberg, Assistant Administrator for EPA's office of Air and Radiation, to John Boston, President of WEPCO, at 1 ("WEPCO Remand Letter") (Attachment E). Thus, EPA immediately adopted *WEPCO*'s conclusion that the actual-to-projected test was not compelled by the 1980 regulations.

Soon thereafter, EPA began a rulemaking to revise its interpretation and application of the 1980 PSD regulations, stating that the *WEPCO* and *Puerto Rican Cement* decisions "occasion a re-examination of EPA's interpretation of the phrase" "begun normal operations." 57 Fed. Reg. at 32,317 (the "WEPCO Rule"). While EPA also adopted new regulatory language, the preamble to the final regulations sets forth EPA's definitive interpretation of the 1980 PSD regulatory language. EPA stated:

> Neither [*WEPCO* nor *Puerto Rican Cement*] specified the threshold for when a unit has "begun normal operations." Based on these decisions, **under its current [1980] regulations**, EPA must consider the facts of each case and apply the actual-to-potential test only where the change is sufficiently significant to support a finding that "normal operations" have not "begun." At least for changes that are "like kind replacements,[16]" "normal

---

[16] The term "like-kind replacement" was used by the Seventh Circuit to describe WEPCO's renovation project at its Port Washington plant, which involved

operations" have begun, and the actual-to-potential test is
**impermissible**.

*Id.* (emphasis added).  Put simply, EPA conceded that its prior interpretation (the

one advanced by Plaintiffs here) that the actual-to-potential test applies to *all*

physical and operational changes at EGUs is "impermissible."[17]

EPA contrasted the ability to project actual emissions from EGUs that had

available operating histories and those that did not.   For new EGUs and

replacement EGUs "there is no relevant operating history," so "it is not possible to

reasonably project post-change utilization for those units."  57 Fed. Reg. at 32,317.

However, for other physical and operational changes to EGUs EPA concluded,

based on its "extensive experience with electric utilities, and the generally similar

nature of operations within this source category,"  that EPA has "an adequate basis

on which to predict future actual emissions."  57 Fed. Reg. 32,317.

---

replacement of existing equipment at the plant, rather than construction of a new
unit.  *WEPCO*, 893 F.2d at 917.  Upon remand from the Seventh Circuit, EPA
explained that the term "like-kind replacement" encompasses "the replacement of
components at an emissions unit with the same (or functionally similar)
components."  WEPCO Remand Letter, at 4 n.1 (Attachment E).

[17] Because the *WEPCO* decision merely invalidated EPA's *interpretation* of the
1980 PSD regulations, rather than the underlying regulations, EPA implemented
the Seventh Circuit's ruling prior to finalizing the WEPCO Rule.  As EPA put it,
"[p]ending final adoption of this new rule, EPA will *continue* to apply an actual-to-
actual test to units that undertake 'like-kind replacements' and other units which
are found to have 'begun normal operations.'"  56 Fed. Reg. 27,630, 27,633  (June
14, 1991) (emphasis added).

Plaintiffs studiously avoid any discussion of the WEPCO Remand Letter or the WEPCO Rule preamble because those actions eviscerate Plaintiffs' argument that EPA's prior interpretation still applies.  *See*, *e.g.,*  Pls.' Br. at 21-22 (Doc. 64). The Court cannot require adherence to EPA's *prior* regulatory interpretation that has been rejected, abandoned and superseded by subsequent interpretations.  *See Price*, 697 F.3d at 828 ("[A]gencies' interpretations of their own regulations are entitled to deference . . . ."); *Long Island Care at Home*, 551 U.S. at 170 (changes to prior interpretations of regulations are entitled to deference as long as they do not create an "unfair surprise"); *see also Resident Councils of Wash. v. Leavitt*, 500 F.3d 1025, 1036 (9th Cir. 2007) ("[A]n initial agency interpretation is not instantly carved in stone . . . . [A]n agency must be given ample latitude to adapt its rules and policies to the demands of changing circumstances.") (citation omitted); *Ober v. EPA*, 84 F.3d 304, 311 (9th Cir. 1996) (explaining that because EPA set forth a change in regulatory interpretation through a regulatory preamble the prior guidance "no longer accurately reflects the EPA's interpretation of the requirements").

In short, EPA and the courts have confirmed that the language at issue in this case cannot be interpreted to mean, as Plaintiffs contend, that the actual-to-potential test applies to all alleged modifications to EGUs.  Plaintiffs' reading of the regulations is wrong and must be rejected.

