Norman J. Mullen, SBMT #5049
Special Assistant Attorney General
Montana Department of Environmental Quality
Legal Unit, Metcalf Building
P.O. Box 200901
Helena, Montana 59620-0901
Telephone:  (406) 444-4961
email: nmullen@mt.gov

*Attorney for Amicus*
*Montana Department of Environmental Quality*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| SIERRA CLUB and MONTANA ENVIRONMENTAL INFORMATION CENTER,<br><br>        Plaintiffs,<br><br>    vs.<br><br>PPL MONTANA LLC, AVISTA CORP., PUGET SOUND ENERGY, PORTLAND GENERAL ELECTRIC CO., NORTHWESTERN CORP ., and PACIFICORP,<br><br>        Defendants. | Case No.1: 13-cv-00032-DLC-JCL<br><br>**Brief of Amicus Montana Department of Environmental Quality Concerning Plaintiffs' First Motion for Partial Summary Judgment on Applicable Method for Calculating Emission Increases from Modifications Made to Colstrip Power Plant** |

# Table of Contents

I.   INTRODUCTION ...............................................................................1

II.  STATEMENT OF FACTS ...............................................................2

III. ARGUMENT....................................................................................9

  A. Court Should Deny Sierra Club's Motion to Use Actual-Potential Emissions
  Standard for all Changes at Colstrip Because It Ignores Case Law and EPA's
  Revised Interpretations, Interferes with Department's Duty to Make Fact-
  Specific Determinations, and Would Likely Burden Department and Require
  Many New & Costly Permits for Defendants and Others .....................................9

    1)  Only Major Modification, Not Every Change, Triggers New Requirements,
    Controls.  Fact-Intensive Determinations Decide if Modification is Major .....10

    2)  The Representative Period for Pre-Change Emissions is Not Required to
    Be the Immediately Preceding Two-Years.......................................................10

    3)  Determination of Post-Change Emissions Requires Consideration of Facts
    of Each Case; Actual-to-Potential Test Allowed Only if Changes So
    Significant that Normal Operations Have Not Begun.......................................15

    4)  Montana Repealed Pre-*WEPCO* Actual Emissions Definition and
    Readopted it after *WEPCO*, and EPA approved it into SIP; Montana is not
    Stuck with Rejected Actual-to-Potential Test for All Changes.........................18

    5)  Determination in Montana of Whether Normal Operations Begun is Case-
    by-Case and Fact-Specific ................................................................................19

  B. Non-Substantive Amendment of Montana Actual Emissions Rule Does Not
  Imply that It is Not More Stringent than Federal Regulation...............................23

  C. A Source Does Not Conclusively Determine Major Modification; Montana
  or Court Has Final Authority ...............................................................................25

IV.  CONCLUSION ...............................................................................26

# Table of Authorities

**Cases**

*Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 633 F.3d 1158, 1171 (9th Cir. Cal. 2011)...............................................................................13

*Wisconsin Electric Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990)... 5, 17, 18, 23

**Montana Code Annotated**

2-4-305(6)(b)........................................................................... 12, 26

2-4-311 ...................................................................................27

75-2-103(5) ...............................................................................1

75-2-103(7) ...............................................................................1

75-2-111(1) ...............................................................................1

75-2-112(1) ...............................................................................1

75-2-207 .................................................................................25

75-2-207(1) ..............................................................................27

75-2-401 .................................................................................28

75-2-413 ................................................................................. 28

**Administrative Rules of Montana (ARM)**

ARM 1.2.202(5)(a) .....................................................................27

ARM 16.8.921(2)(a) ....................................................................11

ARM 16.8.945(1)(b) ....................................................................12

ARM 17.8.801.................................................................. 4, 5, 10, 27

ARM 17.8.801(1) .................................................................. passim

ARM 17.8.801(1) (a) ...................................................................11

ARM 17.8.801(1)(c) ................................................................ 16, 22

ARM 17.8.801(20)(b)(i) .................................................................23

ARM 17.8.801(20)(b)(i) through (vii) ...................................................4

ARM 17.8.801(22) .......................................................................4

ARM 17.8.801(24) .....................................................................6, 11

ARM 17.8.801(27) ......................................................................6, 8

ARM 17.8.801(27)(a) ....................................................................8

ARM 17.8.818.............................................................................8

ARM 17.8.818(1) ........................................................................28

ARM 17.8.820...............................................................................................8

Title 17, chapter 8, subchapter 8 .............................................................1

