Norman J. Mullen, SBMT #5049
Special Assistant Attorney General
Montana Department of Environmental Quality
Legal Unit, Metcalf Building
P.O. Box 200901
Helena, Montana 59620-0901
Telephone: (406) 444-4961
email: nmullen@mt.gov

*Attorney for Amicus*
*Montana Department of Environmental Quality*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| SIERRA CLUB and MONTANA ENVIRONMENTAL INFORMATION CENTER,<br><br>Plaintiffs,<br><br>vs.<br><br>PPL MONTANA LLC, AVISTA CORP., PUGET SOUND ENERGY, PORTLAND GENERAL ELECTRIC CO., NORTHWESTERN CORP., and PACIFICORP,<br><br>Defendants. | Case No.1: 13-cv-00032-DLC-JCL<br><br>**Declaration of David L. Klemp in Support of Brief of Amicus Montana Department of Environmental Quality** |

I, David L. Klemp, state as follows:

1. I am over 21 years of age.

2. I reside in Lewis and Clark County, Montana.

3. I am employed by the Air Resources Management Bureau (ARMB), Permitting and Compliance Division, Montana Department of Environmental Quality (DEQ) as the Chief of the ARMB.

4. In this capacity, I oversee air quality activities including permitting, compliance, policy and planning activities conducted by ARMB staff. Before becoming Bureau Chief in December 2007, I previously served as the Permitting, Compliance, and Registration Program Manager as well as the Air Quality Permitting Section Supervisor. I also served as the Lead Engineer in the Air Quality Permitting Section for several years.

5. In the course of my present and past duties, I have had extensive involvement in administering many portions of Montana's air quality program, including extensive involvement in air quality permitting issues and procedures. This involvement includes direct issuance of air quality permits, leading/training staff in the issuance of air quality permits, conferring with stakeholders/public, making permit determinations, defending decisions, and establishing guidance and policy related to permit issuance. In addition, I previously served as the Chair of

the PSD Workgroup for the Western States Air Resources (WESTAR) Council. WESTAR is a regional organization formed to coordinate on air quality issues. It has 15 western states as members and has extensive participation from the Environmental Protection Agency (EPA) and Federal Land Managers.

6.  I am making this declaration to support the Department's amicus brief. My purpose in making it is to provide the court with a description of the approach the Department uses to determine PSD applicability for a change that occurs at an existing major stationary source. Every determination is a case-by-case application of the specific information provided to the Department to the relevant rules, so it impossible to provide an exact, one-size-fits-all standard for everything.

7.  When the Department is determining whether a major modification at a major stationary source will occur, a team of agency staff gathers information from the company/applicant, reviews the applicable rules, reviews previous Department determinations, and those made by other states or EPA that may be applicable, and researches EPA guidance that may be applicable and court cases that may be pertinent. This determination is not completed in a vacuum. Rather, the team regularly consists of professionals from different areas of the Department's Air Resources Management Bureau who often have discussions with EPA, other states, the applicant, the public, or other stakeholders when making a determination.

8. Department staff ask the facility to provide information sufficient to make a determination. This generally means the facility provides the information that is requested on the Air Quality Application for Stationary Sources forms provided by the Department. See Exhibit 2. This information includes general facility information, a description of emitting units, process descriptions, maps, flow charts, emission information, and other information necessary for air quality analyses. When the Department receives this information, it is reviewed by staff and there is usually a lot of back and forth between staff and facility personnel so Department air quality staff have a good understanding of the change that is contemplated and how that change fits into or will affect the entire operation.

9. Once Department staff receive the information from the facility, the first step is to determine if the existing source is currently a "major stationary source" as defined in ARM 17.8.801(22). If the answer is yes, the next step is to determine whether the proposed change meets the definition of a "major modification" in ARM 17.8.801(20). This definition uses several words or phrases that are also further defined in ARM 17.8.801. The most relevant terms for this case are "physical change or change in the method of operation" and "significant net emissions increase."

10. To determine whether an action will result in a major modification, Department staff first determine whether the proposed change is in fact a physical

Declaration of David L. Klemp                                                                 Page 4

change in, or change in the method of operation of, a major stationary source. ARM 17.8.801(20)(b)(i) through (vii) generally identifies those actions that are NOT a physical change or change in the method of operation. The exclusions generally include routine maintenance, repair, and replacement; use of alternative fuels under certain criteria; an increase in hours of operation or in the production rate under certain criteria, and any change in ownership at a stationary source. At this point staff needs to engage in an intensive, fact-specific review of the action to determine if it is excluded from the definition of a change. Determining whether an action is routine maintenance, repair, or replacement, for instance, can be very complex. Some of the considerations weighed are: nature, extent, purpose, frequency, and cost, as well as other relevant factors. These factors are from the *WEPCO* case at 893 F.2d 901, 910. Department staff also consult other Department staff and staff of other states and EPA, review available policy and EPA determinations, and apply court decisions to make the determination whether an exclusion applies.

11. If the proposed action is not considered to be a physical change or change in the method of operation, it is not considered to be a major modification. If the reverse is true, there are additional factors to consider before determining that the proposed change is a major modification, such as whether there is a

"significant net emissions increase" as a result of the physical or operational change.

