William Bumpers (admitted *pro hac vice*)
Joshua B. Frank (admitted *pro hac vice*)
Megan H. Berge (admitted *pro hac vice*)
Christine G. Wyman (admitted *pro hac vice*)
Baker Botts L.L.P.
1299 Pennsylvania Avenue, NW
Washington, DC  20004
Telephone: (202) 639-7700
Fax: (202) 639-7890

**COUNSEL FOR DEFENDANTS**

Stephen R. Brown
Garlington, Lohn & Robinson, PLLP
350 Ryman Street
Missoula, Montana  59802
Telephone:  (406) 523-2500
Fax: (406) 523-2595

**COUNSEL FOR AVISTA
CORPORATION
AND PACIFICORP**

William W. Mercer
Michael P. Manning
Holland & Hart LLP
401 North 31st Street, Suite 1500
P.O. Box 639
Billings, Montana  59103-0639
Telephone:  (406) 252-2166
Fax:  (406) 252-1669

**COUNSEL FOR PPL MONTANA, LLC,
PUGET SOUND ENERGY AND
PORTLAND GENERAL ELECTRIC
COMPANY**

Stephen D. Bell
Dorsey & Whitney LLP
Millennium Building
125 Bank Street, Suite 600
Missoula, Montana  59802-4407
Telephone: (406) 721-6025
Fax: (406) 543-0863

B. Andrew Brown (admitted *pro hac vice*)
Dorsey & Whitney LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota  55402
Telephone: (612) 340-2600
Fax: (612) 340-2868

**COUNSEL FOR
NORTHWESTERN CORPORATION**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| SIERRA CLUB and MONTANA ENVIRONMENTAL INFORMATION CENTER, <br><br> Plaintiffs, <br><br> vs. <br><br> PPL MONTANA LLC, AVISTA CORPORATION, PUGET SOUND ENERGY, PORTLAND GENERAL ELECTRIC COMPANY, NORTHWESTERN CORPORATION, PACIFICORP, <br><br> Defendants. | CV 13-32-BLG-DLC-JCL <br><br><br><br> **Defendants' Response to Brief of Amicus Montana Department of Environmental Quality Concerning Plaintiffs' First Motion for Partial Summary Judgment on Applicable Method for Calculating Emissions Increases from Modifications Made to Colstrip Power Plant.** |

## TABLE OF CONTENTS

I.   MDEQ Has Primary Responsibility For Implementing And Enforcing
     The PSD Regulations In Montana. ...................................................................2

II.  MDEQ's Interpretation Of The PSD Program Is Consistent With
     The Regulatory Language, Applicable Case Law, And Relevant
     EPA Interpretations. ......................................................................................4

     A.   MDEQ correctly identified multiple bases for rejecting
          Plaintiffs' position and denying the Motion for Partial
          Summary Judgment...............................................................................4

     B.   MDEQ's interpretation of its PSD regulations as applied to
          EGUs has been consistent over time....................................................8

III. Conclusion .....................................................................................................14

## ATTACHMENT INDEX

1   Letter from James M. Parker, Manager, Environmental Engineering
    Department for PPL Montana, LLC, to Julie Merkel, Air Quality Specialist
    for MDEQ (Feb. 3, 2005)

2   Letter from Julie Merkel, Air Quality Specialist for MDEQ, to James Parker,
    Manager, Environmental Engineering Department for PPL Montana, LLC
    (May 19, 2005)

3   Montana New Source Review Program Equivalency Demonstration

4   Memorandum from The Brattle Group to Arnold & Porter re: Colstrip Unit
    1, Condenser Tube Replacement (Jan. 10, 2012)

Plaintiffs ask this Court to be the first ever to adopt their position that the "actual-to-potential" test applies to all alleged "major modifications" at electric generating units ("EGUs") under the prevention of significant deterioration ("PSD") program of the Clean Air Act.  Pls.' First Mot. for Partial Summ. J. (Docs. 63, 64).  Plaintiffs' regulatory interpretation was long ago rejected by the courts, abandoned by EPA, and superseded by regulatory interpretations published by EPA in the Federal Register and implemented over time.  *See* Defs.' Opp'n to Pls.' First Mot. for Partial Summ. J. ("Opposition") at 18-26 (Doc. 76).

