# Attachment 3



**RECEIVED**

MAR 31 2006

MT Dept. of Environmental Quality
Permitting & Compliance Division / Air Resources Management

## Montana Department of
## ENVIRONMENTAL QUALITY

Brian Schweitzer, Governor

P.O. Box 200901 • Helena, MT 59620-0901 • (406) 444-2544 • www.deq.mt.gov

March 29, 2006

Robert E. Roberts
Regional Administrator
U.S. EPA – Region 8
999 – 18th Street, Suite 300
Denver, CO 80202-2466

Dear Mr. Roberts:

I am pleased to submit for your review and approval the enclosed *Montana New Source Review Program Equivalency Demonstration*. On December 31, 2002, the U.S. Environmental Protection Agency (USEPA) promulgated final New Source Review Reform regulations governing the New Source Review program under Parts C and D, Title 1, of the Clean Air Act.

These rules required all State Implementation Plan (SIP) approved States, including Montana, to submit for USEPA approval any changes to the SIP that would be necessary to keep the state program at least as stringent as the federal rules. As outlined in the enclosed document, Montana has determined that the existing SIP-approved Montana New Source Review rules, contained in the Administrative Rules of Montana Title 17, Chapter 8, Subchapters 8 and 9, are at least as stringent as, or more stringent than, the final New Source Review Reform rules, as promulgated by EPA, excluding those portions of the rule either vacated or remanded by the District of Columbia Circuit Court of Appeals on June 24, 2005.

Because Montana's existing SIP-approved New Source Review program is equivalent to the New Source Review Reform program, we have prepared the enclosed equivalency demonstration in lieu of a SIP revision. All major elements of the amended NSR Reform rules are addressed and information is provided to demonstrate that the existing SIP-approved Montana New Source Review program is equivalent. Montana's existing New Source Review program not only provides the emission benefits necessary to attain our air quality goals, but also includes many features that provide regulatory certainty and flexibility to our New Source Review program-regulated sources of air pollution.

I look forward to your timely concurrence with our submittal. If you have any questions, please feel free to contact me by telephone at (406) 444-6815. You may also contact Don Vidrine, Chief of DEQ's Air Resources Management Bureau, at (406) 444-2467.

Sincerely,

Richard H. Opper
Director

Enforcement Division • Permitting & Compliance Division • Planning, Prevention & Assistance Division • Remediation Division

PL-0014490

## Montana New Source Review Program Equivalency Demonstration

Comparison of Federal New Source Review Reform Program and Existing Montana State Implementation Plan Approved New Source Review Program Requirements for Major Facilities Locating in Attainment/Unclassified Areas and Non-Attainment Areas

I.   Introduction ........................................................................................................... 1
II.  Analysis of NSR Reform Program Requirements vs. MDEQ NSR Program
     Requirements ....................................................................................................... 2
     A. Baseline Emissions ........................................................................................ 3
     B. Applicability Test........................................................................................... 5
     C. Plantwide Applicability Limits (PALs) ......................................................... 7
III. Conclusions........................................................................................................... 9

PL-0014491

I. Introduction

On December 31, 2002, the United States Environmental Protection Agency (EPA) promulgated a revised New Source Review program (NSR Reform) affecting major modifications to existing major sources [67 FR 80186, the 2002 EPA rule]. Nationally, major modifications account for only 20% of NSR permit actions. In Montana, all major modifications and minor permitting actions at major sources go through minor NSR permitting as well, including a minor source best available control technology (BACT) requirement (ARM 17.8.752). Nevertheless, as demonstrated through the following analysis, Montana's existing and SIP approved major NSR program is as stringent as, or more stringent than, the federal NSR Reform program.

The NSR Reform rule consisted of five elements purported by EPA to grant facilities greater operational flexibility while providing incentives for reduced emissions of air pollutants, thereby resulting in increased environmental benefit. The revisions resulted from a long-term NSR reform process dating back to 1992. The first regulatory proposal regarding this reform was issued in the Federal Register on July 23, 1996 [61 FR 38250]. A Notice of Availability, seeking further comments, was published on July 24, 1998 in the Federal Register [63 FR 39857] prior to adoption of the 2002 EPA rule.

