IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| SIERRA CLUB and MONTANA ENVIRONMENTAL INFORMATION CENTER,<br><br>Plaintiffs,<br><br>v.<br><br>TALEN MONTANA LLC, AVISTA CORPORATION, PUGET SOUND ENERGY, PORTLAND GENERAL ELECTRIC COMPANY, NORTHWESTERN CORPORATION, and PACIFICORP,<br><br>Defendants. | Case No: CV 13-32-BLG-DLC-JCL |

**UNITED STATES' *AMICUS CURIAE* BRIEF IN RESPONSE TO DEFENDANTS' AUGUST 31, 2015 NOTICE OF SUPPLEMENTAL AUTHORITY**

**INTRODUCTION**

The United States submits this brief in response to Defendants' Notice of Supplemental Authority, filed on August 31, 2015, which addresses the significance of the Environmental Protection Agency's (EPA) application of a

regulatory exception for "routine maintenance, repair or replacement" in another case. The proper interpretation of that regulatory exception is a central issue in the instant case. In support of their positions, both Plaintiffs and Defendants cite to a May 23, 2000, letter that EPA issued to the Detroit Edison Company (the "Detroit Edison determination"). Dkt. 64-4. The routine maintenance exception is discussed in the Detroit Edison determination.

Shortly after the Detroit Edison determination was issued, it was challenged in the D.C. Circuit on the ground that is was a new EPA policy. *Utility Air Regulatory Group v. EPA*, No. 01-1064 (D.C. Cir.) (*UARG v. EPA*). Defendants, in their Notice of Supplemental Authority, point to EPA's briefs seeking to dismiss or transfer that D.C. Circuit challenge, arguing that the United States' position in *UARG v. EPA* supports Defendants' claims that the Detroit Edison determination does not accurately reflect the Agency's routine maintenance policy and that it would be inappropriate to apply the Detroit Edison determination's underlying logic to this case. The United States submits this brief to assist the Court in resolving the dispute regarding the impact of those D.C. Circuit briefs and the proper weight to be given to the Detroit Edison determination.

## INTERESTS OF THE UNITED STATES

Congress has entrusted EPA with implementing the Prevention of Significant Deterioration (PSD) program. *See New York v. EPA*, 413 F.3d 3, 23

2

(D.C. Cir. 2005). Beyond EPA's generalized interest in proper implementation of the PSD program, this case has spawned a specific dispute regarding EPA's interpretation of a specific regulatory provision – the exception from PSD applicability for "routine maintenance, repair or replacement." *See* 40 C.F.R. § 51.166(b)(2). Not only does EPA have an interest in the consistent application of its policy, but this dispute centers on the meaning of previous EPA briefs filed in another case, and we have a strong interest in ensuring that the previous EPA briefs are not misinterpreted.

## DISCUSSION

The PSD provisions of the Clean Air Act apply to certain new sources of air pollution, as well as existing sources that undergo any physical or operational change that will increase the amount of air pollution from the source. *See New York*, 413 F.3d at 13; *Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901, 905 (7th Cir. 1990). Plaintiffs describe the Detroit Edison determination as EPA's "definitive statement on routine maintenance." Dkt. 247 at 5. Defendants, however, rely on EPA's briefs seeking dismissal of *UARG v. EPA* to argue that the Detroit Edison determination "does not supply the 'substantive law' of this case." Dkt. 261 at 2.

EPA sometimes conducts determinations to assess the applicability of certain aspects of the Clean Air Act to a particular facility. For example, such

3

determinations may be used to assess whether proposed construction would subject the facility to PSD requirements. These determinations, by their nature, are made on a case-by-case basis. On May 23, 2000, EPA issued such a determination to the Detroit Edison Company, where EPA applied its regulations to the impact of a specific project (the Dense Pack project) at a specific power plant (the Monroe Power Plant), and required Detroit Edison to do additional analysis to assess whether that project would trigger PSD permitting requirements. Dkt. 64-6 at 6, 22. Defendants' Notice of Supplemental Authority cites to EPA briefs filed in 2001 in an attempt to undermine Plaintiffs' reliance on that determination.

The Detroit Edison determination is an application of EPA's policy on routine maintenance. It was not EPA's first application of that policy,[1] nor even the most recent.[2] But shortly after the Detroit Edison determination was issued it was challenged in the D.C. Circuit in *UARG v. EPA* on the grounds that it was a new EPA policy. Defendants here point to EPA's briefs seeking to dismiss or transfer that challenge as support for Defendants' claim in this case that the Detroit

---

[1] *See, e.g.*, Letter from David Howekamp, EPA Region IX, at 3-6 (Nov. 6, 1987) (Ex. A); Memo from Don Clay, Acting EPA Ass't Adm'r (Sept. 9, 1988) ("Routine maintenance, repair, or replacement generally means regular, customary, or standard undertakings for the purpose of maintaining the plant/unit in its present condition.") (attached as Ex. B). Letter from Charles Whitmore, EPA Region VII, at 1 (Nov. 28, 1989) (Ex. C).

