| | |
|---|---|
| William Bumpers (admitted *pro hac vice*)<br>Joshua B. Frank (admitted *pro hac vice*)<br>David Super (admitted *pro hac vice*)<br>Megan H. Berge (admitted *pro hac vice*)<br>Baker Botts L.L.P.<br>1299 Pennsylvania Avenue, NW<br>Washington, DC 20004<br>Telephone: (202) 639-7700<br>Fax: (202) 639-7890<br><br>**COUNSEL FOR DEFENDANTS**<br><br>Stephen R. Brown<br>Garlington, Lohn & Robinson, PLLP<br>350 Ryman Street<br>Missoula, Montana 59802<br>Telephone: (406) 523-2500<br>Fax: (406) 523-2595<br><br>**COUNSEL FOR AVISTA CORPORATION AND PACIFICORP** | William W. Mercer<br>Michael P. Manning<br>Holland & Hart LLP<br>401 North 31st Street, Suite 1500<br>P.O. Box 639<br>Billings, Montana 59103-0639<br>Telephone: (406) 252-2166<br>Fax: (406) 252-1669<br><br>**COUNSEL FOR TALEN MONTANA, LLC, PUGET SOUND ENERGY AND PORTLAND GENERAL ELECTRIC COMPANY**<br><br>Stephen D. Bell<br>Dorsey & Whitney LLP<br>Millennium Building<br>125 Bank Street, Suite 600<br>Missoula, Montana 59802-4407<br>Telephone: (406) 721-6025<br>Fax: (406) 543-0863<br><br>B. Andrew Brown (admitted *pro hac vice*)<br>Dorsey & Whitney LLP<br>50 South Sixth Street, Suite 1500<br>Minneapolis, Minnesota 55402<br>Telephone: (612) 340-2600<br>Fax: (612) 340-2868<br><br>**COUNSEL FOR NORTHWESTERN CORPORATION** |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| SIERRA CLUB and MONTANA ENVIRONMENTAL INFORMATION CENTER,<br><br>    Plaintiffs,<br><br>vs.<br><br>TALEN MONTANA LLC, AVISTA CORPORATION, PUGET SOUND ENERGY, PORTLAND GENERAL ELECTRIC COMPANY, NORTHWESTERN CORPORATION, PACIFICORP,<br><br>    Defendants. | Case No: CV 13-32-BLG-DLC-JCL<br><br><br><br><br>**DEFENDANTS' RESPONSE TO UNITED STATES' AMICUS CURIAE BRIEF IN RESPONSE TO DEFENDANTS' AUGUST 31, 2015 NOTICE OF SUPPLEMENTAL AUTHORITY** |

EPA's *Amicus Curiae* brief ("*Amicus*") (Doc. 264) underscores that Plaintiffs' motion for summary judgment on RMRR should be denied and that the RMRR issue should be decided only after this Court hears and considers all of the evidence at trial.

To place the *Amicus* in context, it is instructive to briefly review the parties' respective positions on the RMRR standard. According to Plaintiffs, the Detroit Edison applicability determination provides "the substantive law" of this case. Doc. 247 at 35; Doc. 248 ¶¶ 256-60. Plaintiffs argue that the Court should assess the frequency factor of the *WEPCO* test by considering activities conducted at the specific Colstrip units as well as at typical units in the electric utility industry, but by *disregarding* activities in the electric utility industry at large. Further, Plaintiffs ask the Court to strictly apply the 14 factors listed in Detroit Edison and draw any inferences from those factors against a finding of routineness. Doc. 162 at 9-12; Doc. 247 at 35-45.

Defendants, in contrast, ask the Court to apply the "compromise" RMRR standard adopted by the majority of courts, which considers "***all*** of the WEPCO factors, including frequency, taking into consideration [i] the work conducted at the particular [Colstrip] unit, [ii] **the work conducted by others in the industry**, and [iii] the work conducted at other individual units within the industry." *United States v. Duke Energy Corp.* ("*Duke V*"), 5 F. Supp. 3d 771, 776 (M.D.N.C. 2014)

(citations and internal quotes omitted) (emphasis added).[1] *See also* Doc. 198 at 18-23 (discussing other cases adopting the majority view). Under the cases adopting the majority view, routineness is assessed by applying the standard *WEPCO* factors—(i) nature, (ii) extent, (iii) purpose, (iv) frequency, and (v) cost (*id.*). No case has applied the 14 factors introduced in Detroit Edison.

