Roger Sullivan
McGarvey, Heberling, Sullivan & McGarvey, P.C.
345 1st Ave E.
Kalispell, Montana   59901-5341
(406) 752-5566
RSullivan@McGarveyLaw.com

John Heenan
Bishop & Heenan
3970 Avenue D, Suite A
Billings, Montana   59102
(406) 839-9091
john@bishopandheenan.com

Counsel for Plaintiffs (Other Counsel Listed Below)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| SIERRA CLUB and MONTANA ENVIRONMENTAL INFORMATION CENTER,<br><br>               Plaintiffs,<br><br>       v.<br><br>TALEN MONTANA LLC, AVISTA CORP., PUGET SOUND ENERGY, PORTLAND GENERAL ELECTRIC CO., NORTHWESTERN CORP., and PACIFICORP,<br><br>               Defendants. | Case No. 1:13-cv-00032-DLC-JCL<br><br>PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATIONS OF U.S. MAGISTRATE JUDGE OF DECEMBER 31, 2015 (Doc. 277) |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

EXHIBIT INDEX ................................................................................... iv

INTRODUCTION .................................................................................... 1

ARGUMENT .......................................................................................... 2

I.     Because EPA Does Not Interpret its Own PSD Regulations To Allow an Air Pollution Source to Select its Own Alternate Baseline Without Approval by the Agency, Defendants Were Required To Obtain Approval From The Agency Before Using Their Desired Alternative Baseline for the Unit 3 Reheater Project. .......................................................................................... 2

II.    Recommendations 2 and 3 Do Not Apply The Correct Legal Standard For Whether The Unit 1 and 4 Projects Were "Like-Kind Replacements" or Had "Begun Normal Operation" In Their Redesigned State. ........................................................... 10

     A.    A "Like-Kind Replacement" Excludes Equipment Redesign That Impacts the Equipment's Normal Operation, Even Though It Does Not Serve an Entirely Different Broadly-Defined Industrial Purpose. .................................................................. 13

     B.    The F&R Fails To Apply the Seventh Circuit's Definition of "Like-Kind Replacement," A Case-By-Case EPA Determination, Or Persuasive Authority From Every District Court To Have Actually Made A Case-By-Case "Like-Kind Replacement" Determination. ... 14

     C.    The F&R Incorrectly Applies An Alternative and Unsupported Legal Standard, Based On Whether Projections Are Theoretically Possible, Instead of The Applicable "Like-Kind Replacement" Test. ............... 17

III.    Because Recommendation 6 (Doc. 277, at 78) is Dependent on Acceptance of Recommendations 2 and 3 (Doc. 277, at 77-78), if the Court Rejects Recommendations 2 and 3, then it Should Also Reject Recommendation 6. .................................................... 21

CONCLUSION ...................................................................................... 22

CERTIFICATE OF COMPLIANCE ........................................................ 25

# TABLE OF AUTHORITIES

## Cases

*Alaska Dep't of Envtl. Conservation v. E.P.A.,*
    540 U.S. 461 ..................................................................................4

*Alabama Power Co. v. Costle,*
    636 F.2d 323 (D.C. Cir. 1979) ...............................................19, 20

*National Parks Conservation Ass'n, Inc. v. Tennessee Valley Authority,*
    618 F. Supp. 2d 815 (E.D. Tenn. 2009) ........................................7

*Puerto Rican Cement Co., Inc. v. U.S.E.P.A,*
    889 F.2d 292 (1st Cir. 1989) ........................................................20

*Safe Air for Everyone v. EPA,*
    488 F.3d 1088 (9th Cir. 2007) .......................................................7

*Sierra Club v. Morgan*, No. 07-C-251-S 2007 U.S. Dist. LEXIS 82760,
    2007 WL 3287850 (W.D. Wis. 2007) .....................................15, 16

*United States v.Duke Energy Corp.,*
    981 F. Supp. 2d 892 (M.D.N.C. 2013) ....................................7, 11

*United States v. DTE Energy Co.,*
    711 F.3d 643 (6th Cir. 2013) .........................................................8

*United States v. Murphy Oil USA, Inc.,*
    143 F. Supp. 2d 1054 (W.D. Wis. 2001) ...............................15, 16

*United States v. Ohio Edison,*
    276 F. Supp. 2d 829 (S.D. Ohio 2003) .........................................7

*United States v. Westvaco Corp.,*
    2010 U.S. Dist. LEXIS 113333 (D.Md., Sept. 1, 2010) ........15, 16