26

### 3. *Montana does not require a SIP revision to apply the actual-to-projected actual test to existing EGUs.*

Plaintiffs argue that EGUs cannot use any test but the actual-to-potential test in Montana unless EPA approves a revised SIP adopting the 1992 WEPCO Rule. *See* Pls.' Br. at 25 (Doc. 64).  But this position ignores EPA's express recognition in the WEPCO Remand Letter, and in the WEPCO Rule preamble, that existing EGUs could apply an actual-to-projected-actual test under the 1980 regulations. *See supra*, Section III.B.2.  Though EPA subsequently adopted new, unambiguous regulatory language in the WEPCO Rule that offered a cleaner regulatory alternative for States that preferred that option, states that continued to follow the 1980 rules, including Montana, did not need to adopt the WEPCO in order to use an actual-to-projected-actual test for existing EGUs.

The history of Montana's PSD regulations supports this same flexibility regarding the applicable emissions test.  In 1993, after the WEPCO Rule, Montana repealed its prior PSD regulations and promulgated revised PSD regulations to bring the State's PSD rules up to date with certain federal PSD requirements.  23 Mont. Admin. Reg. 2919 (Dec. 9, 1993) (Attachment A).  At that time, Montana re-adopted EPA's 1980 PSD definition of "actual emissions."[18]  EPA approved the new PSD regulations, stating that the Montana PSD rules were "revised to conform

---

[18] As discussed in Section III.C. *infra*, Montana adopted a wording change regarding the choice of the pre-project baseline to conform Montana's language to EPA's.

with the *existing* Federal PSD rules" and "are consistent with the Federal PSD

permitting requirements."  60 Fed. Reg. at 36,716, 36,719 (emphasis added)  EPA

recognized that Montana was not bound by EPA's prior, superseded regulatory

interpretations.[19]

Moreover, multiple courts have applied the actual-to-projected-actual test for

projects completed prior to the 1992 WEPCO Rule.  Though Plaintiffs try to

distinguish some of the cases as applying the WEPCO Rule, *see* Pls.' Br. at 24-25

(Doc. 64), Plaintiffs have their facts wrong.  In every case noted by Plaintiffs, the

court applied the actual-to-projected actual test to one or more projects performed

under the 1980 PSD regulations (or state regulations tracking the 1980 rules),

before EPA's 1992 WEPCO Rule.  *See Duke Energy,* 278 F. Supp. 2d at 625

---

[19] The Montana Clean Air Act also undermines Plaintiffs' proposed interpretation of the Montana PSD rules.  Section 75-2-207 prohibits MDEQ from promulgating regulations that are more stringent than those issued by EPA.  Mont. Code Ann. § 75-2-207 (directing that "[a]fter April 14, 1995," the state "may not adopt a rule to implement this chapter that is more stringent than the comparable federal regulations or guidelines that address the same circumstances.").  The actual-to-potential test is more stringent than the actual-to-projected-actual test because, as the Seventh Circuit pointed out, it tends to presume a major modification. *WEPCO,* 893 F.2d at 917.   In 2003, Montana made minor changes to applicable provisions of its PSD program, and re-adopted the regulations.  *See* 7 Mont. Admin. Reg. 647 (April 10, 2003) (revising the definition of "actual emissions") (Attachment D); 71 Fed. Reg. 3,776 (Jan. 24, 2006) (incorporating revisions into the SIP).  Consistent with the statutory directive, those re-adopted regulations should not be interpreted to require an actual-to-potential test that is more stringent than EPA's contemporaneous, post-WEPCO Rule preamble interpretation.

(M.D.N.C. 2003), No: 1:00CV1262, 2010 WL 3023517, at \*3, \*5-6 (M.D.N.C. July 28, 2010) (recognizing that the actual-to-projected-actual test applies to projects dating back to 1988 under SIP provisions based on the 1980 regulations); *Ohio Edison*, 276 F. Supp. 2d at 843, 856-66 (confirming that the actual-to-projected-actual test applies under the 1980 regulations to projects dating back to 1984); *In re Tenn. Valley Auth.*, 9 E.A.D. 357, 439-50 (E.A.B. 2000) (applying the actual-to-projected actual test to projects dating back to 1982 under SIP provisions tracking the 1980 rules). Each of these cases is directly on point, and none of the courts "required [a SIP revision adopting] new regulatory language that was added to the federal regulations in 1992" before applying the actual-to-projected-actual test under the 1980 rules. Pls.' Br. at 24 (Doc. 64). Indeed, EPA has conceded in litigating recent PSD lawsuits that the actual-to-potential test does not apply to existing EGUs even where the projects were completed before the 1992 WEPCO Rule.[20] *See, e.g., Cinergy Corp.*, 384 F. Supp. 2d at 1277 (EPA conceded that

---

[20] In a very recent brief filed in an Oklahoma lawsuit alleging PSD violations against an EGU, EPA, through the Department of Justice, explained the evolution of EPA's position. *United States v. Okla. Gas & Elec.*, No. 5:13-CV-00690 (W.D. Okla.). Like Montana, Oklahoma's SIP "was modeled after EPA's 1980 PSD rules." United States' Br. in Support Mot. for Summ. J. & Decl. Relief (Aug. 30, 2013) at 5 (Attachment F). EPA explained that under the 1980 PSD language, "a power plant operator should make [the emissions] assessment by comparing 'representative actual emissions for the baseline period' . . . to estimated future actual emissions . . . based on all the available facts in the record." *Id.* at 6 (quotation omitted); *and see id.* at 5 n.8. ("The WEPCO Remand Letter, issued in response to the Seventh Circuit's criticisms, outlined an electric utility's

actual-to-projected-actual test applied to projects occurring under the 1980 PSD regulations).