**Montana Administrative Register**

1993 Mont.Admin.Reg. 1264, 1273 (June 24, 1993) ..............................11

1993 Mont.Admin.Reg. 1264, 1316 (June 24, 1993) ..............................12

1993 Mont.Admin.Reg. 2919, 2920 (December 9, 1993) .......................11

2002 Mont.Admin.Reg. 3468, 3474 (December 26, 2002) .....................24

2002 Mont.Admin.Reg. 3468, 3487 (December 26, 2002) .....................24

2003 Mont.Admin.Reg. 645, 647 (April 10, 2003) .................................24

**Code of Federal Regulations**

40 C.F.R. § 52.21(b)(21)(ii) (1981) .......................................................11

40 CFR 51.166 .......................................................................................18

**Federal Register**

45 Fed.Reg. 52676, 52705, 52718 (1980) .............................................13

56 Fed.Reg 27,630 (June 14, 1991) ......................................... 13, 17, 21

57 Fed.Reg. 32,314 (July 21, 1992)......................................... 13, 17, 21

60 Fed.Reg. 36715, 36,719 (July 18, 1995).............................................18

## Exhibits Index

Exhibit 1        Declaration of David Klemp

Exhibit 2        Air Quality Application for Stationary Sources

Exhibit 3        Flow Chart, Montana PSD Major Modification Process

Exhibit 4        ARM 16.8.921(2)(a) (1992)

Exhibit 5        1993 Mont.Admin.Reg. 1264, 1273, 1316 (June 24, 1993)

Exhibit 6        1993 Mont.Admin.Reg. 2919, 2920 (December 9, 1993)

Exhibit 7        2002 Mont.Admin.Reg. 3468, 3474, 3487 (December 26, 2002)

Exhibit 8        2003 Mont.Admin.Reg. 645, 647 (April 10, 2003)

# I.   INTRODUCTION

The Montana Department of Environmental Quality (Department), through its attorney, Norman J. Mullen, submits the following amicus brief on the Plaintiffs' Motion for Partial Summary Judgment in this Clean Air Act citizens' suit between Plaintiffs Sierra Club and Montana Environmental Information Center (referred to as Sierra Club) and Defendants (referred to as PPLM).

The Department is the state regulatory agency in Montana for air quality matters.  § 75-2-103(7), MCA.  The Montana Legislature has passed the Clean Air Act of Montana, Title 75, chapter 2, parts 1-4, MCA, and has directed the Montana Board of Environmental Review (BER) to adopt administrative rules implementing those laws.  §§ 75-2-103(5) and 75-2-111(1), MCA.  The Legislature also directed the Department to administer those laws and rules.  § 75-2-112(1), MCA.  The BER has adopted rules regulating New Source Review/Prevention of Significant Deterioration (PSD) in Montana at Admin. R. Mont. (ARM) Title 17, chapter 8, subchapter 8.  The Department is required by § 75-2-112(1), MCA, to administer those rules.

The Department requested amicus status in this case because its interests in regulating major stationary sources of air pollution in Montana would be affected if this court granted the Plaintiffs' motion for partial summary judgment.  The Department believes partial summary judgment is not warranted.

## II.   STATEMENT OF FACTS

Sierra Club has sued PPLM, claiming that it failed to obtain Prevention of Significant Deterioration (PSD) permits from the Department for approximately 64 changes at the Colstrip power plant (Colstrip) that Sierra Club claims are major modifications.  Am. Compl. 53-61 (Doc. 67).  The Colstrip power plant has four electrical generating units (EGUs).

Sierra Club has filed a motion for partial summary judgment, arguing that all changes at the Colstrip EGUs must be assumed not to have begun normal operations.  Therefore, Sierra Club argues, the emissions increase caused by each change is the difference between the potential to emit of the EGU after the change and the actual emissions in the two-year period before the change.  Doc. 64 at 17-18.

The Department disagrees with Sierra Club's interpretation of Montana's PSD rules.  It does not reflect how the Department determines whether a major modification has occurred at a major stationary source, and therefore, whether a PSD permit is required.  The Department's description of its process follows.

When the Department is determining whether a major modification at a major stationary source will occur, a team of agency staff gathers information from the company/applicant, reviews the applicable rules, reviews previous Department determinations, and those made by other states or the federal Environmental

Protection Agency (EPA) that may be applicable, and researches EPA guidance that may be applicable and court cases that may be pertinent.  This determination is not completed in a vacuum.  Rather, the team regularly consists of professionals from different areas of the Department's Air Resources Management Bureau who often have discussions with EPA, other states, the applicant, the public, or other stakeholders when making a determination.  Declaration of David Klemp, Chief of Department's Air Resources Management Bureau, Exhibit 1 at ¶ 7.

Department staff ask the facility to provide information sufficient to make a determination.  This generally means the facility provides the information that is requested on the Air Quality Application for Stationary Sources forms provided by the Department.  See Exhibit 2.  This information includes general facility information, a description of emitting units, process descriptions, maps, flow charts, emission information, and other information necessary for air quality analyses.  When the Department receives this information, it is reviewed by staff and there is usually a lot of back and forth between staff and facility personnel so Department air quality staff have a good understanding of the change that is contemplated and how that change fits into or will affect the entire operation. Klemp Declaration, Exhibit 1 at ¶ 8.