12. "Significant net emissions increase" is a compilation of several definitions in ARM 17.8.801. "Significant" is defined in ARM 17.8.801(27) and generally refers to emission thresholds for certain pollutants. The significance threshold for each pollutant is set out in a table in that subsection. "Net emissions increase" is defined in ARM 17.8.801(24) as "any increase in **actual** emissions from a particular physical change or change in the method of operation at a stationary source ... ."(emphasis added) "Actual emissions" are then defined in ARM 17.8.801(1). That rule requires the use of a two-year period preceding the change that is representative of normal source operation.

13. The determination of whether a two-year period is representative is also fact-intensive. Factors such as downtime cause by equipment failure or decrease in demand for the unit's product could make the two years immediately preceding the change not representative. The Department has used the immediately preceding two years as a starting point, but it is not required by the Montana rule or EPA's regulation. The determination of whether a change at a unit is a major modification is first addressed by the facility in internal review. If the facility analyzes a change and does not determine it to be a major modification, it is likely not to report the change to the Department. If, in its internal review, the facility

selects a two-year baseline period that is representative of normal source operation, it is not bound to use a baseline of the immediately preceding two years. However, a facility such as Colstrip may often contact the Department to discuss a project, so that it may obtain the Department's feedback on the elements of a major modification, including on an appropriate representative period.

14. The measure of "actual emissions" turns on whether an emitting unit has begun "normal operations."

15. To determine if normal operations have begun, staff must again engage in an intensive, fact-specific review of the facility. This review could include an assessment of the emitting unit that is being changed and the effect that change has on all emissions at the facility. This review could also include investigating the operational history of the emitting unit and/or the facility, prior production or emission levels, and types and amounts of emissions produced, as well as a review of the anticipated future operation of the emitting unit and/or the facility. There may be additional information from the facility that could be relevant for the Department to consider in this assessment, such as market conditions that have affected or will affect the operation or production of an emitting unit or the facility. Market conditions may cause changes in hours of operation, and therefore in amounts of pollutants emitted, for instance. Some of these determinations, such as the installation of a new emitting unit, are easier to make than others. The

installation of a new emitting unit is an easier determination because it is much more obvious that a new emitting unit proposed at a facility has not "begun normal operations". However, for a change at an existing emitting unit, it is much more difficult to make the determination of whether normal operations have begun. So staff focus their analysis on the factors generally described above and obtain information from the facility to make this determination. The idea here is for staff to determine if the emitting unit will be so significantly changed that the historical operations, the emissions, and the impact of these emissions are not indicative of the future operation, emissions, and impacts. If this is the case, staff may determine that the emitting unit had begun normal operation prior to the change for purposes of estimating baseline actual emissions, but the future emissions are best represented by the emitting unit's potential to emit. A simple example of this situation is a facility that changed its combustion system to increase its capacity or use a different type of fuel. The determination of whether a unit has begun normal operations is necessary to understand pre-project baseline emissions as well as to predict post-project actual, allowable, or potential emissions.

16. If the potential-to-emit standard is used, rather than projections of actual emissions, the emissions from continuous operation at maximum capacity year round are more likely to result in a finding of a significant emissions increase,

which in turn will lead to a determination of a major modification, and trigger PSD requirements.

17. Once staff determines pre- and post- project emission levels, the difference between the two is then compared to the significant emissions thresholds in ARM 17.8.801(27). Whether the comparison of emissions is made by taking the difference between pre-project actual emissions and post-project projected actual or post-project allowable/potential emissions depends on whether the emitting unit has begun "normal operations" as described above. Whichever method is required for the specific situation at issue, if the increase in emissions equals or exceeds the significance levels identified in ARM 17.8.801(27)(a) and there are no other contemporaneous emission increases or decreases, then the change is considered to have resulted in a significant net emissions increase. If there is a significant net emissions increase, then a major modification is occurring at a major stationary source, and it is subject to the additional requirements of ARM 17.8.818.

18. The flow chart in Exhibit 3 generally depicts the process I have described above.

19. Additional requirements referred to in ARM 17.8.818 include the requirement in ARM 17.8.819 for the installation of best available control technology (BACT), a source impact analysis under ARM 17.8.820, modeling in

ARM 17.8.821, air quality analysis in ARM 17.8.822, additional impact analyses in ARM 17.8.824, matters in ARM 17.8.825 concerning source impacts on Class I areas (certain federal wilderness areas and national parks), and public participation requirements in ARM 17.8.826.

20. The Department believes that the baseline and potential to emit standards urged by Sierra Club are improper because they are not always required under rule and case law. If each change was analyzed under the potential to emit standard, many new PSD permit applications would be submitted to the Department. The Department's staffing and funding for air permitting are based on its interpretations and implementation of the rules described in this brief, and the Department would be overwhelmed by the applications and corresponding analyses required under the Sierra Club's approach.

21. That completes my declaration.

I declare under penalty of perjury that the foregoing is true and correct.

_12/3/13_  _Helena, MT_  _____
Date        Place         Signature of David L. Klemp