In response to Plaintiffs' incorrect reading, the Montana Department of Environmental Quality ("MDEQ") — the agency responsible for implementing and enforcing the  PSD program in Montana — has filed an amicus brief expressing its "disagree[ment] with the Sierra Club that the Department and the court are required to always use the actual-to-potential test."  Br. of Amicus Mont. Dept. of Envtl. Quality Concerning Pls.' First Mot. for Partial Summ. J. ("Amicus Br.") at 16 (Doc. 83).  MDEQ's rejection of Plaintiffs' position is consistent with the Montana PSD regulations, EPA's long-standing interpretation of the similar federal regulations, the overwhelming weight of judicial authority and the manner in which the PSD regulations have been applied to Montana EGUs.  Defendants have relied upon these authorities in the past when evaluating compliance and making investments.  Plaintiffs' *post hoc* effort to change how the PSD program

1

applies to EGUs is wrong as a matter of law and would disrupt those settled expectations.  Plaintiffs' Motion must be denied.

## I.   MDEQ Has Primary Responsibility For Implementing And Enforcing The PSD Regulations In Montana.

The Montana Legislature has directed MDEQ to administer the state's responsibilities under the PSD provisions of the Clean Air Act.  Mont. Code Ann. § 75-2-112(1).  Since 1983, EPA has authorized Montana to implement its own PSD program with MDEQ serving as the permitting authority.  *See* 48 Fed. Reg. 20,231 (May 5, 1983).  Thus, MDEQ has the legal authority to issue PSD permits to Montana facilities if required.   MDEQ also plays an important role in implementing the PSD program by assisting facilities with practical compliance questions.  The PSD program is "self-effectuating" – that is, it places responsibility on facility owners and operators to make the initial determination of whether a project is a major modification that could trigger PSD requirements.  Amicus Br. at 14 (Doc. 83).  But if the facility has questions about the potential application of PSD to a project, it may contact MDEQ to get feedback about how the project should be treated from a permitting perspective.  *Id.*

MDEQ's description of its PSD program is consistent with how the program works in practice.  As MDEQ notes, "a facility such as Colstrip may often contact the Department to discuss a project, so that it may obtain the Department's feedback on the elements of a major modification."  *See id.*  Defendants have

2

sought MDEQ's input for certain projects at Colstrip when they believed additional guidance was necessary to supplement their internal review.   For example, Defendants planned to make certain efficiency upgrades to the turbines at Colstrip Units 1 (in Spring 2006), 2 (in Spring 2008), 3 (in Spring 2007), and 4 (in Fall 2006).  Ltr. from James M. Parker to Julie Merkel (Feb. 3, 2005) (Attachment 1). Defendants determined that the projects would allow the Units to generate more electricity with the same amount of steam, increasing electricity production without increasing the amount of coal burned or emissions.  *Id.*  Defendants sought MDEQ's concurrence that the projects would not require PSD permits and would comply with other state permitting requirements.   *Id.*   After additional communications about the projects, MDEQ concurred that no PSD permit was necessary.[1]  Defendants moved forward with the projects, which Plaintiffs now claim violated PSD.  *See* Am. Compl. ¶¶ 57-60, and Claims 7, 10, 13, 14. (Doc. 67).

In its Amicus Brief, at 2, MDEQ has confirmed that "Sierra Club's interpretation of Montana's PSD rules . . . does not reflect how the Department determines whether a major modification has occurred at a major stationary source,

---

[1] Ltr. from Julie Merkel to James Parker (May 19, 2005) (Attachment 2).  MDEQ concluded that the projects "can be accomplished under the provisions of [ARM] 17.8.745."  Attachment 2.  ARM 17.8.745 states that a permit is not required for *de minimis* changes, which cannot include any construction that triggers PSD requirements.

and therefore, whether a PSD permit is required."  Plaintiffs have intimated that MDEQ's interpretation of the Montana PSD regulations is irrelevant because, in Plaintiffs' opinion, only EPA's interpretation is entitled to deference.  *See* Pls.' Br. in Supp. of Pls.' First Mot. for Partial Summ. J. ("Pls.' Br.") at 18 (Doc. 64).  This argument fails to acknowledge MDEQ's critical role as the PSD permitting authority.  But with or without deference to MDEQ, the outcome is exactly the same here.  The interpretation set forth by MDEQ in the Amicus Brief is the same position that EPA adopted in the WEPCO Rule preamble and the WEPCO Remand Letter, the same position that EPA has recently taken in similar PSD litigation, and the same conclusion reached by every court interpreting the very same regulatory language as applied to EGUs.  Opposition at 18-33 (Doc. 76).  MDEQ's interpretation and historical application of its PSD regulations consistent with those authorities compels rejection of Plaintiffs' Motion.