The five elements of the 2002 EPA NSR Reform rule involved 1) revising the method to determine the baseline for emissions, 2) changing the major modification applicability test (i.e. the method for determining an increase in emissions), 3) the authorization of Plantwide Applicability Limits (PALs), 4) exemptions for designated Clean Units, and 5) exemptions for Pollution Control Projects. EPA stated it expected that together these five elements would: "…reduce the burden, maximize operating flexibility, improve environmental quality, provide additional certainty, and promote administrative efficiency." [67 FR 80189] EPA's expectation was that the rules would be adopted by states as a complete set as it was their belief that the "…program will work better as a practical matter and will produce better environmental results if all five of the new applicability provisions are adopted and implemented." [67 FR 80241].

Subsequently, two elements of the program, the Clean Unit exemption and the Pollution Control Project exemption, were vacated by the D.C. Circuit Court of Appeals [*State of New York v. U.S. EPA*, 413 F.3d 3 (D.C. Cir. 2005)]. Further, EPA's petition to rehear the case was denied on December 9, 2005. EPA ranked the two vacated elements among the more beneficial of the five elements in their November 21, 2002 report entitled "Supplemental Analysis of the Environmental Impact of the 2002 Final NSR Improvement Rules" (SEA).

Because the EPA has adopted the new provisions as base elements, each state implementing the NSR program through an approved State Implementation Plan (SIP), must, if necessary, revise its implementing statutes and regulations and make a demonstration to EPA that the SIP is equivalent to, or at least as stringent as, EPA's 2002 rule [Clean Air Act section 116; 40 CFR 51.165 and 166]. Montana is an NSR program SIP approved state.

Therefore, in the absence of any federal guidance beyond a statement on "equivalency" in the December 2002 rulemaking preamble, the following discussion will focus on the MDEQ's existing NSR program as a whole, as reflected in Montana's NSR rules. The

1

legal test for "equivalency" is really a test of whether the Montana NSR program is at least as stringent as, if not more stringent than, the federal requirements. The ability of States to undertake more stringent programs than the federal government is explicitly provided for in Section 116 of the Clean Air Act. It provides in relevant part:

> "[N]othing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution; except that if an emission standard or limitation is in effect under an applicable implementation plan or under [section 7411 or section 7412 of this title], such State or political subdivision may not adopt or enforce any emission standard or limitation, which is less stringent than the standard or limitation under such plan or section." 42 U.S.C. 7416.

Further, in the preamble to the December 2002 rulemaking, EPA wrote:

> "...[I]f a State decides it does not want to implement any part of the new applicability provisions, the State will need to show that it's existing program is at least as stringent as our revised base program" 67 Fed. Reg. 80241.

This not only enables States to adopt stricter pollution abatement requirements than EPA, but also requires that EPA approve any such requirements. *Duquesne Light Co. v. EPA,* 166 F.3d 609, 613 (3d Cir. 1999) (holding a utility lacks standing to challenge EPA's SIP approval of a more stringent regulation, and holding that "EPA...only has the power to disallow state plans that fail to be stringent enough - that is, plans that fall below the level of stringency provided by federal law.") See also *Union Electric v. EPA,* 427 U.S. 246, 263-264 (1976); *Her Majesty the Queen v. City of Detroit,* 874 F. 2d 332, 336 (6th Cir. 1989); cf. *American Corn Growers Assoc. v. EPA,* 291 F. 3d 1, 8 (D.C. Cir. 2002) (rejecting EPA's attempt to circumscribe the authority Congress provided to the States).

This document demonstrates that MDEQ's existing and SIP approved NSR program is at least as stringent as EPA's 2002 rule. Each of the three remaining elements of EPA's 2002 rule – baseline emissions, applicability test, and PALs – are considered and compared with MDEQ's existing SIP approved NSR program. In developing the Montana NSR program and in making this demonstration, the MDEQ has utilized the provisions of the federal Clean Air Act, and court decisions, specifying that a state permitting authority may exercise discretion in designing a SIP to best meet the needs of its jurisdiction, provided the SIP is at least as stringent as the base federal program.

## II.   Analysis of NSR Reform Program Requirements vs. MDEQ NSR Program Requirements

This section examines each of the three NSR elements and describes how the Montana NSR program addresses each of the program elements in an equal or more stringent manner. While the Montana NSR program differs in certain respects, such differences alone or in combination with other elements of the Montana NSR program are more protective of the environment and provide additional and appropriate flexibility suited to the inventory of Montana sources subject to the requirements of the major NSR permit program.