[2] *See, e.g., In re Tenn. Valley Auth.*, Petition No. IV-2010-1 (May 2, 2011) (Ex. D).

4

Edison determination does not accurately reflect the Agency's routine maintenance policy or that it would be inappropriate to apply the logic of the Detroit Edison determination to this case. The brief actually states the exact opposite. Since the policy presented in the Detroit Edison determination was not new when the determination was issued, EPA informed the court that the determination could not be challenged in the D.C. Circuit as a new policy. Thus, EPA's briefing to the D.C. Circuit highlights—rather than undermines—that the Detroit Edison determination is but one more example of EPA's application of its longstanding routine maintenance policy, which has been in full force and effect for decades.

The precise question in *UARG v. EPA* was whether UARG's challenge to the Detroit Edison determination had to be brought in the Sixth Circuit, rather than the D.C. Circuit, under the Clean Air Act's jurisdictional provisions. Under the Clean Air Act, judicial review of final actions taken by EPA under the Clean Air Act is governed by Section 307(b)(1). 42 U.S.C. § 7607(b)(1). *See generally Harrison v. PPG Indus.*, 446 U.S. 578 (1980). Challenges to "nationally applicable" actions may be filed "only in the United States Court of Appeals for the District of Columbia." *Id.* On the other hand, petitions for review that challenge final agency action that is "locally or regionally applicable" may be filed only in the United States Court of Appeals for the appropriate circuit. *Id.*

UARG sought review in the D.C. Circuit, arguing that the Detroit Edison determination was a new interpretation of the routine maintenance exception, and was thus a nationally applicable interpretive rule under 42 U.S.C. 7607(b)(2). *See* UARG Brief, at 10 (Doc. 261-2, at 11). As EPA explained in seeking to dismiss the challenge, the interpretation of the routine maintenance exception expressed in Detroit Edison was not new,[3] and the determination itself, like any other source-specific determination, was directly applicable only to Detroit Edison. Thus, jurisdiction lay solely in the Sixth Circuit. *See, e.g.*, EPA Reply Brief, at 5-7 (Doc. 261-3, at 6-8).[4]

The *UARG v. EPA* briefing thus did nothing to undercut EPA's authoritative interpretation of the routine maintenance exception as reflected in the Detroit Edison determination. To the contrary, EPA specifically stated in its *UARG v. EPA* briefing that the routine maintenance *interpretation* applied in Detroit Edison was "the same test EPA has consistently applied to applicability determinations . . . ." EPA Reply Brief, at 5 (Doc. 261-3, at 6); *see also id.* at 7 ("the determination is simply a statement of what EPA believes its current regulations mean as applied to the Detroit Edison's proposed Dense Pack project for its Monroe Plant.").

---

[3] *See e.g.*, *United States v. Southern Indiana Gas and Electric Company*, 2002 WL 31427523 *9-*10 (S.D. Ind. 2002) (acknowledging that EPA applied a previously developed test, "the WEPCO test," to the Detroit Edison project).
[4] The D.C. Circuit ultimately dismissed this challenge. *See* July 10, 2001 Order in *UARG v. EPA*, Case No. 01-2064 (D.C. Cir.) (Ex. E).

6

Moreover, while the Detroit Edison determination itself was directly applicable only to Detroit Edison, EPA has continued to rely upon the Detroit Edison determination as an example of its long-standing narrow interpretation of the routine maintenance exception. *See, e.g., In re Tenn. Valley Auth.*, Petition No. IV-2010-1 (May 2, 2011) (Doc. 164-8).

## CONCLUSION

EPA's Detroit Edison determination is highly relevant to the issue of whether the particular facts of this case constitute a "routine maintenance, repair, or replacement." For the reasons discussed above, EPA's briefs seeking to dismiss or transfer *UARG v. EPA* do nothing to undermine that relevance.

Dated: September 24, 2015

Respectfully Submitted,

JOHN C. CRUDEN
Assistant Attorney General

MATTHEW R. OAKES
Trial Attorney
U.S. Department of Justice
Environment & Natural Resources
   Division
Law and Policy Section
P.O. Box 7415, Ben Franklin Station
Washington, D.C. 20044-7415
Telephone: (202) 514-2686
Fax: (202) 514-4231

Email: Matthew.Oakes@usdoj.gov

MICHAEL W. COTTER
United States Attorney
VICTORIA FRANCIS
Assistant United States Attorney
U.S. Department of Justice
2601 2nd Ave. N.
Box 3200
Billings, MT 59101
Telephone: 406-247-4633
Email: Victoria.Francis@usdoj.gov

*Attorneys for the United States*