The *Amicus* supports the application of the RMRR standard that has been adopted by the majority of courts.

1.   Plaintiffs' reliance on Detroit Edison as providing "the substantive law" that is binding in this case (Doc. 247 at 35) is inconsistent with EPA's position in 2001 that Detroit Edison "is not binding on EPA or the regulated public in any determination regarding the supposed routine maintenance at another plant." Doc. 261, Ex. 3 at 7. Plaintiffs say they "cannot fathom how sophisticated regulated entities such as the Defendants" with knowledge of EPA's interpretation in Detroit Edison would not view it as binding. Doc. 247 at 13. But EPA expressly rejected as "crystal ball gazing" the notion that "others may use EPA's determination in [Detroit Edison] to predict the Agency's actions in other settings." Doc. 261, Ex. 3 at 7. That is exactly what Plaintiffs urge here: they seek to apply Detroit Edison as the binding, substantive law on "the supposed routine

---

[1] It should be noted that *Duke V* is another recent case denying summary judgment on RMRR. *Duke V*, 5 F. Supp. 3d at 776-78. *See* Doc. 198 at 38-42 (discussing seven other cases denying summary judgment on RMRR).

2

maintenance at another plant"—Colstrip—and contend that Defendants *should* have "use[d] EPA's determination in [Detroit Edison] to predict" how RMRR would be applied to the Colstrip projects at issue. Doc. 261, Ex. 3 at 7. Consistent with Defendants' analysis of the history of the RMRR standard in the summary judgment briefing (Doc. 198 at 7-17), and the cases adopting the majority view on RMRR (*id.* at 18-26), the UARG briefing simply underscores that Defendants and the rest of the utility industry had legitimate reasons to *not* view Detroit Edison as the binding, "definitive statement on routine maintenance" at the time the projects were done.[2]

2. Regarding the majority-view cases, Plaintiffs acknowledge "that there are two lines of district court cases, and those lines strongly diverge," and Plaintiffs criticize the line of cases that considers evidence of routineness in the electric utility industry at large to be relevant under each of the *WEPCO* factors. Doc. 247 at 21. Instead, Plaintiffs urge the Court to disregard Defendants' evidence of routineness in the industry under each *WEPCO* factor. *Id.* at 35-45 (arguing for each *WEPCO* factor that Defendants' industry evidence is "uniformly

---

[2] The *Amicus* repeatedly states that the thrust of UARG's challenge was that Detroit Edison was a "new" policy. Doc. 264 at 2-5. While EPA's interpretation in Detroit Edison was certainly new, the real thrust of UARG's challenge was that Detroit Edison purported to be a binding policy with national applicability (Doc. 261, Ex. 2 at 9, 11, 18)—the position that Plaintiffs take in this case. EPA's UARG brief confirmed that Detroit Edison is *not* binding and does *not* apply nationally.

3

immaterial").[3] EPA has *not agreed* with Plaintiffs' position. Although it is not mentioned in the *Amicus*, EPA is taking the opposite position in ongoing litigation. In its litigation against Ameren Missouri in the Eastern District of Missouri ("Ameren litigation"), EPA alleges that various replacement projects constituted PSD violations. Like this case, the disputed projects in the Ameren litigation occurred after the Detroit Edison letter. In the Ameren litigation, EPA agreed that evidence of industry practices is relevant to the analysis under each of the five *WEPCO* factors, and EPA proposed to stipulate to the same three-pronged "compromise" standard adopted in *Duke IV* and the other majority-view cases. *See U.S. v. Ameren Missouri*, No. 4:11-cv-00077-RWS, Stipulation and Proposed Order on the Applicable Legal Test for Applying the "Routine Maintenance, Repair, and Replacement" Exception at ¶ 4 ("Draft Stipulation") (attached hereto as Ex. 1) (EPA offering to stipulate to RMRR standard that considers *all WEPCO* factors by looking at (i) work at the units at issue, (ii) work in industry at large, and (iii) work at typical units in the industry). Although EPA took the position that, for the frequency factor alone, evidence of work at a "typical" unit is the "central

---

[3] In addressing the frequency factor, Plaintiffs completely disregard activities in the industry at large, and, although they purport to focus on whether projects "recur" at "the typical unit" in the industry (Doc. 162 at 40-41), their RMRR expert, Scott Trantham, failed to offer any such analyses or opinions regarding the typical unit. Trantham Dep. at 254:1-12, 256:21-257:3 (Trantham looked solely to number of times components were replaced at *Colstrip units at issue*) (Doc. 199, Ex. 58).