*Wis. Elec. Power Co. v. Reilly,*
    893 F.2d 901 (7th Cir. 1990) ...............................................14, 16

**Rules, Regulations, and Federal Register Notices**

40 C.F.R. § 52.21(r)(6)(ii) (2013) ..........................................................8

57 Fed. Reg. 32,314 (July 21, 1992) ...............................3, 9, 15, 17, 18

61 Fed. Reg. 38,250 (July 23, 1996) ......................................................5

67 Fed. Reg. 80,186 (Dec. 31, 2002) .....................................................5

ARM 17.8.801(1) .....................................................................................9

ARM 17.8.804 ........................................................................................20

ARM 17.8.820 ........................................................................................20

**EXHIBIT INDEX**

December 1, 2015 Hearing Transcript ......................................Doc. 278-1

Excerpt New Source Review Workshop Manual (Draft Oct. 1990) .......Doc. 278-2

Excerpt Montana Board of Environmental Review (June 5, 2003) .........Doc. 278-3

**INTRODUCTION**

Pursuant to Fed. R. Civ. P. 72(b)(2) and D. Mont. L.R 72.3, Plaintiffs respectfully object to portions of the Findings and Recommendations ("F&R") of Judge Lynch of December 31, 2015 (Doc. 277)[1] that:

 (1) Defendants were not required to obtain approval from MDEQ a two-year baseline period that is outside the five-year period immediately preceding the date actual construction began for the Unit 3 Reheater Project (Doc. 277, at 48);

(2) Claims 1 and 2 be dismissed in their entirety;

(3) the Unit 1 and 4 turbine and Unit 1 economizer redesign and replacement projects had "begun normal operations" in their redesigned state as "like kind replacements" because a projection of future emissions was theoretically possible; and

(4) Defendants' motion (Doc. 182) regarding aggregation be granted.

---

[1] A transcript of Judge Lynch's hearing on this matter, conducted December 1, 2015, is appended as Doc. 278-1.

# ARGUMENT

I.  <u>Because EPA Does Not Interpret its Own PSD Regulations To Allow an Air Pollution Source to Select its Own Alternate Baseline Without Approval by the Agency, Defendants Were Required To Obtain Approval From The Agency Before Using Their Desired Alternative Baseline for the Unit 3 Reheater Project</u>.

The Plaintiffs agree with most of Judge Lynch's rulings with respect to baseline selection.  (Doc. 277, at 34 – 55).  Judge Lynch correctly framed the baseline issues in the Recommendation, *id*. at 34 – 39, with one important caveat discussed in footnote 2 below.[2]  Furthermore, Judge Lynch correctly noted that for a utility such as the Colstrip plant, the baseline "must be representative of normal source operation for the unit in question" and that "any two-year baseline period in the five-year period before a project is presumed to be representative of normal source operation."  *Id*. at 36.  Judge Lynch also agreed with Plaintiffs that the five-year period runs from the date actual construction begins, *id*. at 51, and that "the

---

[2] In Doc. 277, at 38, n. 4, Judge Lynch notes that Plaintiffs acknowledge that they cannot prove a NOx increase for the economizer replacement project using the projected actual test, so to the extent that test applies, the modification claims with respect to NOx should be dismissed.  However, Claims 1 and 2 also allege modifications with respect to $SO_2$ and $PM_{2.5}$, and Plaintiffs still plan to show at trial that using the projected actual test, emission increases for those pollutants would occur.  Accordingly, Claims 1 and 2 SHOULD NOT be dismissed in their entirety.

2

baseline is properly calculated on a monthly basis rather than a calendar year basis." *Id*. at 53.

Judge Lynch erred, however, in ruling that to obtain a baseline outside the five-year period preceding the project, Defendants need not seek approval from MDEQ. *Id*. at 48. In reaching that conclusion, Judge Lynch focused on language in the WEPCO Rule preamble stating: "[s]ource owners or operators desiring to use other than a 2-year period or a baseline prior to the last 5 years *may* seek the Administrator's specific determination that such period is more representative of normal operations." *Id*. at 41-42, *quoting* 57 Fed. Reg. at 32,323. Judge Lynch concluded that by using the permissive word "may" in this sentence, the Environmental Protection Agency ("EPA") meant to give sources wishing to use alternate baselines the option to seek, or not seek, agency approval for an alternative baseline. While Judge Lynch's construction is plausible, it is not the only plausible interpretation. The word "may" can also indicate that a source has the option to *seek to use* an alternate baseline by seeking permission, not that seeking agency approval was optional if an alternate baseline is used. That is, a source owner desiring to use an alternate baseline may seek agency permission, or it may forego its desired baseline and use the default baseline instead.