### 4. *The EPA statements cited by Plaintiffs do not support application of the actual-to-potential test to EGUs.*

Plaintiffs have cobbled together a disparate set of EPA statements that they mischaracterize as requiring the continued use of the actual-to-potential test for all physical changes at EGUs under the 1980 rules. *See* Pls.' Br. at 15-19 (Doc. 64) ("Over the years, EPA has confirmed and further explained that non-routine changes are subject to the actual-to-potential test . . . ."). These excerpted statements are out of context, inapplicable to EGUs, and entitled to no deference in interpreting the relevant PSD provisions.

Plaintiffs initially quote from an EPA request for comments on a regulatory proposal for PSD revisions that was never made final. *See* Pls.' Br. at 15 (Doc. 64) (citing 63 Fed. Reg. 39,857, 39,858 (July 24, 1998)). But the language Plaintiffs cite does not describe EPA's rules *as they apply to EGUs*. EPA specifically confirmed later in the same proposal its separate interpretation for EGUs that was developed in direct response to the *WEPCO* decision. 63 Fed. Reg. at 39,858-59

---

preconstruction projection process under a more realistic actual-to-projected-actual test. This methodology was further clarified when EPA promulgated the 1992 Rules." (citing 57 Fed. Reg. at 32,335-36)).

(describing EPA's use of the "actual-to-future-actual" test following remand in the *WEPCO* matter).[21]

Plaintiffs further direct the Court to various statements EPA made solely in the context of advocating an enforcement position. Such statements merely reflect a convenient litigating position, rather than the agency's fair and considered judgment on the matter in question. *Price*, 697 F.3d at 829. Accordingly, these statements are not entitled to *Auer* deference. *Id.*; *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) (convenient agency litigation positions are not afforded deference).

Even if such statements were relevant, Plaintiffs have mischaracterized their scope and context. Plaintiffs rely on a May 23, 2000 EPA letter providing a PSD applicability determination to Detroit Edison Company regarding a turbine upgrade project at an existing EGU. Pls.' Br. at 15-16 n.7. EPA explicitly informed Detroit Edison that "in determining if a physical change will result in a significant emissions increase at an electric utility plant, companies may use an 'actual' to 'representative actual annual emissions test' [*i.e.*, actual-to-projected-actual]." Ltr.

---

[21] Even if Plaintiffs had characterized EPA's statements accurately, agency positions set forth only in proposed rule makings that were never finalized are afforded little deference. *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 845 (1986) ("a proposed regulation does not represent an agency's considered interpretation"); *Auer*, 519 U.S. at 462 ("Deference is unwarranted when the interpretation does not reflect the agency's fair and considered judgment on the matter in question." (quotation omitted)).

from Francis X. Lyons, EPA, to Henry Nickel at 2, 18-19 (Doc. 64-6, Ex. F. to Pls.' Br.). However, Plaintiffs quote instead from a footnote discussing the use of the actual-to-potential test for sources *other than EGUs*. *See* Pls.' Br. at 15, n.7 (Doc. 64). EPA's letter does not support Plaintiffs' arguments here regarding the Colstrip EGUs.[22]

Plaintiffs also point to selected statements from EPA in the administrative determination in *In re Monroe Electric Generating Plant*. Pls.' Br. at 18 (Doc. 64). In *Monroe*, EPA objected to a state's decision to issue a permit that would allow EGUs that had been shut down for more than ten years to return to operation without applying PSD. *Monroe*, at 1-2, 4 (Doc. 64-7, Ex. G to Pls.' Br.). EPA determined that no matter what emissions test applied, restarting the EGUs under those circumstances would cause a significant net emissions increase because the baseline emissions were zero. *Id.* at 14-15, 16 n. 15. Plaintiffs do not focus on EPA's analysis or conclusion, but rather cite to a footnote that discusses EPA's regulations in *dicta*. *See* Pls.' Br. at 18 (Doc. 64) (citing *Monroe* at 15-16 n.15). Not only was this discussion irrelevant to EPA's analysis, but it also contradicts EPA's direct interpretative statements regarding EGUs in the WEPCO Rule

---

[22] Plaintiffs' reliance on the D.C. Circuit's description of EPA's litigating position regarding the application of the 1980 rules is similarly flawed. *See* Pls.' Br. at 18 (citing *"New York I,* at 15"). The cited interpretation addressed application of the 1980 rules to sources other than electric generating units. *See New York v. EPA,* 413 F.3d at 15, 20-21.