Once Department staff receive the information from the facility, the first step is to determine if the existing source is currently a "major stationary source"

as defined in ARM 17.8.801(22).  If the answer is yes, the next step is to determine

whether the proposed change meets the definition of a "major modification" in

ARM 17.8.801(20).  This definition uses several words or phrases that are also

further defined in ARM 17.8.801.  The most relevant terms for this case are

"physical change or change in the method of operation" and "significant net

emissions increase."  Exhibit 1 at ¶ 9.

　　　　To determine whether an action will result in a major modification,

Department staff first determine whether the proposed change is in fact a physical

change in, or change in the method of operation of, a major stationary source.

ARM 17.8.801(20)(b)(i) through (vii) generally identifies those actions that are

NOT a physical change or change in the method of operation.  The exclusions

generally include routine maintenance, repair, and replacement; use of alternative

fuels under certain criteria; an increase in hours of operation or in the production

rate under certain criteria, and any change in ownership at a stationary source.  At

this point staff needs to engage in an intensive, fact-specific review of the action to

determine if it is excluded from the definition of a change.  Determining whether

an action is routine maintenance, repair, or replacement, for instance, can be very

complex.  Some of the considerations weighed are: nature, extent, purpose,

frequency, and cost, as well as other relevant factors.  These factors are from

*Wisconsin Electric Power Co. v. Reilly*, 893 F.2d 901, 910 (7th Cir. 1990)

(*WEPCO*) .  Department staff also consult other Department staff and staff of other states and EPA, review available policy and EPA determinations, and apply court decisions to make the determination whether an exclusion applies.  Exhibit 1 at ¶ 10.

If the proposed action is not considered to be a physical change or change in the method of operation, it is not considered to be a major modification.  If the reverse is true, there are additional factors to consider before determining that the proposed change is a major modification, such as whether there is a "significant net emissions increase" as a result of the physical or operational change.  Exhibit 1 at ¶ 11.

"Significant net emissions increase" is a compilation of several definitions in ARM 17.8.801. "Significant" is defined in ARM 17.8.801(27) and generally refers to emission thresholds for certain pollutants.  The significance threshold for each pollutant is set out in a table in that subsection.  "Net emissions increase" is defined in ARM 17.8.801(24) as "any increase in **actual** emissions from a particular physical change or change in the method of operation at a stationary source ... ."(emphasis added).  "Actual emissions" are then defined in ARM 17.8.801(1) and can be based upon whether or not an emitting unit has begun "normal operations."  Exhibit 1 at ¶ 12.

To determine if normal operations have begun, staff must again engage in an intensive, fact-specific review of the facility.  This review could include an assessment of the emitting unit that is being changed and the effect that change has on all emissions at the facility.  This review could also include investigating the operational history of the emitting unit and/or the facility, prior production or emission levels, and types and amounts of emissions produced, as well as a review of the anticipated future operation of the emitting unit and/or the facility.  There may be additional information from the facility that could be relevant for the Department to consider in this assessment, such as market conditions that have affected or will affect the operation or production of an emitting unit or the facility.  Market conditions may cause changes in hours of operation, and therefore in amounts of pollutants emitted, for instance.  Some of these determinations, such as the installation of a new emitting unit, are easier to make than others.  The installation of a new emitting unit is an easier determination because it is much more obvious that a new emitting unit proposed at a facility has not "begun normal operations".  However, for a change at an existing emitting unit, it is much more difficult to make the determination of whether normal operations have begun.  So staff focus their analysis on the factors generally described above and obtain information from the facility to make this determination.  The idea here is for staff to determine if the emitting unit will be so significantly changed that the historical

operations, the emissions, and the impact of these emissions are not indicative of the future operation, emissions, and impacts.  If this is the case, staff may determine that the emitting unit had begun normal operation prior to the change for purposes of estimating baseline actual emissions, but the future emissions are best represented by the emitting unit's potential to emit.  A simple example of this situation is a facility that changed its combustion system to increase its capacity or use a different type of fuel.  The determination of whether a unit has begun normal operations is necessary to understand pre-project baseline emissions as well as to predict post-project actual, allowable, or potential emissions.  Exhibit 1 at ¶ 15.

Once staff determines pre- and post- project emission levels, the difference between the two is then compared to the significant emissions thresholds in ARM 17.8.801(27).  Whether the comparison of emissions is made by taking the difference between pre-project actual emissions and post-project projected actual or post-project allowable/potential emissions depends on whether the emitting unit has begun "normal operations" as described above.  Whichever method is required for the specific situation at issue, if the increase in emissions equals or exceeds the significance levels identified in ARM 17.8.801(27)(a) and there are no other contemporaneous emission increases or decreases, then the change is considered to have resulted in a significant net emissions increase.  If there is a significant net emissions increase, then a major modification is occurring at a major stationary

Brief of Amicus Montana Department of Environmental Quality                    Page 7

source, and it is subject to the additional requirements of ARM 17.8.818.  Exhibit 1 at ¶ 17.