## II.   MDEQ's Interpretation Of The PSD Program Is Consistent With The Regulatory Language, Applicable Case Law, And Relevant EPA Interpretations.

### A.   *MDEQ correctly identified multiple bases for rejecting Plaintiffs' position and denying the Motion for Partial Summary Judgment.*

MDEQ squarely rejects Plaintiffs' argument that the Montana regulations require the actual-to-potential test for all projects at EGUs.  Amicus Br. at 9 (Doc. 83) (stating that Plaintiffs' argument "ignores case law and EPA's interpretation of the rules, and would interfere with the Department's case-by-case, fact-specific

process for deciding if a major modification would occur"). MDEQ bases its rejection of Plaintiffs' position on "the plain language of Montana's air quality rules and the case law interpreting similar federal regulations, as well as EPA's interpretation of those regulations as affected by [*WEPCO* and other] cases." *Id.*

MDEQ identifies multiple flaws in Plaintiffs' proposed interpretation, and indicates its agreement with the criticisms of Plaintiffs' arguments identified by Defendants in their Opposition. *See, e.g.*, Amicus Br. at 22 (Doc. 83); Opposition at 14-16, 18-33 (Doc. 76). Citing the Seventh Circuit's decision in *Wisconsin Electric Power Co. v. Reilly*, 893 F.2d 901 (7th Cir. 1990) ("*WEPCO*"), MDEQ rejects Plaintiffs' argument that the actual-to-potential test always applies because the regulations limit that test to units that have "not begun normal operations." *See* Amicus Br. at 15-16 (Doc. 83); *see also* Opposition at 14-16 (Doc. 76) (Plaintiffs' argument would read the words "not begun normal operations" out of the regulations). MDEQ states that it implements its PSD regulations regarding the applicable emissions test consistent with the regulatory language limiting the actual-to-potential test to units that have "not begun normal operations." Amicus Br. at 10 (Doc. 83)*; ARM 17.8.801(1)(c). MDEQ recognizes that the regulations are "silent on the standard for a unit to apply when it has begun normal operations," Amicus Br. at 15, but agrees with EPA's interpretation, after the Seventh Circuit's *WEPCO* decision, that "the appropriate standard is actual-to-

5

projected-future-actual" if normal operations have begun, *id.* at 19.

MDEQ further confirms that it looks to EPA's 1992 preamble to "the WEPCO Rule" for guidance in interpreting Montana's PSD regulations, not EPA's pre-*WEPCO* interpretation. Amicus Br. at 16-17 (Doc. 83). In the WEPCO Rule preamble, EPA recognized that, under the language of EPA's 1980 PSD Regulations on which Montana's PSD regulations are based, the actual-to-potential test applies "only where the change is sufficiently significant to support a finding that 'normal operations' have not 'begun.'" *Id*. at 17 (quoting 56 Fed. Reg. 27,630, 27,633 (June 14, 1991); 57 Fed. Reg. 32,314, 32,317 (July 21, 1992)).[2] In 1993, after the issuance of the WEPCO Rule, Montana revised and reissued its PSD regulations, and EPA subsequently approved those revisions as "consistent

---

[2] MDEQ recognizes that the factual determination of whether normal operation has begun would not be complex in most scenarios: "The Department is likely to agree with EPA that, in most cases, emissions from a change that is less extreme than an addition of a new unit or a replacement of an existing unit at an [electric] power plant can be estimated by using the actual-to-projected-future-actual standard adopted in the *WEPCO* rule." Amicus Br. at 22; *see also id.* at 20 ("The clearest example of a change that allows the determination that a unit has begun normal operations, so its emissions can be reasonably predicted, is the non-routine substitution of new parts of the same kind for old, worn out parts."). Plaintiffs' contrary contention that EPA uses the phrase "begun normal operations" to mean that "the source has not yet begun operations following the renovation" is based solely on a September 1988 EPA memorandum issued *before* the Seventh Circuit's *WEPCO* decision. *See* Pls.' Reply Br. in Supp. of First Mot. Summ. J. ("Reply") at 8 (Doc. 81). The Seventh Circuit rejected EPA's interpretation relied on by Plaintiffs here, and EPA subsequently abandoned that position in the WEPCO Remand Letter and the WEPCO Rule preamble.