PL-0014493

A.  Baseline Emissions

If a physical or operational change at a major source results in a significant increase in pollutant emissions, the major modification requirement of NSR is triggered. Pre- and post- change emission rates must be compared to quantify the size of the emissions increase. The pre-change emission rate is referred to as the baseline emission rate.

The baseline emission rate, or any emission rate for that matter, must occur over a defined time period. Determining this period is an area where Montana chooses to be more stringent than the federal regulations.

In general, the Montana NSR program requires that the baseline period is the two years just prior to implementation of a proposed physical or operational change at a facility. If it is demonstrated by the source that some other two-year period is more representative of normal source operation, then that period may be substituted as the baseline. The Administrative Rules of Montana (ARM) 17.8.801(1) for determining the baseline refer to the Federal regulations in place prior to the 2002 EPA rule (i.e. December 31, 2002), and are similar. Two definitions in the Montana's rules are particularly relevant to the two-year time frame. These definitions are "net emissions increase [ARM 17.8.801(24)]" and "actual emissions [ARM 17.8.801(1)]." Actual emissions as of a particular date are the emissions that occurred during the two years prior to the particular date and that represent normal source operation. A source which has not begun normal operations as of a particular date must use potential emissions as a substitute for historical actual emissions.

Through policy, MDEQ determines the baseline for Electric Utility Steam Generating Units (EUSGUs) in a slightly different manner, as allowed under the Montana NSR Rules. The baseline emission period for an EUSGU is any consecutive two years demonstrated to be typical of normal operations and occurring in the five years immediately prior to instituting a physical or operational change. This treatment for EUSGUs is known nationally as the WEPCO rule, after a court case involving Wisconsin Electric Power Company, and is used by Montana through policy.

The NSR Reform rule continues to treat EUSGUs by the WEPCO rule. Therefore, Montana and EPA do not differ in their treatment of these sources. For other sources, the 2002 EPA rule allows the baseline period for determining emissions to be any consecutive 24-months occurring during the ten years prior to the implementation of the change. It is left solely to the permittee to determine the most representative 24 months.

In the SEA, EPA concludes that the changes to the baseline resulting from the 2002 EPA rule will have no effect for ninety percent of sources. These ninety percent include: new sources; new units at existing sources; EUSGUs; sources with recently high levels of emissions; and sources with emissions comparable to the past. In fact, as documented in the SEA, EPA's overall assessment of the effect of the December 2002 baseline rule is that it is negligible.

PL-0014494

EPA recognizes that not all of the remaining ten percent of sources would be likely to consider a modification, but is concerned about two categories of sources in this subset: sources with recently installed control equipment that would be able to use a higher baseline period occurring prior to the installation of the equipment; and sources with progressively declining emissions.

EPA's solution for a source with recently installed control equipment is to require consideration of enforceable air pollution control measures that have been put into place.

In the case of recently installed air pollution control equipment, the Montana NSR rule presumes that the most recent two years prior to the modification are the two years to be used as the baseline period. The recently installed air pollution control equipment would likely be in place during the period. In the event that the applicant chooses earlier years for the baseline, the applicant assumes the burden to demonstrate that the earlier years are representative of normal source operation. If the applicant demonstrates that the earlier years are more representative, the State would make a downward adjustment for any pollution control equipment with enforceable conditions in place prior to the making of a physical or operational change.

In the case of sources with progressively declining emissions, EPA states that a source owner could claim that, because there is no set "look back" limit in Montana's approach (i.e. the federal regulation prior to December 31, 2002), the source owner might persuade the State to accept a baseline period going back more than ten years. EPA is concerned that this would allow for a higher baseline than the baseline established by the NSR Reform rule. However, the selection of a baseline period beyond ten years would be a highly exceptional occurrence, for several reasons. First, Montana's NSR rule emphasizes a five-year time frame in a definition related to the baseline – the definition of "net emissions increase," [ARM 17.8.801(24)] and the WEPCO rule, implemented by MDEQ through policy, further emphasizes the five-year look back period. Further, in the event that the applicant chooses a baseline period outside of a ten-year look-back period, the burden is on the applicant to demonstrate that such a two-year period is in fact representative. As time passes, it is more difficult to demonstrate that those conditions are still representative of normal source operation. EPA has pointed out it is this uncertainty in obtaining approval for the baseline years, which may cause source owners to forego a modification. EPA further points out that the time and resources necessary to convince the regulating authority that the selected baseline is representative encourages the applicant to select a reasonable baseline time period. An applicant would realize that supporting a baseline which is ten or more years past would be difficult. EPA emphasizes this point in the SEA. Further, EPA's analysis shows that the longest business cycle for any industry identified in the SEA was eight years. Therefore, except in the rarest of circumstances, source operation beyond the ten years immediately preceding a modification would not serve as a reasonable baseline; virtually all baselines would be based on source operation within the five years immediately preceding the modification.