4

question"—a position that conflicts with the view of the majority of cases—there is no question that, unlike Plaintiffs here, EPA acknowledged that evidence of work practices in the industry at large is material to the analysis under each of the *WEPCO* factors and should be considered by a court assessing routineness. Draft Stipulation, Ex. 1, ¶ 4. Thus, Plaintiffs are wrong that such industry evidence should be ignored, particularly on summary judgment.

3. Plaintiffs seek to side-step the majority-view cases by arguing that "[n]one of those cases involved projects that occurred after EPA had issued the Detroit Edison determination." Doc. 247 at 17. But the *Amicus* directly undercuts Plaintiffs' reliance on the timing of the projects by stating that Detroit Edison simply applies the same RMRR standard applied by EPA from the beginning of the NSR program. *Amicus* at 5 (Asserting that Detroit Edison "is but one more example of EPA's application of its longstanding routine maintenance policy, which has been in full force and effect for decades."). Assuming that is true, then there is no basis for a distinction between the application of the RMRR standard to projects that occurred before the Detroit Edison determination versus projects occurring after Detroit Edison. The cases adopting the majority view on the RMRR standard *did* carefully assess the standard that was being espoused by EPA in the years before issuing Detroit Edison, and those cases adopted the standard Defendants advocate here. *See* Doc. 198 at 18-23 (discussing cases). Moreover, in

agreeing in the Ameren litigation to stipulate to a standard that treats industry evidence as relevant, EPA relied upon one of the cases (the *Duke IV* case) from the line of cases that Plaintiffs now say should be disregarded because it dealt with projects that pre-date Detroit Edison. Ex. 1 at ¶ 4. In sum, Plaintiffs' effort to distinguish the cases adopting the majority view on the RMRR standard based on the timing of the projects at issue in those cases is baseless.

4. Finally, in the *Amicus*, EPA studiously avoids any statement even remotely suggesting that the 14 factors listed in Detroit Edison *must* be applied in this case (or in any other case) or, more importantly, *must* be given the dispositive treatment that Plaintiffs demand here. In the UARG case, EPA disputed UARG's argument that the 14 factors had binding, national applicability, by emphasizing that its Federal Register notice regarding the Detroit Edison letter "clearly states that EPA's determination was based on 'the nature, extent, purpose, frequency, and cost of the work, as well as other relevant factors"—in other words, the standard *WEPCO* factors that Defendants ask this Court to apply. *See* EPA Reply at 4-5 (Doc. 261, Ex. 3). Moreover, EPA further emphasized in its UARG brief that the 14 factors (or "detailed analysis") in Detroit Edison were "<u>not</u> published in the Federal Register." *Id.* at 5 (emphasis supplied by EPA). Defendants make the same point here—the Detroit Edison letter is not binding and the discussion of the 14 factors was not published in the Federal Register. *See* Doc. 198 at 30-31. Thus,

there is no support for Plaintiffs' position that the 14 factors from Detroit Edison—as opposed to the standard five *WEPCO* factors—*must* be applied by this Court as *the* binding standard from which specific inferences *must* be drawn.

Dated: October 8, 2015

  /s/ William W. Mercer
William W. Mercer
**COUNSEL FOR TALEN MONTANA, LLC, PUGET SOUND ENERGY AND PORTLAND GENERAL ELECTRIC COMPANY**

  /s/ Stephen R. Brown
Stephen R. Brown
**COUNSEL FOR AVISTA CORPORATION AND PACIFICORP**

  /s/ Stephen D. Bell
Stephen D. Bell
**COUNSEL FOR NORTHWESTERN CORPORATION**

  /s/ Joshua B. Frank
Joshua B. Frank (admitted *pro hac vice*)
**COUNSEL FOR DEFENDANTS**