3

Thus given the ambiguity of the meaning of the word "may" in that sentence, reference to other sources of EPA guidance is helpful, and review of that guidance shows that EPA has always maintained that only a permitting authority can allow use of an alternate baseline.  First in 1990, in a manual covering how to implement the PSD program, *New Source Review Workshop Manual* (Draft Oct. 1990) (hereinafter New Source Review Manual),[3] EPA stated that:

> In certain limited situations where the applicant adequately demonstrates that the prior 2 years is not representative of normal source operation, a different (2 year) time period may be used **upon a determination by the reviewing agency** that it is more representative of normal source operation.

Exhibit 278-2, New Source Review Manual, at A. 39 (emphasis added).

Second, in a 1996 proposal to revise the PSD regulations, EPA contemplated making changes to the baseline requirement, noting that for non-utility sources, EPA had been receiving complaints that its baseline approach was too restrictive. In describing its existing approach, EPA said:

> Provisions in the existing regulations which, *at the discretion of the permitting authority*, allow the use a different, ''more representative,'' period have not alleviated the problem.

---

[3] The U.S. Supreme Court cited this manual, an excerpt of which is attached as Exhibit 278-2, as authority in *Alaska Dep't of Envtl. Conservation v. E.P.A.*, 540 U.S. 461, 476 and 497 (2004).  Furthermore, in an administrative proceeding in 2004, Dave Klemp, air permitting supervisor for MDEQ, who has provided a declaration in this case for MDEQ, stated that MDEQ considers this manual to be "authoritative guidance."  Exhibit 278-3, at 100-01.

61 Fed. Reg. 38,250, 38,258 (July 23, 1996) (emphasis added).  Again, this discussion shows that the discretion to allow an alternate baseline belongs to the permitting authority, not to the pollution source itself or to a later reviewing court, and reflects no notion that a source can self-select an alternate and simply wait to be challenged in an enforcement action.

Third, as Judge Lynch noted later the F&R, (Doc. 277, at 51), the preamble to EPA's December 31, 2002 PSD rulemaking confirms that EPA was "simply codifying an already existing policy" for "calculating baseline emissions."  That already-existing policy was that only the reviewing agency has the authority to award an alternate baseline:

> The definition of ''actual emissions'' requires that a unit's actual emissions be based on a consecutive 24-month period immediately preceding the particular change. Also, however, it directs **the reviewing authority to allow the use of another time period upon a determination that it is more representative. This procedure continues to be appropriate under the pre-existing regulation** and for other NSR purposes, such as determining a source's ambient impact against the PSD increments, and we continue to require its use for such purposes.

67 Fed. Reg. 80,186, 80,192 n. 13 (Dec. 31, 2002) (emphasis added).

Finally, in a letter issued by EPA in 2011, EPA leaves no doubt that sources must obtain agency permission to use an alternate baseline:

> EPA also notes that the discretion to consider a different period for calculating baseline actual emissions for determining PSD applicability is

5

limited to applicability determinations performed by the Agency and other approved permitting authorities **and may not be invoked independently by emission sources and/or permit applicants.** *See* 40 CFR § 52.21 (b)(48)(i) (limiting use of a different time period to the *Administrator's* determination "that it is more representative of normal source operation"); 40 CFR § 51.166 (b)(48)(i) (providing same discretion to approved permitting authorities).

Doc. 192-2 (emphasis added).[4]

EPA's decision in 1992 to create a five-year baseline window for utilities was a major relaxation of the PSD applicability rules.  As Judge Lynch recognized, prior to the WEPCO preamble, EPA allowed only one possible baseline, the two-years immediately preceding the project, to be used absent permission.  (Doc 277, at 35).  By creating the presumption allowing any two years within the five years preceding the project to be used, EPA allowed utility sources to use 37 possible baseline periods without having to obtain approval from the permitting authority.  As the authorities above show, however, EPA has never allowed utilities, or any other sources, seeking an alternate baseline to simply select an alternative baseline on its own accord with plans to defend it later if an enforcement action ensues.

Hence, in a PSD enforcement action, the Southern District of Ohio refused to allow a source to use an alternate baseline since the source had failed to take the

---

[4] Plaintiffs alerted the Court to this letter in its briefing, Doc. 187, at 6, but the F&R does not discuss it.