Preamble.  Statements made outside the rule-making process cannot trump EPA's clear and direct statements made within that process.  *See Christopher,* 132 S.Ct. at 2168 (deference not given to agency interpretations announced outside the rule making process that conflict with prior interpretations); *Indep. Training & Apprenticeship Program v. Cal. Dep't of Indus. Relations,* 730 F.3d 1024, 1035 (9th Cir. 2013) (*Auer* deference is unsuitable "when such deference would result in 'unfair surprise' . . . .").

### C.   Plaintiffs Misstate the Method for Determining Pre-Project Baseline Actual Emissions.

Though their motion identifies only a dispute regarding how to project *post-project* emissions for the Colstrip EGUs, Plaintiffs also include a back-door attempt to obtain a ruling on the appropriate way to assess *pre-project* (or "baseline") actual emissions.  Plaintiffs state that under the 1980 EPA rules pre-project emissions are the annual average from "the" two years of emissions data preceding the modification.  Pls.' Br. at 1, 14 (Doc. 64).  But EPA definitively abandoned Plaintiffs' incorrect interpretation well before the projects at issue in this case were performed.

Under the applicable PSD regulations, "actual emissions as of a particular date shall equal the average rate, in tons per year, at which the unit actually emitted the pollutant during *a* two-year period which precedes the particular date."  ARM 17.8.801(1)(a) (emphasis added); 40 C.F.R. § 52.21(b)(21)(ii) (1981) (emphasis

added).  "Although not required by the regulations" (which refer to "a" two-year period rather than "the" two-year period), EPA generally used the two years immediately preceding the proposed change to establish the baseline prior to 1992. 57 Fed. Reg. at 32,323.  In the 1992 WEPCO Rule preamble, EPA expressly adopted a new presumption regarding implementation *of the existing regulatory definition* of actual emissions in the 1980 rules.  From that point forward, EPA "would presume that *any* 2 consecutive years within the 5 years prior to the proposed change is representative of normal source operations for a utility." *Id.* (emphasis added); *see also id.* at 32,325 (affirming that "the presumption recognizes the nature of utility operations without compromising the existing regulatory language").

     In 1993, Montana followed EPA's action by conforming its definition of "actual emissions" to EPA's.  *See* ARM 17.8.801(1)(a).  Montana's PSD regulations previously defined "actual emissions" as "the average rate, in tons per year, at which the emissions unit actually emitted the pollutant during *the* previous two-year period and which represents normal operation."  ARM 16.8.921(2) (1983) (emphasis added) (Attachment G).  But in 1993 Montana changed the wording from "*the* [previous] two-year period" to "*a* [previous] two-year period" to be consistent with EPA's definition. ARM 17.8.801(1)(a) (emphasis added).  As all work at issue in the Amended Complaint occurred after 1992, this Court should

34

reject Plaintiffs' attempt to limit pre-project baseline actual emissions to the two-year period immediately preceding each project, rather than a two year period preceding each project.[23]

## IV.   CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Partial Summary Judgment.

---

[23] Baselines beyond the five years are allowed if more representative of normal source operation.  ARM 17.8.801(1)(a); 40 C.F.R. 52.21(b)(21)(ii).

Dated this 15th day of November, 2013.

/s/ William W. Mercer
William W. Mercer
**COUNSEL FOR PPL MONTANA, LLC,
PUGET SOUND ENERGY AND
PORTLAND GENERAL ELECTRIC
COMPANY**

/s/ Stephen R. Brown
Stephen R. Brown
**COUNSEL FOR AVISTA
CORPORATION AND PACIFICORP**

/s/ Stephen D. Bell
Stephen D. Bell
**COUNSEL FOR NORTHWESTERN
CORPORATION**

/s/ Joshua B. Frank
Joshua B. Frank (admitted *pro hac vice*)
**COUNSEL FOR DEFENDANTS**

36

# **CERTIFICATE OF COMPLIANCE**

The undersigned certifies that this Brief complies with the requirements of Rule 7.1(d)(2), as modified by the Court's November 12, 2013 Order.  The lines in this document are double spaced, except for footnotes and quoted and indented material, and the document is proportionately spaced with Times New Roman font typeface consisting of 14 characters per inch.   The total word count is 8,425 excluding caption, certificate of compliance, signature block, tables of contents and authorities, and exhibit index.   The undersigned relies on the word count of the word processing system used to prepare this document.

/s/ William W. Mercer

William W. Mercer