The Department has attached a flow chart that describes the process described above.  See Exhibit 3, and Exhibit 1 at ¶ 18.

Additional requirements referred to in ARM 17.8.818 include the requirement in ARM 17.8.819 for the installation of best available control technology (BACT), a source impact analysis under ARM 17.8.820, modeling in ARM 17.8.821, air quality analysis in ARM 17.8.822, additional impact analyses in ARM 17.8.824, matters in ARM 17.8.825 concerning source impacts on Class I areas (certain federal wilderness areas and national parks), and public participation requirements in ARM 17.8.826.  Exhibit 1 at ¶ 19.

The Department believes that the baseline and potential to emit standards urged by Sierra Club are improper because they are not always required under rule and case law.  If each change was analyzed under the potential to emit standard, many new PSD permit applications would be submitted to the Department.  The Department's staffing and funding for air permitting are based on its interpretations and implementation of the rules described in this brief, and the Department would be overwhelmed by the applications and corresponding analyses required under the Sierra Club's approach.  Exhibit 1 at ¶ 20.

# III.   ARGUMENT

## A. Court Should Deny Sierra Club's Motion to Use Actual-Potential Emissions Standard for all Changes at Colstrip Because It Ignores Case Law and EPA's Revised Interpretations, Interferes with Department's Duty to Make Fact-Specific Determinations, and Would Likely Burden Department and Require Many New & Costly Permits for Defendants and Others

The Department urges the court, based on the plain language of Montana's air quality rules and the case law interpreting similar federal regulations, as well as EPA's interpretation of those regulations as affected by the cases, to deny Plaintiffs' requested ruling that the actual-to-potential-to-emit standard must be used to determine if significant emissions increases will occur for all changes at an EGU.  The selection of the appropriate standard can be complex, and may require fact-intensive determinations at several stages.  The flowchart in Exhibit 3 provides a graphical representation of the process the Department uses under ARM 17.8.801 to determine if a change at a major stationary source is a major modification.

Sierra Club's requested standard ignores case law and EPA's interpretation of the rules, and would interfere with the Department's case-by-case, fact-specific process for deciding if a major modification would occur.  It also would result in many new permit applications being submitted to the Department.  These applications would overwhelm the Department's capabilities.

1) **Only Major Modification, Not Every Change, Triggers New Requirements, Controls.  Fact-Intensive Determinations Decide if Modification is Major**

Under the rules, case law, and EPA's interpretation, which guides the Department, the actual-to-potential-to-emit standard is applicable only to a change at a major stationary source at a unit that has not begun normal operations. Whether normal operations have begun is a fact-intensive inquiry.  To provide context for this inquiry, the Department first discusses the elements of "major modification" under the PSD rules.

The term "major modification" has at least three elements: (1) a "physical change in, or change in the method of operation of, a major stationary source (2) that would result in a net emissions increase of any pollutant subject to regulation under the federal Clean Air Act (3) that is significant.  ARM 17.8.801(20).  Each of those elements requires a factual determination.  In addition, "net emissions increase" has several elements/aspects.  It is defined in ARM 17.8.801(24) as an "increase in **actual emissions** from a particular … change." (emphasis added).

2) **The Representative Period for Pre-Change Emissions is Not Required to Be the Immediately Preceding Two-Years**

"Actual emissions" are defined in ARM 17.8.801(1).  ARM 17.8.801(1) (a) establishes a baseline for pre-change actual emissions that uses "a two-year period which precedes" the change "and which is representative of normal source

operation." EPA's comparable regulation, on which Montana based the rule it adopted 1983, used the term "a two-year period." 40 C.F.R. § 52.21(b)(21)(ii) (1981). During at least one period running from 1990 through 1993, Montana's rule, ARM 16.8.921(2)(a), used the term "**the** two-year period" (emphasis added). Exhibit 4. However, that rule was repealed in 1993, and a New Rule III, codified at ARM 16.8.945(1)(b), was adopted. That new rule contained the term "**a** two-year period" (emphasis added). 1993 Mont.Admin.Reg. 1264, 1273 (June 24, 1993) (rule proposal notice), Exhibit 5; that subsection was adopted as proposed in 1993 Mont.Admin.Reg. 2919, 2920 (December 9, 1993) (adoption notice), Exhibit 6.

In the statement of reasonable necessity required by § 2-4-305(6)(b), MCA, of the Montana Administrative Procedure Act, the BER's predecessor stated that it was proposing to revise the PSD rules to address EPA's concerns and to eliminate confusion because of differences between federal and Montana rule language by adopting language as close as possible to the federal regulations:

> Proposed new rules III –XXI … implement substantial changes to the existing PSD … permitting program[] … . The department is proposing these new rules … for a number of reasons. First, the department has been notified by the [EPA] that a number of changes to the department's current permitting authority are necessary … . Specifically, EPA has requested that the department revise the current rules relating to new source review, prevention of significant deterioration, and nonattainment permitting. … Second, through practice and application of the current rules, the department has identified a number of areas in the current permitting rules where

confusion existed, primarily because of the differences between the federal language and the current language in the state rules.  To eliminate this confusion, the department has attempted to stay as close to the federal language as possible in both the new PSD and nonattainment rules.