with the Federal PSD permitting requirements."  Amicus Br. at 18 (Doc. 83) (quoting 60 Fed. Reg. 36,715, 36,719 (July 18, 1995)).  As MDEQ notes, EPA's revised interpretation and Montana's subsequent regulatory action contradict Plaintiffs' claim that Montana is compelled to follow EPA's superseded pre-*WEPCO* interpretation.  Amicus Br. at 15-19 (Doc. 83); *see also* Opposition at 27-30 (Doc. 76) (rebutting Plaintiffs' argument and identifying examples of courts applying the actual-to-projected-actual test for projects completed prior to the 1992 WEPCO Rule).  Nor should Montana be required to follow a regulatory interpretation that was firmly rejected by the Seventh Circuit.  Amicus Br. at 16 (Doc. 83); *WEPCO*, 893 F.2d at 917.

MDEQ also rejects Plaintiffs' contention that EGUs must use the two years immediately preceding a project to determine the "baseline emissions."  Amicus Br. at 12-13 (Doc. 83).  The relevant EPA and Montana regulations state that the pre-project baseline emissions "shall equal the average rate, in tons per year, at which the unit actually emitted the pollutant during *a* two-year period which precedes the particular date and which is representative of normal source operation."  ARM 17.8.801(1)(a); 40 C.F.R. § 52.21(b)(21)(ii)(1983) (emphasis added).  Plaintiffs would convert the words "a two-year period" into "the two-year period," which is the exact opposite of the change Montana made to the regulatory language in 1993.  Amicus Br. at 11 (Doc. 83) (citing Montana Administrative

Register notices).  MDEQ's position is consistent with EPA's interpretation of the same language, *i.e.*, that baseline emissions can be the average emissions from any two-year period within the five years before a project that are representative of normal operations.[3]  *Id.* at 13; *see also infra* at 10 (consistent MDEQ statement explaining the Montana PSD program to EPA in 2006); *cf.* Opposition at 33-35 (Doc. 76).

   B.   *MDEQ's interpretation of its PSD regulations as applied to EGUs has been consistent over time.*

   MDEQ's description of its PSD program in the Amicus Brief is fully consistent with its past actions and prior explanations of its treatment of EGUs. MDEQ explained its historic PSD treatment of EGUs like the Colstrip units in its response to EPA's adoption in 2002 of new PSD regulations (known as "the NSR reform rules").  *See* 67 Fed. Reg. 80,186 (Dec. 31, 2002).  Through these rules, EPA extended the use of the actual-to-projected-actual test from EGUs, as provided in the WEPCO Rule and preamble, to all source categories.  In response to EPA's promulgation of the NSR reform rules, Montana was required to either adopt the new regulations or to demonstrate to EPA that the State's PSD program

---

[3] In the WEPCO Rule preamble, EPA explained that this language creates a presumption that "any 2 consecutive years within the 5 years prior to the proposed change is representative of normal source operations."  57 Fed. Reg. at 32,323. Baselines earlier than five years before the project also may be considered if the selected period is more representative of normal operations.  *See* Amicus Br. at 13-14.

is at least equivalent in stringency to EPA's PSD program.  *See* 42 U.S.C. § 7416; 67 Fed. Reg. at  80,240-41.  Rather than adopt the NSR reform rules, Montana elected to submit an equivalency demonstration to EPA.  *See* Mont. New Source Review Program Equivalency Demonstration (Attachment 3).

In that Equivalency Demonstration, MDEQ expressly addressed its treatment of EGUs under its existing PSD regulations.  MDEQ explained to EPA that the decision not to adopt EPA's new rules expanding the use of the actual-to-projected-actual test would not affect EGUs in Montana because MDEQ interpreted its existing PSD regulations to allow EGUs to use that test consistent with EPA's WEPCO Rule and preamble.