It is improbable then that baseline emissions selected under Montana's rule would ever be as high as would be selected under the 2002 EPA rule. At most,

PL-0014495

Montana's rules would allow a baseline which is as high as the EPA rule. More likely, the baseline would be higher under the EPA rule because it assures that the applicant can go back to a peak which is ten years past. In the case of a steadily declining business cycle, Montana's rule would generally take the applicant back less than halfway to the peak.

Though not an environmental concern, EPA has raised the issue of certainty and predictability of outcome as a factor which might prevent a source owner from pursuing a modification. Under Montana's rule, the outcome is assured if the applicant selects the two years just prior to the implementation of the change. Also, an applicant has the opportunity to select the timing of a modification and can conduct it near a peak if so desired.

Montana's rules would typically result in a lower baseline than under EPA's NSR Reform rules but would never result in a higher baseline. Moreover, Montana accomplishes this in a manner which does not unduly burden the applicants. Therefore, Montana's rule for determining the baseline is at least as stringent as EPA's.

B.  Applicability Test

The difference between the baseline emission rate and the post-change emission rate is compared to a pre-determined level of emissions, the significance level, to determine if the modification is major. If the difference exceeds the significance level, the calculation may be refined to include net emissions reductions at the facility. This is the applicability test used to determine if a physical or operational change at a major source results in a major modification.

Prior to NSR Reform, the emissions difference was determined by comparing the actual emissions prior to the change to the potential emissions after the change. This is referred to as the "actual-to-potential" applicability test.

The NSR Reform rule adopts an "actual-to-projected-actual" applicability test. This test compares the actual emissions before the change to the expected actual emissions after the change. However, the NSR Reform rule retains the actual-to-potential test as an option. EPA retained this option because it recognized that the record-keeping burden for demonstrating compliance with the future actual emission rates might be considered by some to be too burdensome.

A source owner will evaluate all options when making an application and will use the least stringent option available. EPA's rule allows a source to use either applicability test. Therefore, if the actual-to-future-actual test were more stringent, the source owner would likely elect to use the actual-to-potential option. Because EPA allows this choice, the NSR Reform approach is less stringent than the Montana requirement.

The WEPCO ruling, made prior to 2002, allowed utilities to use an actual-to-projected-actual emissions test based on projected future emissions. Utilities remain unaffected by the rule changes as both the Montana (through policy) and

5

federal rules continue to apply the WEPCO rule to utilities. Therefore, most sources in Montana, including EGUs, will be unaffected by this rule change.

The change to the applicability test affects only existing major sources that implement a change and that will not increase actual emissions but would show an increase using the actual-to-potential test. According to the SEA, there are two possibilities for such a source.

One possibility is to avoid major NSR applicability by stipulating to an emissions limit that does not trigger major source review. Under the prior federal rules, and under the existing Montana NSR rules, the procedure for doing this is to accept a permit limit. Under the NSR Reform rules the source can stipulate to the new limit and avoid the permit process by keeping emissions records for five to ten years to show that the emissions did not exceed the threshold. EPA has asserted that significant administrative savings result from removing such a source from the NSR permit process. MDEQ disagrees. The permit review process sets up record keeping requirements in a clear and predetermined manner specific to the source. The permit process avoids future difficulties and ambiguities. In the SEA, EPA correctly states that, for such sources, no environmental benefit is gained by the change to this test.

The second possibility is that the source does not stipulate to the emission limit, and instead undergoes NSR for a major modification. EPA concedes that no environmental benefit is gained by its rule change in this case either.

EPA has asserted that the environmental benefit from the change in the test will result from: removing disincentives to implementing beneficial changes; and removing incentives to increase emissions just prior to a modification. Montana has long been aware of these concerns and, as discussed below, addresses them appropriately, efficiently, and effectively.