6

issue to the reviewing agency. *U.S. v. Ohio Edison Co*., 276 F. Supp. 2d 829, 881 (S.D. Ohio 2003). Judge Lynch acknowledged the *Ohio Edison* holding, (Doc. 277, at 44), but because Judge Lynch found that other decisions contradict that holding, it appears he did not follow it. Those other decisions do not contradict the *Ohio Edison* holding, however. First, in the *Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.*, 618 F. Supp. 2d 815, 828-29 (E.D. Tenn. 2009), the question presented in *Ohio Edison* (whether the agency alone has the authority to grant an alternate baseline) was never at issue; the *National Parks* court simply assumed, without challenge, that it had the authority to choose an alternate baseline. Moreover, contrary to the Recommendation's conclusion, the holding in *U.S. v. Duke Energy Corp*., 981 F. Supp. 2d 435 (M.D.N.C. 2013) was consistent with *Ohio Edison*. In *Duke*, a PSD enforcement action, EPA as the plaintiff claimed that the two years immediately preceding the project at issue should be the baseline. The Defendant wanted to use an earlier period. The *Duke* court gave three reasons why it accepted EPA's preferred baseline, starting with EPA's position that the company can only use an alternate baseline by seeking a determination from the state. The court found that the company never obtained a determination from the state, and therefore the baseline immediately preceding the project would be used. *Id.* at 447-50.

Disregarding these cases, the Recommendation instead cites *United States v. DTE Energy Co.*, 711 F.3d 643, 649 (6th Cir. 2013) for the proposition that because the Sixth Circuit found the PSD program to be "self-effectuating," the agency "'does not contemplate agency approval of a facility's internal emissions assessment prior to construction,'" (Doc. 277, at 47, *quoting DTE* 711 F.3d at 649), therefore Defendants are not required to have a pre-approved baseline. *DTE,* however, addresses a feature of the 2002 NSR rule, 67 Fed. Reg. at 80,186, a rule never adopted in Montana, regarding the import of required projections of post-project emissions, and did not address the specific baseline issue here. The provision in question in *DTE* provides that:

> If the emissions unit is an existing electric utility steam generating unit, before beginning actual construction, the owner or operator shall provide a copy of the information set out in paragraph (r)(6)(i) of this section to the Administrator. **Nothing in this paragraph (r)(6)(ii) shall be construed to require the owner or operator of such a unit to obtain any determination from the Administrator before beginning actual construction.**

40 CFR § 52.21(r)(6)(ii) (emphasis added), *discussed in DTE*, 722 F.3d at 650. There is no similar prohibition against obtaining the Administrator's determination with respect to the alternate baseline issue here.

Moreover, "self-effectuating" does not mean self-interpreting or self-approving.  The would-be applicant has the responsibility to get a PSD permit in the first instance, but it does not have the authority to interpret the applicable standards.  A source of pollution can no more grant itself permission to use an alternative baseline without approval than it can decide to use a different threshold of emissions to determine if an increase is "significant" or by granting itself a permit.  Simply because the PSD program has been described as "self-effectuating" by the Sixth Circuit does not mean that the regulatory agencies' roles have been redelegated to the air pollution sources.

Finally, in further support of the ruling, the Recommendation notes that the regulation itself says nothing about a presumptive five-year period.  (Doc. 277, at 43).  The plaintiffs agree – the regulatory language, which refers to "a two year period which precedes the particular date," (Doc. 277, at 35, *quoting* Admin. R. Mont. 17.8.801(1)), is inherently ambiguous, begging the question, *which* two-year period should apply?  EPA has provided a reasonable interpretation to answer that question, and as discussed above, the answer is: any two-year period within the five years immediately preceding the project will presumptively be applied.  That answer comes straight from EPA through the WEPCO preamble.  (Doc. 277, at 36, *citing* 57 Fed. Reg. at 32323).  But by giving pollution sources the option to select

9

any 24 months in the preceding 60 months, EPA did not mean that the facility could also use any other baseline period without first seeking permission.  And as mentioned above, EPA has always interpreted this regulatory language to require agency approval of an alternate baseline.[5]

In summary, EPA has pre-approved 37 possible baselines as representative of normal operation (any 24 month period within the 60 months preceding the project), but if a utility wants to use an alternate baseline outside the 60 month period as representative, agency approval is required.

II.  <u>Recommendations 2 and 3 Do Not Apply The Correct Legal Standard For Whether The Unit 1 and 4 Projects Were "Like-Kind Replacements" or Had "Begun Normal Operation" In Their Redesigned State</u>.