1993 Mont.Admin.Reg. 1264, 1316 (June 24, 1993) (rule proposal notice), Exhibit 5.

The Sierra Club appears to claim that the two years immediately preceding the change must be used as the two years in the baseline representative period. Doc. 64 at 1, 13, and 14.  This conflicts with the plain meaning of the rule.  The plain meaning of "a", the indefinite article, in "a two-year period which precedes" the change is that multiple possible periods may be used.  In contrast, if EPA had intended to require the immediately preceding period, it would have used "the", the definite article, which does not allow for a choice and requires one specific period. *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 633 F.3d 1158, 1171 (9th Cir. Cal. 2011).

EPA's preamble language in the adoption notice for the 1980 PSD regulations does indicate that EPA expected the two years immediately preceding the date of a change to be generally used as the baseline period, "provided that the two-year period is representative of normal source operation," while recognizing that the regulation allows a reviewing authority, such as the Department, to select another period as more typical of normal source operations.  45 Fed.Reg. 52676,

52705, 52718 (1980).   However, in subsequent rulemakings, EPA acknowledged

that the regulation does not require the use of the immediately preceding two-years

as the representative period: "Although **not required by the regulations**, EPA has

historically used the 2 years immediately preceding the proposed change to

establish the baseline."  56 Fed.Reg 27,630, 27,636 (June 14, 1991) (*WEPCO* Rule

proposal notice); 57 Fed.Reg. 32,314, 32,323 (July 21, 1992) (final *WEPCO*

Rule)(emphasis added).

　　　　Therefore, the interpretation urged by the Sierra Club, that the use of the

immediately preceding two years as a baseline period is required, is incorrect

because it conflicts with the plain meaning of the rule.  To the extent that their

position is based on EPA's interpretation, EPA's interpretation is not entitled to

deference, because it conflicts with the plain meaning of its own regulation, and

EPA has admitted that its interpretation is not required by the regulations.

　　　　The key in selecting the baseline period is that it be representative of normal

source operation.  Factors such as downtime caused by equipment failure or

decrease in demand for the product of the facility caused by an economic downturn

could make the two years immediately before the change not representative.  While

the two-year period immediately preceding the change may be used as a starting

point if representative, that period is not required by the Montana rule or EPA's

interpretation of its regulation, and a facility may utilize another two-year period if it can be justified as representative.  Klemp Declaration, Exhibit 1 at ¶ 13.

It is important to recognize that the determination of whether a change is a major modification is at first a self-effectuating one.  That is, a facility first reviews possible changes internally to determine whether it is proposing a major modification.  Therefore, a facility such as Colstrip may analyze many changes to its emitting units that do not result in a determination of major modification and so are not reported to the Department because no permit application would be submitted.  If a facility selects a two-year baseline period that is representative of normal source operation, it is not required to use a baseline of the immediately preceding two years.  However, a facility such as Colstrip may often contact the Department to discuss a project, so that it may obtain the Department's feedback on the elements of a major modification, including on an appropriate representative period.  Klemp Declaration, Exhibit 1 at ¶ 13.

Therefore, even the selection of a representative baseline period for pre-change actual emissions is a fact-specific determination in which the facility is allowed some discretion.  The Department and, when litigation occurs, the court, also must, in the exercise of their discretion, make fact-specific determinations of whether a particular baseline period is representative.

### 3) Determination of Post-Change Emissions Requires Consideration of Facts of Each Case; Actual-to-Potential Test Allowed Only if Changes So Significant that Normal Operations Have Not Begun

Once a representative baseline period is established for pre-change actual emissions, the post-change actual emissions must be determined.  The major regulatory factor in this determination is whether normal operations have begun.  ARM 17.8.801(1)(c) is clear that the post-change actual emissions for a unit that has not begun normal operations before the change are its potential to emit.  However, that rule is silent on the standard for a unit to apply when it **has** begun normal operations before the change.

Until 1990, EPA interpreted the 1980 regulations to require use of the actual-to-potential to emit standard for <u>all</u> changes at a power plant.  That interpretation was challenged by the Wisconsin Electric Power Company (WEPCO), and was rejected in a major opinion from the Seventh Circuit in 1990.  *Wisconsin Electric Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990) (*WEPCO*).  The *WEPCO* court held that EPA had assumed the issue it was attempting to prove, that a major modification was being proposed, by adopting a potential-to-emit standard for post-change emissions.  The reason EPA's assumption was circular, and therefore faulty, was that the potential-to-emit standard assumes that the facility will run at its maximum capacity: "In calculating the plant's post-renovation potential to emit, the EPA bases its figures on round-the-clock

operations (24 hours per day, 365 days per year) because WEPCO could *potentially operate* its facility continuously, despite the fact that WEPCO has never done so in the past." (italics in original).  *WEPCO*,  893 F.2d at 916.