> The WEPCO ruling, made prior to 2002, allowed utilities to use an actual-to-projected-actual emissions test based on projected future emissions.  *Utilities remain unaffected by [EPA's 2002] rule changes as both the Montana (through policy) and the federal rules continue to apply the WEPCO rule to utilities.*

Equivalency Demonstration at PL-0014496-97 (Attachment 3) (emphasis added). MDEQ further explained that it interpreted its existing regulations to allow EGUs to use a baseline emissions period of "any consecutive two years demonstrated to be typical of normal operations and occurring in the five years immediately prior to instituting a physical or operational change," consistent with the WEPCO Rule.  *Id.* at PL-0014494.  In both the Equivalency Demonstration and the Amicus Brief, MDEQ has based its interpretation on the Seventh Circuit's *WEPCO* decision and

9

EPA's interpretations in the WEPCO Rule and preamble.[4]

Defendants, likewise, have understood and applied the regulations consistent with those interpretations. For example, prior to undertaking projects at Colstrip, Defendants work with a consultant to perform pre-project emissions analyses to evaluate whether PSD requirements may be implicated.[5] Defendants' analyses are based on their understanding that EPA, the courts, and MDEQ (a) allow use of the actual-to-projected-actual test for EGUs that have begun normal operations, and

---

[4] The Amicus Brief and Equivalency Demonstration reflect MDEQ's considered description of the way in which it applies the PSD regulations to EGUs. Plaintiffs may attempt to support their argument that the actual-to-projected-actual test is unavailable in Montana by identifying statements MDEQ has made in less formal discussions of the NSR reform rules that do not specifically address EGUs. For example, Plaintiffs may point to statements such as "generally, the actual to potential applicability test was used," "proposed modified units were generally analyzed under the actual to potential test," or the "proposed NSR Reform rules would allow for" use of "projected future emissions, rather than potential emissions" to give the impression that the actual-to-projected-actual test was unavailable without revisions to the regulations. EPA's WEPCO interpretation specifically differentiated EGUs from other sources, and MDEQ specifically followed EPA's interpretation for EGUs as reflected in the Equivalency Demonstration. Accordingly, any MDEQ statements Plaintiffs may cite that do not address EGUs cannot overcome MDEQ's clear interpretation regarding EGUs set forth in the Amicus Brief and Equivalency Demonstration.

[5] *See, e,g.,* Ltr. from James M. Parker to Julie Merkel (Feb. 3, 2005) (Attachment 1) at 2 (noting that "PPL Montana routinely reviews our capital projects in order to adequately address any [NSR] or [PSD] issues resulting from such projects"). Out of an abundance of caution, Defendants generally evaluate the possibility that capital projects at Colstrip could result in an emissions increase, even if they consider the projects "routine maintenance, repair, and replacement" that are not physical changes, and thus cannot trigger PSD. *See* ARM 17.8.801(2)(b) (defining "physical change").

(b) do not limit the emissions baseline to the two years immediately preceding the project. *See, e.g.,* Mem. from The Brattle Group to Arnold & Porter (Jan. 10, 2012) (Attachment 4).[6]

Plaintiffs incorrectly contend that Montana's treatment of EGUs consistent with the WEPCO Rule and preamble is precluded by a 2001 letter from EPA regional staff to North Dakota's environmental agency suggesting that the actual-to-projected-actual emissions test would not apply unless North Dakota had adopted the WEPCO Rule into its state implementation plan. Reply at 7 (Doc. 81). Not only is the Region's isolated statement unrelated to the specific analysis in the letter, the statement directly conflicts with EPA's formal interpretation of the 1980 PSD regulations published in the Federal Register as part of the WEPCO Rule preamble. *See* Opposition at 23-25 (Doc. 76); *see also id.* at 32-33 (explaining why Plaintiffs' similar reliance on the *In re Monroe* administrative decision is misplaced). EPA would not undo this long-standing interpretation through a single letter to North Dakota from its staff in a regional office. Moreover, EPA has not issued a similar letter regarding the Montana PSD program even though MDEQ

---

[6] In keeping with the self-effectuating nature of the PSD program, Defendants typically do not share their internal emissions analyses with MDEQ where those analyses do not indicate that PSD requirements are applicable. *See* Amicus Br. at 14 (Doc. 83) (noting that "a facility such as Colstrip may analyze many changes to its emitting units that do not result in a determination of major modification and so are not reported to [MDEQ] because no permit application would be submitted").

specifically informed EPA in the 2006 Equivalency Demonstration that Montana was following the WEPCO Rule without formally adopting it.