With respect to EPA's concern that the actual to potential applicability test creates a disincentive to implementing beneficial change, ultimately economics dictates whether a business decides to implement any change at a facility. A business must weigh the costs of implementing a change at a facility, and among the costs the facility must weigh is the cost of implementing pollution control measures. Montana's businesses know this, and know that MDEQ is available to discuss the procedures and expectations prior to submitting a permit application. By taking a role in this process, once the decision to invest in the facility is made, MDEQ can assure that the most appropriate control measures are implemented. This process prevents a source from implementing a less stringent control measure than might occur without MDEQ's input. So many factors affect a decision to modify a facility that it is unreasonable to attribute Montana's rules as an inhibition to beneficial change.

In the SEA, EPA claims that the actual-to-potential-test provides an incentive for a business to keep emissions high so that the source retains a high baseline emission rate. This concern is mitigated by real business needs. The source must first have the capability of increasing its emissions in a cost-effective way. For example, sources with fuel switching capabilities - those most ready to exploit this situation - are going to consider both the cost of switching fuels and the

6

likelihood that the reviewing authority will approve the resulting increases as representative. Furthermore, in many cases, it can be expected that the highest production rates, and, hence, emission rates, will occur in the two years prior to implementing a change, as equipment investments are typically preceded by production increases resulting from expanding business. Further, there are other disincentives for increasing emissions simply for the sake of increasing the baseline, including increased emissions fees and lost opportunity to net out of major source review.

On certain occasions, sources will find loopholes to the regulations and will make their best effort to take advantage of them. However, these opportunities are minimized by requiring review by MDEQ, an opportunity missed by EPA in its approach to streamlining. MDEQ's review evaluates the applicant's claims against the record of the facility's annual emissions and the results of MDEQ's frequent inspections. MDEQ's NSR rules further reduce the opportunity for loopholes by minimizing the time frame over which the emissions baseline is considered.

In the SEA, EPA's overall assessment of NSR Reform is that it is likely to be environmentally beneficial, but only to a small extent. The basis for this claim is EPA's assertion that NSR Reform will induce sources to make beneficial changes that they would not otherwise make because the permit process discourages such changes. However, to the extent that EPA really believes this, it is merely unsupported speculation. MDEQ's implementation of the applicability test is at least as stringent as EPA's because it covers more sources.

C.  Plantwide Applicability Limits (PALs)

The last element under stringency review, Plantwide Applicability Limits (PALs), allows facilities to establish a cap on emissions and trade increases or decreases under the cap. Any modifications to a unit that maintain the source's emissions under the cap do not trigger major NSR requirements. The source owner can look back ten years to select the highest level of emissions for setting the PAL.

In the preamble to the NSR Reform rule [at 67 FR 80207], EPA describes the PAL as a voluntary tool that allows the applicant to make rapid changes to its facility, provided it does not exceed the PAL. MDEQ does not believe that the NSR Reform PAL represents anything other than a specification as to how a PAL is established and implemented, since Montana's NSR rules (federal NSR rules prior to December 31, 2002) do not specifically preclude the establishment and implementation of a PAL. In fact, MDEQ has previously issued a PAL under the existing NSR rules.

EPA bases its findings on an examination of six facilities and concludes "in a cap-based program sources strive to create enough headroom for future expansions by voluntarily controlling emissions." EPA goes on to say that:

> Based on results of these [six] pilot projects, we believe that PALs will over time tend to shift growth in emissions to cleaner units, because the growth will

PL-0014498

> have to be accommodated under the PAL cap. Specifically, we expect that PALs will encourage [a source owner] to undertake such projects as: replacing outdated, dirty emissions units with new, more efficient models; installing voluntary emissions controls; and researching and implementing improvements in process efficiency and use of pollution prevention technologies so that you can maintain maximum operational flexibility. We also expect that you and the reviewing authority will need to devote substantially fewer resources to discussing and reviewing whether major NSR applies to individual changes. Thus overall, we believe that PALs will prove to be as beneficial to the environment as they are to you and your reviewing authority [67 FR 80207-80208].

EPA's assertion that the availability of a PAL will result in net environmental benefits nationwide is based on a case study approach involving six large manufacturing facilities. However, these facilities are not representative of the businesses located in Montana. One facility in the study, Minnesota Mining and Manufacturing (3M), once had potential VOC emissions of 65,000 tons per year. Under the flexible permit, the PAL limited 3M's actual emissions to 4,283 tons of VOCs per year. It is not clear that the availability of the PAL was a motivating factor for these reductions. In the case of 3M, the SEA cites the value of the Clean Unit rule, which is no longer a viable option. Moreover, EPA does not appear to weigh the incentive that the 1990 Amendments to the Clean Air Act may have played in 3M's decision to install air pollution control equipment. Such incentives may have included avoidance of Title V fees and existing or expected regulations, such as National Emissions Standards for Hazardous Air Pollutants. Regardless, manufacturing facilities of the sizes and categories considered by EPA in the SEA are not characteristic of the Montana business environment. Montana's business environment is natural resource oriented, and manufacturing does not make up a significant portion of Montana businesses.