The undisputed facts in the parties' cross-motions for summary judgment regarding the applicable method for determining an emissions increase indicate that while the projects did not change the generic purpose of the replaced equipment, the projects did redesign major components to affect the way the equipment operated.  (Doc. 277, at 21-23.)  Specifically, the Unit 1 and 4 turbine replacement projects made various changes to the turbine designs, which in turn changed the heat rate, operating pressures, solid particle erosion, maintenance

---

[5] MDEQ offered additional alternate interpretations, but the Recommendation "did not consider the merits of MDEQ's position."  (Doc. 277, at 43 n. 6).

intervals, reheat spray, power output, component life, and efficiency loss between outages.  (Doc. 277, at 21-23.)  The Unit 1 economizer replacement similarly involved design changes, including by greatly expanding the overall tube lengths, the amount of heating surface, the fin types, and tube orientations.  (Doc. 277, at 21.)  Those design changes affected how the equipment operated by reducing gas flow velocity, reducing erosion, reducing ash pluggage, changing the water side pressure drop, and the flue gas draft loss.  (Doc. 277 at 21-22.)

As the Court previously determined, the test to apply to determine which post-project emission calculation method to use depends on whether the change is "sufficiently significant" that post-project "normal operations" had not begun pre-project.  (Doc. 277, at 13, *citing* Doc. 129 at 6-11 and Doc. 112 at 43-57.)  Because this test is not specifically defined in the regulations, it is necessary to look to how EPA, who wrote the rule, defines that phrase.  (Doc. 277, at 14.)[6]  As the F&R notes, following the Seventh Circuit's "WEPCO" decision that coined the phrase "like-kind replacement," EPA made that the sole determinant of whether a project had "begun normal operations":

---

[6] MDEQ purports to follow EPA's interpretations.  (Doc. 277, at 16 ("MDEQ has adopted the EPA's interpretation of "begun normal operations.").)  If it did otherwise, the EPA's interpretation would control over the state agency. *Duke,* 981 F. Supp. 2d. at 454-55.

> In its subsequent [to the WEPCO case] remand letter, the EPA recognized that the Seventh Circuit had effectively created a subcategory of changes called "like-kind replacements" and approved "of EPA's application of the actual-to-potential test to the full spectrum of changes" not falling into that category. (Doc. 76-5, at 5). The EPA indicated that for "nonroutine physical or operational changes at an existing major source which are not specifically 'like-kind replacements' in nature," it would "continue to apply the actual-to-potential test for PSD applicability purposes." (Doc. 76-5, at 6.).

(Doc. 277, at 15.)[7] After identifying this as the controlling standard, however, the F&R then makes two errors in its application. First, the F&R interprets "like-kind" to include design and functional changes contrary to EPA's subsequent interpretations and also contrary to the only cases to have undertaken a "like-kind replacement" analysis. Second, rather than EPA's like-kind replacement standard, the F&R substitutes a different standard based on whether a projection of emissions is theoretically possible. This test has never been the standard applied

---

[7] The WEPCO remand letter explicitly stated that it was not defining "like-kind replacement" and would instead leave that to future case-by-case determinations. (Doc. 76-5, at 5 n.1.) Yet, with the caveat that it was not defining a "like-kind replacement" a footnote contained a further discussion of "like-kind replacement" that lacked an explicit principle, but focused on how the equipment operates, not whether the equipment's fundamental purpose changed. For example, the footnote suggests that even an identical replacement may not be like-kind if it fundamentally changes the production process, or if it replaces all or most of a unit. (Doc. 76-5 at 5.)

12

by the EPA or by any other court addressing whether a change was so significant that normal operations had not begun.

A.     A "*Like-Kind Replacement*" *Excludes Equipment Redesign That Impacts the Equipment's Normal Operation, Even Though It Does Not Serve an Entirely Different Broadly-Defined Industrial Purpose.*

Defendants urged the Court to accept the principle that every redesign of a turbine and an economizer is a "like-kind replacement," as long as the redesigned turbine still rotates to make electricity and the economizer still heats water.  (Doc. 277, at 18-19 and 30-31.)  In other words, the redesigned replacement equipment would have to be a different industrial purpose (making donuts instead of electricity, for example) to fall outside the "like-kind replacement" category.  The F&R correctly expresses doubt about Defendants' interpretation.  (Doc. 277, at 31.)  Yet despite its doubts, the F&R effectively applies the Defendants' interpretation rather than the standard applied by the EPA and courts.  Because the turbine and economizer projects changed equipment designs in order to effect changes in how the equipment functioned, the correct application of the "like-kind replacement" standard requires granting Plaintiffs' motion and denying Defendants' motion.