If the potential-to-emit standard is used, rather than projections of actual emissions based on pre-change operations, the emissions from continuous operation at maximum capacity year round are more likely to result in a finding of a significant emissions increase, which in turn will lead to a determination of a major modification, and trigger PSD requirements.  Klemp Declaration, Exhibit 1 at ¶ 16.

The *WEPCO* court further stated that "we find no support in the regulations for the EPA's decision wholly to disregard past operating conditions at the plant. … If the source has no actual emissions because it has yet to commence operating, its hypothetical, projected emissions are included in the baseline.  If however, the source is an established operation, a more realistic assessment of its impact on ambient air is possible, and thus is directed."  *WEPCO,* 893 F.2d at 917.

The Department disagrees with the Sierra Club that the Department and the court are required to always use the actual-to-potential test that EPA used before the *WEPCO* court rejected it as impermissible when future emissions could be projected.  As the *WEPCO* court noted, "we cannot defer to agency interpretations that, as applied here, appear to assume what they seek to prove.  *WEPCO, 893*

*F.2d at 917*.  An interpretation that has been rejected should not continue to dictate requirements in Montana.

One reason *WEPCO* is so significant is that after the decision, EPA revised its interpretation of its 1980 regulations to conform to *WEPCO*.  In the preambles to the proposed new regulation, commonly referred to as the *WEPCO* Rule, and that regulation's adoption notice, EPA recognized that it was impermissible for it to always assume that post-change emissions at a power plant would be maximum emissions at 24 hours per day, 365 days per year.  Rather, EPA stated that

> under its **current** [1980] regulations, EPA must consider the **facts of each case** and apply the actual-to-potential test only where the change is sufficiently significant to support a finding that "normal operations" have not "begun."  At least for changes that are "like kind replacements," "normal operations" have begun, and the actual-to-potential test is impermissible.

See preambles to proposed rule, 56 Fed.Reg. 27,630, 27,633 (June 14, 1991) (emphasis added), and to final rule at 57 Fed.Reg. 32,314, 32,317 (July 21, 1992). EPA further stated that, "[b]ecause the 'begun normal operations' criterion is highly fact-dependent and its application is inherently case-by-case, it may be an uncertain indicator of what emissions test will be applied in a given instance."  *Id.*

In adopting the *WEPCO* Rule, EPA adopted the actual-to- projected-future-actual standard for EGUs that have begun normal operations.  57 Fed.Reg. 32,314, 32,317 (July 21, 1992).[1]

In 2002, EPA adopted regulations that adopted the approach of the *WEPCO* Rule for facilities other than EGUs.  This is called NSR Reform.  Montana did not adopt the changes to the *WEPCO* Rule, and did not adopt NSR Reform.

### 4) Montana Repealed Pre-*WEPCO* Actual Emissions Definition and Readopted it after *WEPCO*, and EPA approved it into SIP; Montana is not Stuck with Rejected Actual-to-Potential Test for All Changes

However, Montana did repeal its earlier rules and adopted new rules with the definition of actual emissions in 1993.  EPA approved those rules into the Montana State Implementation Plan (SIP) in 1995.  In its approval, EPA stated "EPA's review of the State's revisions to its PSD permitting rules in subchapter 9 found that the State's revised rules are consistent with the Federal PSD permitting requirements in 40 CFR 51.166."  60 Fed.Reg. 36715, 36,719 (July 18, 1995). That EPA regulation included the *WEPCO* Rule.  So, Montana adopted its rules defining actual emissions after the *WEPCO* decision and after EPA revised its previous interpretation that all changes triggered a potential-to-emit standard.

---

[1] The *WEPCO* Rule called this test the actual to representative actual annual emissions test, but, as Sierra Club noted at Doc. 64, fn. 5, it refers to the same methodology as the actual-to-projected-future-actual test.

That Montana did not change its rules to explicitly adopt an actual-to-projected-future-actual standard does not mean, as Sierra Club argues at Doc. 64, at 19-26, that Montana is always stuck with a standard, actual-to-potential, that was rejected by the *WEPCO* and other courts starting 23 years ago.  Rather, it means that Montana must analyze changes to EGUs by considering the facts of each case to determine if normal operations have begun.  If they have not begun, then the standard urged by Sierra Club, actual-to-potential, is appropriate.  If normal operations have begun, then the appropriate standard is actual-to-projected-future-actual.