Plaintiffs also argue that the actual-to-projected-actual test may not be applied if the state has not adopted the 1992 WEPCO Rule regulatory language because doing so would exempt EGUs from certain reporting obligations that EPA imposed as a condition for use of that test in the WEPCO Rule.  Reply at 14-15 (Doc. 81).  However, EPA explained in the preamble to the WEPCO Rule that the 1980 regulations must be interpreted as allowing use of the actual-to-projected-actual test for EGUs that have begun normal operations.  *See* 57 Fed. Reg. at 32,317 ("EPA must consider the facts of each case and apply the actual-to-potential test only where the change is sufficiently significant to support a finding that 'normal operations' have not 'begun.'").  In promulgating the WEPCO Rule itself, EPA concluded that a bright-line rule would avoid such factual determinations that are required under the 1980 regulations and thus revised "its regulations to apply the actual-to-[projected]-actual test on *all* physical or operational changes at electric utility steam generating units," except for the addition or replacement of an entire unit.  *Id.* (emphasis added).  At the same time, EPA included a requirement that EGUs maintain and report their emissions after applying the actual-to-projected-actual test.  *Id.* at 32,325-26.  EPA did not, however, include such reporting requirements in its interpretation of the 1980

regulations in the preamble to the WEPCO Rule.

Importantly, MDEQ requires Colstrip to comply with reporting requirements consistent with the ones set forth in the WEPCO Rule. EPA's reporting requirement from the WEPCO Rule required an EGU to "maintain[] and submit to the Administrator on an annual basis for a period of 5 years from the date the unit resumes regular operation, information demonstrating that the physical or operational change did not result in an emissions increase." 40 C.F.R. § 52.21(b)(21)(v) (1993). However, EPA did not require any particular or additional form of reporting post project emissions because EGUs already are required to report them.

> Since it is expected that utilities will submit the same data normally used to report emissions or operational levels under existing Federal, State or local air pollution control agency requirements, EPA does not expect that documentation of post-change actual annual emissions will impose any additional data collection burden on the part of a utility.

57 Fed. Reg. at 32,325. Montana's air regulations and Colstrip's operating permit require Colstrip to report its actual emissions quarterly and annually to MDEQ. *See* ARM 17.8.1212(3)(a); Colstrip Steam Electric Station Final Operating Permit #OP0513-08 at 9-10, 42 (Doc. 47-1). These reports allow MDEQ to monitor for any changes in emissions that might warrant further investigation into PSD compliance. Contrary to Plaintiffs' contention, Reply at 14-15 (Doc. 81), no

further reporting requirements are necessary for Montana to implement its regulations consistent with EPA's WEPCO Rule preamble.  57 Fed. Reg. at 32,325 (noting that EPA expects utilities to meet the WEPCO Rule reporting requirement at 40 C.F.R. § 52.21(b)(21)(v) using the same data normally used to report emissions under existing requirements).

In sum, MDEQ's rejection of Plaintiffs' position is consistent with the regulatory language, the Seventh Circuit's *WEPCO* decision and subsequent precedent, and EPA's interpretations.

## III.   Conclusion

MDEQ urges this Court to reject Plaintiffs' interpretation of the Montana PSD regulations as inconsistent with the manner in which MDEQ has interpreted and implemented its PSD program.  For the reasons provided by MDEQ and in Defendants' Opposition, the Court should deny Plaintiffs' Motion for Partial Summary Judgment.

Dated this 20th day of December, 2013.


/s/ William W. Mercer
William W. Mercer

**COUNSEL FOR PPL MONTANA, LLC, PUGET SOUND ENERGY AND PORTLAND GENERAL ELECTRIC COMPANY**


/s/ Stephen R. Brown
Stephen R. Brown

**COUNSEL FOR AVISTA CORPORATION AND PACIFICORP**


/s/ Stephen D. Bell
Stephen D. Bell

**COUNSEL FOR NORTHWESTERN CORPORATION**


/s/ Joshua B. Frank
Joshua B. Frank (admitted *pro hac vice*)

**COUNSEL FOR DEFENDANTS**

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies that this Brief complies with the requirements of Rule 7.1(d)(2).  The lines in this document are double spaced, except for footnotes and quoted and indented material, and the document is proportionately spaced with Times New Roman font typeface consisting of 14 characters per inch.  The total word count is 3,449 excluding caption, table of contents, certificate of compliance and signature block.  The undersigned relies on the word count of the word processing system used to prepare this document.

/s/ William W. Mercer
William W. Mercer