The entire State of Montana point source inventory contains on the order of 7500 tons per year (tpy) of VOCs with less than 4000 tpy emitted by major NSR sources. Therefore, the conclusions EPA makes with respect to reductions resulting from PALs are not appropriately generalized to Montana, and thus, PALs cannot be expected to provide the same environmental benefit.

Finally, as stated previously, Montana's NSR rules (federal NSR rules prior to December 31, 2002) do not preclude the establishment and implementation of a PAL, and MDEQ has previously issued a PAL under the existing NSR rules. Nevertheless, MDEQ has not received any additional requests for use of the PAL option. This leads MDEQ to believe that Montana businesses as a general rule do not need the PAL as a means to obtaining permit flexibility.

Therefore, MDEQ does not expect that a significant number of its regulated major NSR sources would assume a PAL. Coupled with the significant administrative overhead required to establish and implement the program, MDEQ concludes that the PAL program established by the NSR Reform program would not be any more effective in Montana than the MDEQ's current rules and policies. Notably, the EPA rule allows the State to deny any petition for a PAL [40 CFR 51.165(f)(1)(i) "The reviewing authority *may* approve the use of an actuals PAL for any existing major stationary source…" and 40 CFR 51.166(w)(1)(i) "The reviewing authority *may* approve the use of an actuals PAL

PL-0014499

for any existing major stationary source..." (emphasis added)]. Moreover, the existing Montana NSR rules achieve many of the same goals of the PAL without the additional administrative burden. Therefore, the Montana NSR program is at least as stringent as that devised by the NSR Reform rule.

### III. Conclusions

The 2002 NSR Reform rule was directed at improving the ability of existing major sources to cope with the requirements imposed by major NSR review. The rule included five elements, which were meant to work together. Due to court rulings, only three of the elements remain. Of these, the EPA attributed negligible environmental benefit on a national scale to two, baseline emissions calculation and the major modification applicability test. The third element, PALs, is optional and is already allowable under the existing Montana NSR rules.

Nationally, major modifications account for only 20% of NSR permit actions. In Montana, all major modifications and minor permitting actions at major sources go through minor NSR permitting as well, including a minor source best available control technology (BACT) requirement (ARM 17.8.752). Nevertheless, as demonstrated through the following analysis, Montana's existing and SIP approved major NSR program is as stringent as, or more stringent than, the federal NSR Reform program.

Montana strives to provide a predictable regulatory environment for business. The preceding analysis demonstrates that adopting the NSR Reform rule changes will not enhance that predictability or improve the environment of Montana. Each time Montana implements a new or revised rule, significant ongoing overhead must be invested: new policies must be established; existing policies must be revisited; application forms must be revised; enforcement actions must be reviewed; and training must be implemented. This cost must be weighed against any environmental benefit that might result from a rule change. EPA's national scale assessment of the benefits of NSR Reform, according to the SEA, show speculative and only minor environmental benefits. MDEQ's assessment of the NSR Reform rules, as they might be applied in Montana, show that no environmental benefit would occur. Therefore, MDEQ cannot justify implementing the rules.

Montana's existing NSR program baseline emissions approach and applicability test each are at least as stringent as, or more stringent than, as those of the NSR Reform program. Also, MDEQ the existing Montana NSR program provides flexibility in a manner well suited to Montana sources and regulates emissions from a broader range of sources, often without the need for a permit. In addition, PALs, which EPA intended to provide flexibility to sources in an effort to reduce the number of major modifications, are already allowed under Montana's existing and SIP approved NSR rules. Further, because the PAL provisions specified under NSR Reform are optional, MDEQ's approach to flexibility is at least as stringent as that of the NSR Reform rule. Pursuant to this analysis of Montana's EPA approved NSR program, Montana exercises its right to retain the existing language and focus efforts on attaining air quality goals rather than pursuing an optional, no more stringent, regulatory revision.