13

> **B.    The F&R Fails To Apply the Seventh Circuit's Definition of "Like-Kind Replacement," A Case-By-Case EPA Determination, Or Persuasive Authority From Every District Court To Have Actually Made A Case-By-Case "Like-Kind Replacement" Determination.**

The Seventh Circuit's *WEPCO* decision, which created the "like-kind replacement" category, was specific that such project "does not 'change or alter' the design or nature of the facility" and "merely allows the facility to operate again as it had before the specific equipment deteriorated." *Wisconsin Elec. Power Co. v. Reilly*, 893 F.2d 901, 908 (7th Cir. 1990) ("*WEPCO*").  That is, from the beginning, the "like-kind replacement" category excluded design changes that caused operations different from the facility's original design.  The *WEPCO* court neither defined "like-kind replacements," nor extended the projected-actual test to any change regardless of design and operational effects as long as an emission projection was feasible.  Yet, the F&R does.

The F&R is also inconsistent with EPA's 1999 interpretation in a letter found in EPA's guidance database, (Doc. 217-4), which considered a turbine redesign at an Indiana power plant similar to the redesign of the Colstrip Unit 1 and 4 turbines in this case.  In that guidance document, EPA concluded that the redesign was not a "like-kind replacement" where the new design was more efficient and would increase the turbine's capacity.  *Id.*  Contrary to the standards the F&R applied, EPA did not interpret "like-kind replacement" to include the

14

turbine redesign merely because it still served the same fundamental purpose, or based on whether an emission projection was theoretically possible.  *Id.*

Three cases have applied the "like-kind replacement" definition to a case-by-case analysis of specific projects: *U.S. v. Westvaco Corp.*, 2010 U.S. Dist. LEXIS 113333 (D.Md., Sept. 1, 2010); *Sierra Club v. Morgan*, 66 ERC (BNA) 1717, 2007 U.S.Dis. LEXIS 82760 (W.D. Wis., Nov. 7, 2007); *U.S. v. Murphy Oil USA, Inc*., 143 F. Supp. 2d 1054 (W.D. Wis. 2001).  The F&R inappropriately distinguishes these cases as involving facilities other than power plants.  (Doc. 277, at 26-27.)  However, the regulations in effect in Montana (and in EPA's regulations prior to 1992) make no distinction based on type of facility.  In fact, EPA explicitly rejects that distinction, stating that while "Puerto Rican Cement involved a cement plant, not an electric utility… the court's legal analysis of the phrase 'begun normal operations' in the current regulations is relevant to all facilities."  57 Fed. Reg. at 32,317 n. 9.  The "current regulations" EPA refers to are the regulations that pre-date the July 1992 WEPCO rulemaking that Montana never adopted.  Thus, as EPA acknowledges, the "begun normal operations" analysis by courts applies the same to electric generators and other types of facilities, except in those states that adopt the 1992 rule.

15

Unlike the three cases above, which the F&R does not follow, the F&R relies on other district court cases which do not apply the "like-kind replacement" definition to a specific project and lack any actual discussion of the impact of design and function changes to determine whether normal operations of the as-modified plant had "begun" prior to the change.  (Doc. 277, at 28-30.)  Those cases applied a projected-actual test because that was the only test urged by the plaintiff in those cases.  To the extent that there is any discussion of the actual-to-potential test in those district court decisions, it is unrelated to the necessary analysis and applicable standards for that test because no party in those cases asked the courts to apply it.  (*See* Doc. 206, at 39-43.)

The Seventh Circuit (which created the standard); every case to have actually considered whether "normal operations" had "begun" based on the facts of a specific project; and the EPA (when interpreting the 1980 regulations still in effect today in Montana) all define a "like-kind replacement" as one that does not involve design changes that impact how the equipment operates.  *Wis. Elec. Power Co.*, 893 F.2d at 908; Doc. 217-4; 56 Fed. Reg. 27,630, 27,633 (June 14, 1991); 61 Fed. Reg. 38,250, 38,255 (July 23, 1996); *Westvaco Corp.*, 2010 U.S. Dist. LEXIS 113333, *13; *Sierra Club,* 2007 U.S. Dist. LEXIS 82760, *55; *Murphy Oil USA, Inc.*, 143 F. Supp. 2d at 1103-06.  EPA applies the actual-to-potential test to

16

everything that is not a "like-kind replacement" under the version of the regulations that apply in this case. (Doc. 76-5.) And, in fact, EPA specifically determined that a turbine redesign like the two at issue in this case are not "like-kind replacements." (Doc. 217-4.)