## 5) Determination in Montana of Whether Normal Operations Begun is Case-by-Case and Fact-Specific

Appropriate factors that the Department considers when determining whether normal operations have begun include an assessment of the emitting unit that is being changed, the effect of the change on all emissions at the facility, the operational history of the emitting unit and/or the facility, prior production or emission levels, types and amounts of emissions produced, anticipated future operation of the emitting unit and/or the facility, and market conditions that have affected or will affect the operation or production of an emitting unit or the facility. Market conditions may cause changes in hours of operation, and therefore in amounts of pollutants emitted, for instance.  Klemp Declaration, Exhibit 1 at ¶ 15.

Only after the relevant factors have been evaluated for a specific change can a proper determination be made of whether the facility has begun normal operations before the change.

An easy example of a change for which normal operations have not begun is the replacement or construction of an entire unit, such as a boiler.  Because there would be no history of operations for such a change, it would be difficult to project the future emissions.  Klemp Declaration, Exhibit 1 at ¶ 15.  Therefore, the potential-to-emit standard would be used as the measure of post-change actual emissions.  That is what is required by ARM 17.8.801(1)(c).

However, if, based on its review of the facts of a particular change, the Department determines that the unit had begun normal operations before the change, then the projected future-actual emissions would be the measure of post-change actual emissions.  The clearest example of a change that allows the determination that a unit has begun normal operations, so its emissions can be reasonably predicted, is the non-routine substitution of new parts of the same kind for old, worn out parts.[2]  The *WEPCO* court referred to this as "like-kind replacement."  WEPCO, 893 F.2d. at 917.  If a representative period for pre-change emissions was chosen so that the equipment was performing properly

---

[2] Conversely, if a change qualified as routine maintenance, repair, or replacement, the substitution would be exempt from further PSD review. ARM 17.8.801(20)(b)(i).

during that period, then like-kind replacement will not cause emissions to change in a way that cannot reasonably be predicted, and the unit is considered to have begun normal operations.  Then, it is appropriate (required by the *WEPCO* decision) to use the actual-to-projected-future-actual standard.

Between changing out one part with an identical part, and replacing a whole emitting unit, there is a continuum that requires a fact-intensive, case-by-case determination by first the facility, and then the Department, as regulating agency, or a court in deciding a case.  That fact-intensive determination satisfies the rules, the *WEPCO* decision, and the EPA interpretation of the rules as revised in the *WEPCO* Rule preamble.

For power plants, EPA has decided that its "extensive experience with electric utilities, and the generally similar nature of operations within this source category, provide EPA an adequate basis on which to predict future actual emissions from such units in most cases."  EPA further stated that only construction of a new unit or replacement of a unit would require the conclusion that normal operations had not begun, and that the actual-to-potential measure was therefore required.  Preamble to proposed *WEPCO* Rule, 56 Fed.Reg. 27,630, 27,633 (June 14, 1991), and to final *WEPCO* Rule, 57 Fed.Reg. 32,314, 32,317 (July 21, 1992).

The Department is likely to agree with EPA that, in most cases, emissions from a change that is less extreme than an addition of a new unit or a replacement of an existing unit at an electrical power plant can be estimated by using the actual-to-projected-future-actual standard adopted in the *WEPCO* rule.[3]  However, because Montana has not adopted the *WEPCO* Rule and NSR reform, a case-by-case analysis is needed and appropriate.

The Department does not believe that the arguments raised by Sierra Club in its reply brief are persuasive.  Faced with a series of cases following the *WEPCO* decision and the *WEPCO* Rule preamble, which require that the facts of each case be reviewed to determine whether an EGU has begun normal operations, Sierra Club claims that the *WEPCO* decision and the *WEPCO* Rule preamble are not applicable, and that EPA allows only states that have adopted the *WEPCO* Rule or NSR reform to use the actual-to-projected-future-actual test.  Doc. 81 at 12-14.

This argument was addressed by PPLM in its response brief, Doc. 76, at 28-30, and the Department believes that PPLM is correct that the courts and EPA have taken the position that, where normal operations have begun at a unit, the actual-to-projected-future-actual test is available in states, such as Montana, that have rules modeled after EPA's 1980 regulations.

---

[3] The *WEPCO* Rule called this test the actual to representative future actual test, but, as Sierra Club noted at Doc. 64, fn. 5, it refers to the same methodology as the actual-to-projected-future-actual test.

**B. Non-Substantive Amendment of Montana Actual Emissions Rule Does Not Imply that It is Not More Stringent than Federal Regulation**

The Department notes that, while it agrees with many of the arguments in PPLM's response brief, it disagrees with one argument in that brief, and believes that another statement must be qualified.