     C.    *The F&R Incorrectly Applies An Alternative and Unsupported Legal Standard, Based On Whether Projections Are Theoretically Possible, Instead of The Applicable "Like-Kind Replacement" Test.*

The F&R concludes that the Unit 1 and 4 projects had "begun normal operations," even in their redesigned state, because a projection of post-project emissions was "reasonably possible." (Doc. 277, at 31). That standard is neither found in any EPA determination nor in any prior judicial decision. Rather, the bases are a misreading of an inapplicable Federal Register notice statement out of context and an inapposite quote related to modeling ambient air impacts when issuing a permit.

The F&R cites 57 Fed. Reg. at 32,317, MDEQ's amicus brief, and a quote from a D.C. Circuit case that the Seventh Circuit requoted in WEPCO. None of those cites supports the F&R's creation of a new "reasonably possible" standard to replace the "like-kind replacement" standard.

The F&R's cite to 57 Fed. Reg. at 32,317 is incorrect. The quotes the F&R attributes to EPA do not actually appear on the Federal Register page the F&R cites -- page 32,317. Rather, page 32,317 actually repeats the Seventh Circuit's

17

definition of a "like-kind replacement" as "one that 'does not change or alter the design or nature of the facility. Rather, it merely allows the facility to operate again as it did before the specific equipment deteriorated." 57 Fed. Reg. at 32,317.

The quotes that the F&R appears to rely on are actually found on 57 Fed. Reg. page 32,323, which is a different section of the preamble addressing a different topic. The statements on page 32,323 specifically discuss two topics: (1) the new provisions adopted in 1992—the "representative actual emissions" definition (which was never adopted in Montana) — and (2) the definition of "reconstructed unit" in 40 C.F.R. § 60.15 (which is not at issue in this case). Those statements do not purport to interpret the regulations that are still in effect in Montana and at issue in this case. Under the version of the rules that still apply in Montana, the test is whether a change is "sufficiently significant," which EPA has never defined as anything other than whether the change is a "like-kind replacement." Doc. 75-4 at 4-5 ("Therefore, in the case of nonroutine physical or operational changes at an existing major source which are not specifically 'like-kind replacements' in nature, EPA will continue to apply the actual-to-potential test…"); 56 Fed. Reg. 27,630-33 (June 14, 1991).

The F&R's erroneous reliance on a discussion about the 1992 rule changes on page 32,323 and the incorrect citation to page 32317 indicates that the F&R

18

unintentionally conflated the 1980 regulations in effect in Montana with the 1992 rules adopted by EPA.  By conflating these two different regulations, rather than recognizing their differences, the F&R effectively modifies the Montana implementation plan to incorporate the 1992 rules without the required implementation plan revision process.  This the Court cannot do.  *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1097 (9th Cir. 2007) (state implementation plan can only be changed through specified process and EPA approval).

The F&R also errs by relying on a quote from the D.C. Circuit's *Alabama Power* decision, requoted in the *WEPCO* case, to support the F&R's creation of a new "reasonably possible" standard.  (Doc. 277, at 32-33) (quoting *WEPCO*, 893 F.2d at 917, in turn quoting *Alabama Power Co. v. Costle*, 636 F.2d 323, 379 (D.C. Cir. 1979)).  But the F&R misreads those decisions.  The actual quote from the *Alabama Power* decision addresses calculating the amount of the available ambient air pollution increment new sources consume versus the amount that existing sources consume under 42 U.S.C. § 7479(4)—an entirely different issue than

whether a project is a "major modification under Montana Administrative Rule 17.8.801(20).  *See Ala. Power*, 636 F.2d at 379.[8]

There is no authority for the F&R's newly minted "reasonably possible" standard to replace EPA's "like-kind replacement" standard for when a modification is "sufficiently significant" that the actual-to-potential test applies under the 1980 EPA regulations (and current Montana regulations).  The "reasonably possible" standard also conflicts with the First Circuit's decision in *Puerto Rican Cement* applying the actual-to-potential test despite the ability to predict future emissions.  Contrary to the F&R's "reasonably possible" standard, a prediction of future emissions was not only possible, but the First Circuit actually predicted post-change utilization and emissions for the modified cement plant and yet still applied the actual-to-potential test.  *Puerto Rican Cement*, 889 F.2d at 294 (projecting emission from the redesigned cement kiln under several scenarios).