PPLM argues that after the 1995 passage of § 75-2-207, MCA, the Board of Environmental Review was prohibited from adopting an air quality rule that was more stringent than a comparable federal regulation addressing the same circumstances.[4]  Further, PPLM argues, ARM 17.8.801(1) was amended and readopted in 2003, and the procedures and findings required to adopt a more stringent rule were not followed.  Therefore, it argues, that rule cannot be more stringent than the comparable federal regulation.  Because the comparable federal regulation at the time contained the NSR Reform test of actual-to-projected-future-actual, PPLM argues, the Montana rule adopted by the Board in 2003 must be interpreted to be no more stringent than the actual-to- projected future-actual test.

The Department disagrees with that argument because the 2003 amendment to ARM 17.8.801(1) was not substantive, and there was no readoption beyond the non-substantive amendment.  The only amendments made to that rule removed a

_____

[4] A more stringent rule may be adopted if certain procedures for public notice and comment are followed and certain findings are made.  See § 75-2-207(2), MCA.

Brief of Amicus Montana Department of Environmental Quality          Page 23

"double earmark" in the numbering of the rule's subsections and replaced it with a "single earmark," and eliminated the word "below," which referred to subsequent subsections.  See proposal notice at 2002 Mont.Admin.Reg. 3468, 3474 (December 26, 2002), attached as Exhibit 7, and adoption notice at 2003 Mont.Admin.Reg. 645, 647 (April 10, 2003), attached as Exhibit 8.

In each rulemaking proposal notice in Montana, the proposing agency is required to state the reasons for the proposed action.  § 2-4-305(6)(b), MCA.  The Board of Environmental Review stated the reason for the 2003 amendment to ARM 17.8.801 as follows:  "The proposed amendment[] to ARM 17.8.801 … would correct double earmarking … ."  2002 Mont.Admin.Reg. 3468, 3487 (December 26, 2002), Exhibit 7.  The rule subsection being amended was numbered "(1)(a)".  The Montana Secretary of State administers the Administrative Rules of Montana.  § 2-4-311, MCA.  The use of "(1)(a)" violated the Secretary of State's convention against double earmarking, which is now contained in ARM 1.2.202(5)(a): "Each section and subsection must be identified with a single numerical or alphabetical earmark."

Therefore, the Board corrected the double earmark in ARM 17.8.801(1).

Section 75-2-207(1), MCA, applies to adoptions of new rules and substantive amendments to existing rules, and it should not be triggered by non-substantive amendments.

### C. A Source Does Not Conclusively Determine Major Modification;
### Montana or Court Has Final Authority

The Department also disagrees with a statement at 5-6 of PPLM's response brief (titled "opposition") to the motion for partial summary judgment, Doc. 76. PPLM stated that if a "source determines that the work will not be a 'major modification' … , then PSD does not apply." The Department disagrees because the source does not make the conclusive determination of whether a major modification occurs. As noted above, the PSD rules are at first self-effectuating, in that a source first analyzes a contemplated change and decides whether it believes a major modification will result, based on whether a significant net emissions increase will occur. It may consult with the Department, as the permitting agency, about this determination. In the end, though, if the Department, as permitting agency, determines that a change has resulted in a major modification, the Department, under its regulatory and enforcement authorities, may determine a major modification has occurred. Then a PSD permit was required and a violation of ARM 17.8.818(1), which prohibits construction not in compliance with PSD requirements, has occurred. For such a violation, the Department may issue an administrative order for penalties and corrective action under § 75-2-401, MCA, or file a judicial complaint in state court for penalties and injunctive relief under § 75-2-413, MCA.

In addition, of course, this court can determine whether a major modification has occurred when resolving claims in a citizen suit.

## IV.   CONCLUSION

Montana is guided by EPA's interpretation of its Prevention of Significant Deterioration rules as modified by the *WEPCO* decision and as expressed in a revised interpretation in the *WEPCO* Rule preamble.  The Montana rules were readopted after that decision and after the issuance of that revised interpretation by EPA.  The revised interpretation requires the Department to consider, on a case-by-case basis based on the facts of each case, whether a change at a power plant is sufficiently significant so that normal operations have not begun.  If normal operations have not begun, the significance of a net emissions increase is determined by the actual-to-potential-to-emit standard.  If normal operations have begun, then the significance is determined by the actual-to-future-actual standard. Montana must not be required to apply an interpretation that the actual-to-potential standard is always required when that interpretation has been rejected by the courts and EPA.

WHEREFORE, the Montana Department of Environmental Quality respectfully requests this court to deny Plaintiffs' Motion for Partial Summary Judgment.

STATE OF MONTANA
DEPARTMENT OF ENVIRONMENTAL QUALITY

December 4, 2013     By     /s/ Norman J. Mullen
Date                              NORMAN J. MULLEN
                                  Special Assistant Attorney General
                                  Attorney for Department

**CERTIFICATE OF COMPLIANCE WITH L.R. 7.1**

In accordance with L.R. 7.1(d)(2)(E), the undersigned certifies that this brief contains 5,957 words, excluding caption, tables of contents and authorities, exhibit index, and certificates of service and compliance.

**By:** /s/ Norman J. Mullen
          Norman J. Mullen