---

[8] If a project is a major modification or a new construction project that requires a Prevention of Significant Deterioration permit, an analysis is required to ensure that the plant's emissions, combined with emissions from other nearby pollution sources, do not increase air pollution above specified thresholds called the "maximum allowable increase over baseline," or "increments."  *See e.g.*, Mont. Admin. R. 17.8.804, 17.8.820.  The *Alabama Power* quote requoted in *WEPCO* and in the F&R at pages 32-33 discussed the applicable regulations and procedures for determining whether the increment was violated, not whether a project is a "major modification."

The F&R's "reasonably possible" standard -- instead of the "like-kind replacement" standard -- ignores the applicable EPA's guidance, conflates EPA and court discussions of different rules, and lacks a legal basis in the regulations, agency guidance, or caselaw.  It is in error, and the Court should reject it in favor of the applicable "like-kind replacement" standard.

III.   <u>Because Recommendation 6 (Doc. 277, at 78) is Dependent on Acceptance of Recommendations 2 and 3 (Doc. 277, at 77-78), if the Court Rejects Recommendations 2 and 3, then it Should Also Reject Recommendation 6</u>.

The F&R's Recommendation 6 (Doc. 277, at 78) with respect to Defendants' Motion 182 was not granted on the basis sought by the Defendants. The Defendants argued that aggregation of the Unit 4 turbine and safety valve projects should be disallowed because Plaintiffs did not put forward evidence of the "aggregated project."  The F&R, however, did not recommend granting the motion on that ground.  Rather the F&R based its recommendation on the notion that because Plaintiffs' Unit 4 turbine claim, aggregated or not, depends on use of the actual-to-potential test, then the aggregated claim should also be dismissed. Thus, if the Court rejects Recommendations 2 and 3 (Doc. 277, at 77-78), it should also reject Recommendation 6 (Doc. 277, at 77-78).

21

## CONCLUSION

For the reasons set forth above, the following recommendations of Judge Lynch should not be adopted:

1.  The Portions of Recommendations 4 and 5 that Claims 1 and 2 be dismissed in their entirety (rather than just with respect to NOx);

2.  The Portions of Recommendations 4 and 5 that for the Unit 3 Reheater Project, where Defendants seek to use a two-year baseline period that is outside the five-year period immediately preceding the date actual construction began, Defendants were not required to obtain approval of that baseline from MDEQ (Doc. 277, at 48);

3.  Recommendation 2 (that Plaintiffs' Motion for Partial Summary Judgment that the Redesign Projects for the Unit 1 and 4 Turbines and the Unit 1 Economizer Were not "Like-Kind Replacements" (Doc. 188) be denied)

4.  Recommendation 3 (that Defendants' Motion for Partial Summary Judgment Regarding Plaintiffs' Use of the "Actual-To-Potential" Emissions Test (Doc. 172) be granted); and

5.  Recommendation 6 (that Defendants' Motion for Partial Summary Judgment on Emissions Calculations for Alleged Aggregated Turbine and Safety Valve Project (Doc. 182) be granted).

22

Dated this 19th day of January, 2016

Respectfully submitted,

Roger Sullivan
McGarvey, Heberling, Sullivan
      & McGarvey, P.C.
745 South Main Street
Kalispell, Montana   59901-5341
(406) 752-5566
RSullivan@McGarveyLaw.com

John Heenan
Bishop & Heenan
3970 Avenue D, Suite A
Billings, Montana   59102
(406) 839-9091
john@bishopandheenan.com

/s/ George E. Hays
George E. Hays (*admitted pro hac vice*)
236 West Portal Avenue, #110
San Francisco, CA   94127
(415) 566-5414
georgehays@mindspring.com

David C. Bender (*admitted pro hac vice*)
Bender Westerberg
10 E. Doty, Ste 800
Madison, WI   53703
(608) 310-3560
bender@benderwesterberg.com

Reed Zars (*admitted pro hac vice*)
910 Kearney Street,
Laramie, WY 82070
(307) 745-7979
rzars@lariat.org

23

David Nicholas *(admitted pro hac vice)*
20 Whitney Road
Newton, Massachusetts  02460
(617) 964-1548

Naomi Kim Melver *(admitted pro hac vice)*
6005 Auburn Ave.
Oakland, CA 94618
(541) 513-0540
nmelver@gmail.com


*Counsel for Plaintiffs*

24

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this Brief complies with the requirements of Rule 72.3(b). The total word count is 4971 excluding caption, certificate of compliance, and signature block. The undersigned relies on the word count of the word processing system used to prepare this document.

<u>/s/ George E. Hays</u>
George E. Hays