Roger Sullivan
McGarvey, Heberling, Sullivan & McGarvey, P.C.
345 1st Ave. E.
Kalispell, Montana   59901-5341
(406) 752-5566
RSullivan@McGarveyLaw.com

John Heenan
Bishop & Heenan
3970 Avenue D, Suite A
Billings, Montana    59102
(406) 839-9091
john@bishopandheenan.com

Counsel for Plaintiffs (Other Counsel Listed Below)

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA

## BILLINGS DIVISION

| | |
|---|---|
| SIERRA CLUB and MONTANA ENVIRONMENTAL INFORMATION CENTER,<br><br>Plaintiffs,<br><br>v.<br><br>TALEN MONTANA LLC, AVISTA CORP., PUGET SOUND ENERGY, PORTLAND GENERAL ELECTRIC CO., NORTHWESTERN CORP., and PACIFICORP,<br><br>Defendants. | Case No. 1:13-cv-00032-DLC-JCL<br><br>**Brief in Support of Plaintiffs' Motion for Attorneys' Fees and Costs** |

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ i

TABLE OF AUTHORITIES ................................................................................ iii

TABLE OF EXHIBITS ........................................................................................ vi

INTRODUCTION .................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ............................................3

    I.     The Consent Decree Guarantees Significant Pollutant
         Emission Reductions. ...............................................................................3

    II.    Plaintiffs Efficiently Litigated this Case Based on
         Available Information, and at the Point the Case Settled
         Many Issues Remained Unresolved. .......................................................9

         A.   The Case Commenced Based on Publicly Available Information.9

         B.   The Discovery of Publicly Unavailable Information Allowed
             Plaintiffs to Narrow Their Claims..............................................12

         C.   Judge Lynch's Recommendations on Motions for Summary
             Judgment and In Limine. ...........................................................14

         D.   Conclusion..................................................................................16

APPLICABLE LAW ..........................................................................................17

    I.     Under the Clean Air Act Citizen's Suit Provision, an
         Award of Reasonable Fees and Costs to Plaintiffs is
         Appropriate if Plaintiffs Have Achieved Some Success
         on the Merits.........................................................................................17

    II.    The Ninth Circuit Endorses the "Lodestar" Method to
         Calculate a Plaintiff's Reasonable Attorneys' Fees. ...........................20

         A.   The Lodestar Approach Requires a Determination of Whether
             Hours Were Reasonably Expended. ...........................................20

         B.   The Lodestar Approach Requires the Application of a Reasonable
             Hourly Rate, Which is Calculated According to the Prevailing
             Market Rates in the Relevant Community...................................23

ARGUMENT ...................................................................................................23

    I.    Through this Case, Plaintiffs Achieved an Excellent
        Result. ...................................................................................23

    II.   The Hourly Rates Used by Plaintiffs Here to Calculate
        the Lodestar Are Reasonable. ...............................................24

    III.  The Hours Spent by Plaintiffs' Attorneys and the Costs
        Incurred by Plaintiffs Are Reasonable. ...............................25

CONCLUSION ................................................................................................30

CERTIFICATE OF COMPLIANCE ..................................................................32

# TABLE OF AUTHORITIES

## Cases

*Alaska Dep't of Envtl. Conservation v. E.P.A.,*
   540 U.S. 461 (2004) ........................................................................5

*Alliance for Wild Rockies v. Krueger,*
   No. CV 12-150-M-DLC, 2014 WL 46498 (D. Mont. 2014),
   appeal dismissed (July 3, 2014) ..................................................21

*Blum v. Stenson,*
   465 U.S. 886, 895 (1984) ............................................................23

*Ctr. for Food Safety v. Vilsack,*
   No. C-08-00484 JSW EDL, 2011 WL 6259891 (N.D. Cal. 2011)
   report and recommendation adopted, No. C 08-00484 JSW,
   2011 WL 6259683 (N.D. Cal. 2011) ...........................................19

*Davis v. Mason County*,
   927 F.2d 1473 (9th Cir.), *cert. denied*, 502 U.S. 899 (1991) ......................23

*Gates v. Deukmejian,*
   *987 F.2d 1392 (9th Cir. 1992)* ...................................................20

*Hensley v. Eckerhart,*
   461 U.S. 424 (1983) ...........................................3, 20, 21, 22, 24

*Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,*
   *478 U.S. 546 (1986)*............................................................1, 17, 18

*Pound v. Airosol Co., Inc.,*
   498 F.3d 1089 (10th Cir. 2007) ..................................................18

*Ruckelshaus v. Sierra Club,*
   463 U.S. 680 (1983) ...................................................................1

*Schwarz v. Sec'y of Health & Human Servs.*,
   73 F.3d 895 (9th Cir. 1995) ...................................................23, 24

*Sierra Club v. Dairyland Power Co-op.*, No. 10-CV-303-BBC,
    2010 WL 4294622, at *14 (W.D. Wis. 2010) ...............................................2

*Sierra Club v. Khanjee Holding (US) Inc.*,
    655 F.3d 699 (7th Cir. 2011) ...................................................................1, 19

*Stivers v. Pierce*,
    71 F.3d 732 (9th Cir. 1995) ...........................................................................19

*Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*,
    489 U.S. 782, 790–91(1989) .........................................................................19

*United States v. Ohio Edison*,
    276 F. Supp. 2d 829 (S.D. Ohio 2003) ........................................................10

*Western States Petroleum Ass'n v. E.P.A.*,
    87 F.3d 280 (9th Cir. 1996) ...........................................................................18

*Wis. Elec. Power Co. v. Reilly*,
    893 F.2d 901 (7th Cir. 1990) ...........................................................................2

**Statutes**

42 U.S.C. §§ 7604(d) ................................................................................... 1, 16

42 U.S.C. §§ 7479(3) ......................................................................................... 5

42 U.S.C. § 1988 .............................................................................................. 18

42 U.S.C. § 7604(f) ......................................................................................... 19

**Rules and Regulations**

ARM 17.8.804 .................................................................................................6

**Legislative History**

H.R. Rep. No. 94-1558, p. 1 (1976) ........................................................17

S. Rep. No. 91-1196, p. 36 (1970) ..........................................................17

# TABLE OF EXHIBITS

CM-Ex. 1 – Declaration of Walter Koucky

CM-Ex. 2 – Declaration of George Hays

CM-Ex. 3 – Declaration of Anne Hedges

CM-Ex. 4 – Declaration of William Rossbach

CM-Ex. 5 – Declaration of Reed Zars

CM-Ex. 6 – Declaration of Roger Sullivan

CM-Ex. 7 – Declaration of Robert Libman

CM-Ex. 8 – Declaration of David Nicholas

CM-Ex. 9 – Declaration of Andrea Issod

CM-Ex. 10 – Declaration of Mike Costa

CM-Ex. 11 – Declaration of David Bender

CM-Ex. 12 – Declaration of Naomi Kim Melver

CM-Ex. 13 – Declaration of Aubrey Baldwin

# INTRODUCTION

The Court entered a Consent Decree (Doc. 318) resolving this case on September 6, 2016.  Paragraph 32 of that Decree entitles any party to "petition or move the Court for an award of costs and/or attorneys' fees for the litigation in this case, to the extent allowed by law."  Under the Clean Air Act's citizen suit fee provision, 42 U.S.C. § 7604(d), the Court "may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate."  The Supreme Court has emphasized that Congress included this provision in the Clean Air Act "specifically to encourage" citizen participation in Clean Air Act enforcement.  *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 560 (1986).  Consequently, courts have determined that a fee and cost award to citizen plaintiffs "is appropriate if the party seeking fees obtained some success on the merits."  *Sierra Club v. Khanjee Holding (US) Inc.,* 655 F.3d 699, 708 (7th Cir. 2011)*, citing Ruckelshaus v. Sierra Club*, 463 U.S. 680, 682 (1983).

Applying that standard here, an award to Plaintiffs for their reasonable attorneys' fees and costs is appropriate.  The parties' negotiated resolution of this hard-fought litigation that resulted in a Court Order requiring the cessation of operation of two of the Colstrip units.  The shutdown of these two units will lead to significant emission reductions in the Colstrip area.  Emissions of sulfur dioxide

($SO_2$) will be reduced 48.9% from annual average emissions in 2014 and 2015.  By similar measure, emissions nitrogen oxides ($NO_x$) will decrease by 42.3%, and emissions of fine particulate matter ($PM_{10}$) will decrease by 34.8%.  *See* Declaration of Walter Koucky, Exhibit CM-Ex. 1 at ¶ 21-22.  Indeed, had Plaintiffs successfully litigated to their conclusion every claim set forth in the original complaint, the amended complaint, or the second amended complaint, the reductions achieved through the Consent Decree in this case are comparable to reductions that might have been otherwise achieved.  Furthermore, the injunctive relief obtained here will also lead to a reduction of 4,824,731 tons per year of carbon dioxide over the plants annual average emissions in 2014 and 2015, the equivalent of taking 993,000 cars off the road.  Koucky Declaration, Exhibit CM-Ex. 1 at ¶ 44.  With these reductions, it is little wonder that the Seattle Post Intelligencer called the settlement "A big Northwest clean air victory."  Hays Declaration, Exhibit CM-Ex. 2 (Ex. 3).

Given that "Congress intended that modification of … facilities would trigger the requirement to install and operate … controls so as to reduce emissions," *Sierra Club v. Dairyland Power Co-op*., No. 10-CV-303-BBC, 2010 WL 4294622, at *14 (W.D. Wis. 2010), *citing Wisconsin Electric Power Co. v. Reilly*, 893 F.2d 901, 909 (7th Cir. 1990), the massive reductions achieved through

this enforcement action is an "excellent result," *see Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983), worthy of the granting of Plaintiffs' costs and fees requested here.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  The Consent Decree Guarantees Significant Pollutant Emission Reductions.

The Consent Decree in this case, (Doc. 318), contains a number of injunctive relief provisions, but by far the most significant is paragraph 7, which requires by 2022, the permanent closure of Units 1 and 2, leaving only Units 3 and 4 in operation.  As the Koucky Declaration, CM-Ex. 1 at ¶¶ 21-22 shows, closing Units 1 and 2 will lead to significant emission reductions.  The following tables illustrate this point.

Table 2A shows average emissions for sulfur dioxide, $NO_x$, and $PM_{10}$ during 2014 and 2015, as reported by the plant to the Environmental Protection Agency ("EPA").  Table 2B shows the decrease in emissions off of the values shown in Table 2A due to the shutdown, and Table 2C shows the emission reductions as a percentage of total plant emissions in 2014 and 2015.

| Table 2A | | | | |
|---|---|---|---|---|
| **Two-Year Average Emissions for Colstrip 1, 2, 3 and 4** | | | | |
| Based on EPA CAMD Data for 2014 and 2015 | | | | |
| Unit | Facility Name | SO2 (tons) | NOx (tons) | PM10 (tons) |
| 1 | Colstrip | 2,320 | 3,845 | 465 |
| 2 | Colstrip | 2,683 | 3,093 | 455 |
| 3 | Colstrip | 2,555 | 4,573 | 838 |
| 4 | Colstrip | 2,669 | 4,876 | 888 |
| SUM | | 10,227 | 16,387 | 2,646 |
| Note: PM10 emissions are CAMD MMBtu/year x PPL reported emissions rate in lb/MMBtu | | | | |

| Table 2B | | | | |
|---|---|---|---|---|
| **Emissions Reduced by Shut-Down of Colstrip 1 and 2** | | | | |
| Based on EPA CAMD Data for 2014 and 2015 | | | | |
| Unit | Facility Name | SO2 (tons) | NOx (tons) | PM10 (tons) |
| 1 | Colstrip | 2,320 | 3,845 | 465 |
| 2 | Colstrip | 2,683 | 3,093 | 455 |
| SUM | | 5,003 | 6,938 | 920 |
| Note: PM10 emissions are CAMD MMBtu/year x PPL reported emissions rate in lb/MMBtu | | | | |

| Table 2C | | | | |
|---|---|---|---|---|
| **Percentage Emissions Reduction at Colstrip from Shut-down of Units 1 and 2** | | | | |
| Based on EPA CAMD Data for 2014 and 2015 | | | | |
| Unit | Facility Name | SO2 (tons) | NOx (tons) | PM10 (tons) |
| Facility total | Colstrip | 48.9% | 42.3% | 34.8% |

Koucky Declaration, CM-Ex. 1 at ¶¶ 21-22.

These reductions achieved plaintiffs' ultimate goal of the litigation – namely, to reduce air pollutant emissions from the Colstrip plant. *See* Declaration of Anne Hedges in support of this motion, Exhibit CM-Ex. 3 at ¶ 20.

In addition to analyzing the level of pollution reductions that will be achieved from the closure of Units 1 and 2, Mr. Koucky also compared these

reductions to what might have been achieved had the litigation taken its full

course.

As the Supreme Court explained in *Alaska Dep't of Envtl. Conservation v.*

*E.P.A.*, 540 U.S. 461, 472 (2004), no major air pollution emitting facility may be

constructed or modified without Best Available Control Technology ("BACT"),

which is defined as:

> "an emission limitation based on the maximum degree of [pollutant] reduction ... which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for [the] facility ...."

*Id*. (quoting, 42 U.S.C. § 7479(3)).[1]

In states with approved Prevention of Significant Deterioration ("PSD")

programs like Montana, the "case-by-case" determination of BACT emission

limits is performed by the state.  *Alaska*, 540 U.S. at 475-76.  States typically use

what is called a "top-down process" to set these emission limits:

> "In brief, the top-down process provides that all available control technologies be ranked in descending order of control effectiveness.  The PSD applicant first examines the most stringent—or 'top'—alternative. That alternative is established as BACT unless the applicant demonstrates, and the permitting authority in its informed judgment agrees, that technical considerations, or energy, environmental, or economic impacts justify a conclusion that the most stringent technology is not 'achievable' in that case.

---

[1] In Montana, modified sources cannot operate without Best Available Control Technology limits.  Findings and Recommendations (Doc. 112) at 35.

5

> If the most stringent technology is eliminated in this fashion, then the next most stringent alternative is considered, and so on."  EPA, New Source Review Workshop Manual B.2 (Draft Oct. 1990) (hereinafter New Source Review Manual).

*Alaska,* 540 U.S. at 475-76.

As the excerpt above explains, the source proposes BACT emission limits, and then the state makes the ultimate decision.  (The public can comment on the proposed emission limits).  *Alaska,* at 508.  Thus, had the case gone to its conclusion with Plaintiffs prevailing on all issues at trial, and the Court ordered the Defendants to obtain a Prevention of Significant Deterioration permit[2] for Colstrip, the emission reductions that would have resulted from that permitting process fall within a range of possible outcomes.  Koucky Declaration, CM-Ex. 1, at ¶ 25.

Mr. Koucky, who has experience with the PSD permitting process and has testified as an expert in PSD permit appeals, analyzed the likely outcome of the PSD permitting process for Colstrip, and developed a range of possible outcomes and then compared those outcomes to the reductions that will be achieved through

---

[2] In addition, before the state can issue a permit, it must ensure that emissions from the modified source will not cause ambient pollution to exceed agency-set maximum concentrations (i.e., "PSD increments") or the national ambient air quality standards.  *Id*. at 473.  *See also* ARM 17.8.804.  It is noteworthy that the Colstrip plant sits only 15 miles from the Northern Cheyenne Indian Reservation which is a Class I air quality area, meaning the allowed increases in pollutant concentrations are very limited there.

6

the Consent Decree.  For NOx, Mr. Koucky concluded that possible BACT

emission limits could lead to reductions between 2000 tons per year and 12,500

tons per year, the settlement guarantees reductions of approximately 7,000 tons per

year.  Similarly, the reductions guaranteed by the Consent Decree are in the middle

of possible BACT outcomes for $SO_2$ and $PM_{10}$.  *Id.* at ¶¶ 29-42.  The table below

summarizes Mr. Koucky's analysis regarding NOx BACT.

Table 3 - NOx  BACT Control Options

| Hierarchy of Technologies | Control Level (lb/MMBtu) | Tons per Year of Reduction Achieved |
|---|---|---|
| Separated Overfire Air (SOFA) plus Selective Catalytic Reduction (SCR). | 0.05 | 12500 |
|  |  | 12000 |
|  |  | 11500 |
|  |  | 11000 |
| Low-NOx Burners  plus SCR | 0.07 | 10500 |
|  |  | 10000 |
|  |  | 9500 |
|  |  | 9000 |
|  |  | 8500 |
|  |  | 8000 |
|  |  | 7500 |
| Units 1 & 2 Shutdown | 0.115 | 7000 |
|  |  | 6500 |
|  |  | 6000 |
|  |  | 5500 |
|  |  | 5000 |
|  |  | 4500 |
| SOFA plus Selective Non-Catalytic Reduction (SNCR) | U1 & U2 @ 0.15, U3 & U4 @ 0.13 | 9500 |
|  |  | 3500 |
|  |  | 3000 |
| SOFA plus SNCR | U1 & U2 @ 0.17, U3 & U4 @ 0.15 | 2500 |
| SOFA only | 0.20 | 2000 |
|  |  | 1500 |

Notes: Range of expected performance with SCR.  *See* Koucky Declaration, CM-Ex. 1 at ¶¶30, 32.

Shut down of U1 and U2 achieves a similar level of control as 0.115 lb/MMBtu on all units at baseline output.  *Id.* at ¶30.

Reflects EPA Assumptions regarding SNCR.  *Id.*

Reflects Colstrip Operator Comments to EPA regarding SNCR.  *Id.*

Reflects EPA assumptions for Units 1 and 2 regarding SOFA.  Units 3 and 4 previously installed SOFA.  *Id.*

Koucky Declaration, CM-Ex. 1, at ¶ 30.  Similar tables regarding $SO_2$ and $PM_{10}$

BACT are presented in Mr. Koucky's declaration at paragraphs 36 and 40.

Finally, as mentioned above, the settlement also produces a very significant decrease of approximately 4.8 million tons per year in $CO_2$ emissions, an added environmental benefit in lieu of a penalty that might have been obtained had Plaintiffs successfully litigated the case to its conclusion at trial. Koucky Declaration, CM-Ex. 1, at ¶ 44. Similarly, although not quantified here, the closure of Units 1 and 2 will decrease the emissions of other pollutants, including mercury, lead, carbon monoxide, volatile organic compounds, and sulfuric acid mist, all pollutants emitted by coal plants. Koucky Declaration, CM-Ex. 1, at ¶ 20.

## II. Plaintiffs Efficiently Litigated this Case Based on Available Information, and at the Point the Case Settled Many Issues Remained Unresolved.

### A.    The Case Commenced Based on Publicly Available Information.

Throughout this case, Plaintiffs alleged that Defendants were operating the Colstrip power plant without Prevention of Significant Deterioration permits requiring Best Available Control Technology, permits required due to major modifications at the plant. *See* Complaint (Doc. 1); 2nd Amended Complaint, (Doc. 132) at 12-13, ¶ 30-31. There has never been any dispute that the Defendants conducted tens of millions of dollars of upgrades to the Colstrip plant without obtaining permits.

The Colstrip plant consists of four units. Amended Answer (Doc. 138) at 7, ¶ 19. Units 1 and 2 each generate around 307 net megawatts of electricity, while

9

units 3 and 4 each generate 740 net megawatts. *Id.*; (Doc. 132) at 6, ¶ 19. Units 1

and 2 began operation in the mid-1970's, while Units 3 and 4 began operation in

the mid-1980's. *Id.* Consequently, the pollution controls at the plant have become

antiquated. For example, modern coal-fired power plants often control NOx with a

technology called selective catalytic reduction, Koucky Declaration, CM-Ex. 1 at

¶ 32, but none of the Colstrip units employ that technology.

This case began in September 2012 when Plaintiffs sent Defendants a notice

letter, Hays Declaration, CM-Ex. 2 (Ex. 1), alerting them of alleged violations of

the Clean Air Act, including the Act's modification provisions. This letter was

based on publicly available information regarding unpermitted modifications at the

plant, including a $70 million dollar project described in the Billings Gazette, Hays

Declaration, CM-Ex. 2 (Ex. 2), consisting of the installation of a redesigned

economizer at Unit 1 and whole walls of the boiler being replaced.

At the time Plaintiffs sent that first notice letter, which also targeted several

turbine projects, Plaintiffs were well aware that EPA and Citizens had successfully

brought actions for unpermitted modifications at other coal-fired power plants.

*See, e.g.*, *United States v. Ohio Edison*, 276 F. Supp. 2d 829 (S.D. Ohio 2003).

Plaintiffs were aware that utility companies often contended that all the work they

did at their plants was exempt from the Act's modification provisions as "routine

maintenance," but Plaintiffs also knew that EPA had explicitly rejected that notion, particularly with respect to turbine projects. *See* Detroit Edison Applicability Determination *(*Doc. 64-6). Hays Declaration, CM-Ex. 2, at ¶ 9.

Plaintiffs were also aware that Montana had publicly stated that its emission increase test was the "actual-to-potential" test and that Montana had contemplated and rejected making a "fundamental change" to adopt the "projected actual test" to calculate post-project emissions. *Id*. at ¶ 11. Indeed, Plaintiff MEIC's Anne Hedges had personally participated in hearings when those changes had been contemplated. Hedges Declaration, CM-Ex. 3 at ¶¶ 4-10. Accordingly, Plaintiffs' theory of the case at the time of the notice letter and throughout much of this case was that the actual-to-potential test applied to Defendants' non-routine projects, a test which Defendants later acknowledged "virtually guarantee[s]," (Doc. 76) at 9, that projects will result in significant emission increases and therefore will be modifications. Hays Declaration, CM-Ex. 2 at ¶ 10.

Before filing a complaint, however, Plaintiffs conducted a thorough investigation, based on publicly available information, Hedges Declaration, CM-Ex. 3 at ¶ 15-19, revising their notice letter in November 2012 and December 2012, each time urging Defendants to contact Plaintiffs if the "facts described … are in error" of if Defendants had "any information indicating that [they] have not

11

violated the Clean Air Act." The notice letter also stressed that Plaintiffs were "interested in obtaining early and prompt resolution of these violations." Before the Complaint was filed in March 2013, however, the Defendants neither sat down with Plaintiffs to discuss any factual errors nor a resolution to the dispute. Hays Declaration, CM-Ex. 2 at ¶ 8. Indeed, the Defendants attempted to block Plaintiffs from gathering evidence about plant modifications, and filed suit to block Plaintiffs from obtaining key results through a Freedom of Information Act request of an investigation EPA had conducted into modifications at Colstrip. *See PPL Montana*, LLC v. Jackson, et al., No. 12-052 (D. Mont. Apr. 23, 2012); *see also* Hedges Declaration, CM-Ex. 3 at ¶ 15-19.

B.    The Discovery of Publicly Unavailable Information Allowed Plaintiffs to Narrow Their Claims.

When Plaintiffs filed the Complaint in March 2013, (Doc. 1), they alleged that twelve major modifications had occurred, as well as some opacity violations.[3] In May 2013, Defendants filed a Partial Motion to Dismiss arguing that some claims were barred by the statute of limitations and attacking some of Plaintiffs' legal theories of liability. In September 2013, Plaintiffs filed a motion for summary judgment on the applicable method for calculating post-project

---

[3] Plaintiffs styled their action with 39 claims to account for several unknown facts and legal theories of liability.

emissions.  (Doc. 63 and 64).  While the Plaintiffs waited for rulings on these very important motions, they continued to prosecute the case, obtaining some key information in discovery, including the fruit of EPA's investigation they had sought for so long.  Hays Declaration, CM-Ex. 2 at ¶ 11.

Based on this information obtained in initial discovery, Plaintiffs sent a new notice letter to the Defendants in July 2013 and filed an Amended Complaint on September 27, 2013, reducing from twelve to nine the number of alleged aggregated modifications (although based on the actual-to-potential theory, Plaintiffs maintained that each stated component of an aggregated project was also a modification).  Plaintiffs then conducted discovery on the Amended Complaint, and in April 2014, before Defendants ever filed their first answer, before the deadline for expert reports, and before Judge Lynch ever ruled on the pending motions, acted to streamline the case eliminating from the case a number of capital projects that had all occurred at the same time, but could not be proven to be pieces of larger projects.  From that point on, Plaintiffs focused on twelve projects, only one of which consisted of two separate work orders.  *See* (Doc. 99).  Plaintiffs believed they could prove that each of these projects was a modification, even under the more stringent projected actual test.  *Id*. at ¶ 13.

13

After the Court ruled in May 2014 on the issue of the applicable emissions increase test and Defendants' motion to dismiss, (Doc. 112), the Plaintiffs filed a second Amended Complaint August 27, 2014 (Doc. 132).  The total number of projects across the four units in Plaintiffs' complaint was at this point reduced to eight projects for a total of nine major modification claims.  (Doc. 132) at 19-34.

In March 2015, following extensive expert discovery and review of materials obtained through subpoenas issued to NAES Corporation, Alstom, and General Electric, three Colstrip contractors, Plaintiffs further narrowed down their claims to five projects and five major modifications.

C.   Judge Lynch's Recommendations on Motions for Summary Judgment and In Limine.

In December 2015, Judge Lynch issued Findings and Recommendation regarding the pending Plaintiffs' and Defendants' motions for partial summary judgment.  (Doc. 277).  Judge Lynch recommended denial of Plaintiffs' motion for partial summary judgment on the routine maintenance, repair, and replacement exemption, stating that it was a decision for the trier of fact to decide, (Doc. 277) at 77, but importantly found it appropriate to use the EPA factors from the Detroit Edison determination.  (Doc. 277) at 63.  Judge Lynch recommended the granting of Defendants' motions and denial of Plaintiffs' motion regarding the applicable emission increase test to apply to the Unit 1 economizer replacement and the Unit

14

1 and 4 turbine projects. (Doc. 277) at 11-34. Judge Lynch also recommended that with those findings, Plaintiffs' claims regarding the Units 1 and 4 turbine replacements be dismissed as well as the claim of NOx increase due to the Unit 1 economizer replacement, because Plaintiffs had decided not to go forward with those projects if they were not like-kind replacements. (Doc. 277) at 34, 38.[4] Judge Lynch also recommended that Defendants' motion on the aggregation of the Unit 4 turbine and safety valve projects be granted, based upon his recommendation that the Unit 4 turbine project be dismissed. (Doc. 277) at 53-55. Last, Judge Lynch recommended that Plaintiffs' motion on baseline and Defendants' motion on baseline be granted in part and denied in part. (Doc. 277) at 34-53 and 78. In January 2016, Plaintiffs filed objections to the December 31, 2015 Findings and Recommendations of Judge Lynch, and as of the time the case settled, the Court had not ruled on that motion.

On March 25, 2016, Judge Lynch issued an order denying Defendants' Motion in Limine and denying Defendants' Motion for Leave to File a Motion for Summary Judgment. (Doc. 298).

---

[4] The Plaintiffs had argued based upon published cases that because of significant design changes, each of these projects were not "like-kind" replacements, meaning that under the Court's orders, (Doc. 112 and 129), the actual-to-potential test, and not the projected actual test, should be used to evaluate the emission increase issue.

D.    <u>Conclusion</u>

Review of this history shows that first, the parties spent a good deal of time policing themselves during the course of this litigation.  Second, that Plaintiffs made continual efforts to streamline the case as key evidence became available.  Third, at the time the case settled, two claims were headed to trial: one involving a $4 million dollar replacement of the pendent reheater in Unit 3 and the other an over $8 million dollar replacement of the economizer in Unit 1.  Fourth, three other claims against Units 1 and 4 remained in limbo pending a ruling on Plaintiffs' objections to Judge Lynch's ruling on the cross-motions for summary judgment.  (Doc. 277 and 278).  Fifth, the case raised many complex issues of facts and law, requiring careful opinions from the Court regarding a number of close legal questions (*see* Doc. 112, Doc. 129, and Doc. 277).

## APPLICABLE LAW

I.  **Under the Clean Air Act Citizen's Suit Provision, an Award of Reasonable Fees and Costs to Plaintiffs is Appropriate if Plaintiffs Have Achieved Some Success on the Merits.**

The Clean Air Act, at 42 U.S.C. § 7604(d), authorizes the award of

attorneys' fees and costs:

> The court, in issuing any final order in any action brought pursuant to subsection (a) of this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate.[5]

Congress adopted this provision to encourage citizen enforcement of the

Act.  And, the Supreme Court has long recognized that Congress enacted Section

7604 "specifically to encourage 'citizen participation in the enforcement of

standards and regulations established under this Act." P*ennsylvania v. Delaware*

*Valley Citizens' Council for Clean Air*, 478 U.S. 546, 560, *supplemented*, 483 U.S.

711 (1987), *quoting* S. Rep. No. 91-1196, p. 36 (1970).  The Court further

emphasized similarities between section 7604(d) and the fee provision for the Civil

Rights Act, 42 U.S.C. § 1988, that their purposes are "nearly identical," and that

Congress recognized that "'effective enforcement of Federal civil rights statutes

depends largely on the efforts of private citizens,'" and unless reasonable

---

[5] Subsection (a) is the section under which this action was brought.

attorney's fees could be awarded for bringing these actions, Congress found that many legitimate claims would not be redressed." *Delaware Valley*, 478 U.S. at 560, quoting H.R. Rep. No. 94-1558, p. 1 (1976). As Justice Blackmun explained in his *Delaware Valley* dissent:

> Congress' purpose-extensively described in the legislative history of the Civil Rights Attorney's Fees Awards Act, but fully applicable to statutes that protect the environment, was to encourage the enforcement of federal law through lawsuits filed by private persons. Congress found that the market itself would not provide an adequate supply of interested lawyers because many potential plaintiffs lacked sufficient funds to hire such lawyers. Thus, fee awards were considered to be 'an essential remedy' in order to encourage enforcement of the law.

*Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 737 (1987) (Blackmun, J. dissenting) (citations omitted).

Under Section 7604(d), environmental plaintiffs are entitled to an award if they are at least "partially prevailing."

> The Supreme Court has also interpreted the attorney fee provision of the CAA as a less stringent standard than that of other civil rights statutes that award attorney fees to 'prevailing parties,' stating that the attorney fee provision of the CAA 'was meant to expand the class of parties eligible for fee awards from prevailing parties to partially prevailing parties—parties achieving some success, even if not major success.' [*Ruckelshaus v. Sierra Club*, 463 U.S. 680, 688 (1983).] Thus, one does not have to succeed completely on a CAA claim to achieve 'some success' which would, in turn, merit the award of fees and costs.

*Pound v. Airosol Co., Inc.*, 498 F.3d 1089, 1101 (10th Cir. 2007).

The Ninth Circuit has ruled that under the fees and costs provision of the Act relating to rulemaking judicial review, 42 U.S.C. § 7604(f), "an award of attorneys' fees is "appropriate" where petitioners have: (1) attained some success on the merits; and (2) contributed substantially to the goals of the Clean Air Act in doing so." *Western States Petroleum Ass'n v. E.P.A.*, 87 F.3d 280, 286 (9th Cir. 1996).[6] *See also Sierra Club v. Khanjee Holding (US) Inc.*, 655 F.3d 699, 708 (7th Cir. 2011) (Applying Section 7604(d), the court stated: "[a]n award is appropriate if the party seeking fees obtained some success on the merits.").

Although "prevailing party" status is not even required under Section 7604(d), "a litigant need not prevail on every issue, or even on the 'central issue' in the case, to be considered the prevailing party.  It is enough that he succeed 'on any significant claim affording some of the relief sought, either pendente lite or at the conclusion of the litigation.'" *Stivers v. Pierce,* 71 F.3d 732, 751 (9th Cir. 1995) (citing *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.,* 489 U.S. 782, 790–91(1989)).  A material "alteration of the legal relationship between

---

[6] The language of Section 7604(f) mirrors the language of Section 7604(d) with respect to the issues at issue in this motion: "In any judicial proceeding under this section, **the court may award costs of litigation (including reasonable attorney and expert witness fees) whenever it determines that such award is appropriate**."  (The language in bold is identical to Section 7604(d), except there is a clause between "court" and "may" in Section 7604(d)).

19

the parties" may be effectuated by a judgment on the merits or a court-

ordered consent decree. *See Ctr. for Food Safety v. Vilsack*, No. C-08-00484 JSW

EDL, 2011 WL 6259891, at *1 (N.D. Cal. 2011) (citation omitted), report and

recommendation adopted, No. C 08-00484 JSW, 2011 WL 6259683 (N.D. Cal.

2011).

## II.    The Ninth Circuit Endorses the "Lodestar" Method to Calculate a Plaintiff's Reasonable Attorneys' Fees.

### A.    The Lodestar Approach Requires a Determination of Whether Hours Were Reasonably Expended.

The Supreme Court first addressed the proper method to determine a

reasonable attorney's fee when, as in this case, multiple claims were involved in

*Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983), emphasizing that fees should be

determined as "the amount of a reasonable fee is the number of hours reasonably

expended on the litigation multiplied by a reasonable hourly rate." *See also Gates*

*v. Deukmejian*, 987 F.2d 1392, 1397 (9th Cir. 1992) ("The starting point for

determining a reasonable fee is the "lodestar" figure.").

*Hensley* addressed the issue of determining the number of hours reasonably

expended when a case involves multiple claims.  According to the Court, if the

case involves "distinctly different claims" based on "different facts and legal

theories, … counsel's work on one claim will be unrelated to his work on another

claim."  *Id*. at 435.  In that event, such "unrelated claims [can] be treated as if they

20

had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim." On the other hand, "in other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories," and in that event, the suit "cannot be viewed as a series of discrete claims," and "the district court should focus on the significance of the overall relief obtained." *Id.* The Court continued:

> **Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee.** Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. *See Davis v. County of Los Angeles*, 8 E.P.D. ¶ 9444, at 5049 (CD Cal.1974). Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. **The result is what matters**.

*Id.* at 435–36.

A case from this District illustrates how to apply *Hensley* when Plaintiff fails to succeed with every claim. *Alliance for Wild Rockies v. Krueger,* No. CV 12-150-M-DLC, 2014 WL 46498 (D. Mont. 2014), appeal dismissed (July 3, 2014) (Christensen, J.). *Hensley*, this court noted, requires application of a two-part test:

First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which [she] succeeded?  Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?

*Id*. at *3 (quoting, *Hensley*, at 434).

In *Wild Rockies*, Plaintiffs sought to enjoin a timber sale and brought claims under the APA, NEPA, NFMA, and the ESA, succeeding on three out of thirteen claims.  In addressing the first issue, the Court rejected a suggestion that Plaintiffs' hours be reduced by 77%, noting that:

Claims are unrelated if they are **entirely distinct** and separate from the claims on which the plaintiff prevailed."  *Webb v. Sloan*, 330 F.3d 1158, 1168 (9th Cir. 2003).  Claims are related if they share 'a common core of facts or are based on related legal theories.'  *Schwarz v. Secretary of Health & Human Services*, 73 F.3d 895, 903 (9th Cir. 1995).

*Id*. at *4 (emphasis added).  Applying this standard, the Court found that plaintiffs' claims were related because they were: "within the same legal framework commonly applied to environmental litigation.  To view the scope of the facts here any more narrowly would violate the intent of the EAJA of eliminating the financial disincentive of challenges to questionable governmental conduct."  *Id*.

This Court then applied the second prong of the *Hensley* test, "whether Plaintiffs achieved a level of success that reasonably justifies the requested fees," *id*., this time refusing to cut plaintiffs' fee request by 50% because the injunction

22

issued was narrower than the relief sought because the Plaintiffs achieved their primary goal.

B.    The Lodestar Approach Requires the Application of a Reasonable Hourly Rate, Which is Calculated According to the Prevailing Market Rates in the Relevant Community.

As the Ninth Circuit stated in *Schwarz v. Sec'y of Health & Human Servs.*, 73 F.3d 895, 906 (9th Cir. 1995), "[a] district court should calculate this reasonable hourly rate 'according to the prevailing market rates in the relevant community," *Blum v. Stenson*, 465 U.S. 886, 895 (1984), which typically is the community "in which the district court sits." *Davis v. Mason County*, 927 F.2d 1473, 1488 (9th Cir.), *cert. denied*, 502 U.S. 899 (1991).

## ARGUMENT

## I.    Through this Case, Plaintiffs Achieved an Excellent Result.

As detailed above, the Consent Decree that Plaintiffs negotiated in this case will result in an outstanding benefit to the environment, is a triumph for air quality in Montana, and accomplished Plaintiffs' ultimate goal of the litigation.  Annual emissions of $SO_2$, $NO_x$, and $PM_{10}$ will decline by approximately 5000, 7000, and 900 respectively, representing decreases of 48.9%, 42.3%, and 34.8% of total emissions of those pollutants.  In addition, $CO_2$ emissions from the plant will decrease by 4.8 million tons per year, the equivalent of taking 993,000 cars off the road.  Koucky Declaration, CM-Ex. 1 at ¶ 21-22, 44.  Furthermore, comparing the

23

emission reductions obtained through the settlement to what Plaintiffs might have achieved by prevailing on all of their claims from the outset of the case shows that Plaintiffs' achievement here is outstanding. The emission reductions for NOx, $SO_2$, and $PM_{10}$ are in the range of options probable from BACT determinations. *Id.* at ¶30, 38, and 42. In addition, emissions of other harmful pollutants, such as mercury, lead, carbon monoxide, VOCs, and sulfuric acid mist will also decline. *Id.* at ¶ 20. By these measurements, the litigation did not just achieve "some success," but rather secured the "excellent result" the Supreme Court spoke of in *Hensley*, 461 U.S. at 433, which warrants an award of Plaintiffs' requested attorneys' fees and costs at reasonable rates.

## II. The Hourly Rates Used by Plaintiffs Here to Calculate the Lodestar Are Reasonable.

Consistent with Ninth Circuit authority, the Plaintiffs' hourly rates used to calculate the lodestar are consistent with the rates charged by other environmental attorneys who work in this forum. *See Schwarz*, 73 F.3d at 906. The declaration of William Rossbach, Exhibit 4, an experienced litigator in Montana and a member of the Montana bar for 39 years, shows that the range of hourly rates generally used by Montana Plaintiffs ($210 to $395 for attorneys depending on experience, and $112 for paralegals and law students) squares with what lawyers in Montana,

including Bill Mercer, counsel for Defendants, and lawyers from his firm have been charging.[7]

### III. The Hours Spent by Plaintiffs' Attorneys and the Costs Incurred by Plaintiffs Are Reasonable.

This case was actively litigated for a little over three years. It was a case that required the Plaintiffs to delve deeply into the operation and workings of the Colstrip power plant, and a case in which almost all of the information necessary to prosecute the case was in the hands of the Defendants or its contractors or vendors. The Defendants refused to go forward with discovery without a confidentiality order in place.

Discovery in this case was extensive. In response to Plaintiffs' requests for production, the Defendants or their contractors and vendors provided over 100,000 pages of material, so much material that Plaintiffs had to employ a cloud-based, legal discovery automation system to store and organize the documents.

Ultimately, in preparation for trial on just two of Defendants' modification projects, Plaintiffs identified 340 documents as exhibits, while the Defendants

---

[7] While Rossbach states that rates typically range from $210-$395 per hour for litigators in the area of environmental law, he also clarified that "highly experienced environmental litigators who are in lead roles in the litigation could reasonably expect to be compensated at more than $395 per hour. I am currently charging $450 per hour in such circumstances." CM-Ex. 4.

identified over 1,100 documents as exhibits. Plaintiffs retained five experts who prepared reports, along with two in-house experts. The Defendants retained seven experts who prepared reports, and they also designated two plant employees as experts. Between Plaintiffs and Defendants, over 25 depositions occurred that were either taken or defended. Furthermore, as review of the docket reflects, motion practice in this case was extensive.

To handle this workload, Plaintiffs utilized twelve lawyers, endeavoring to never over-staff any aspect of the case.

- Roger Sullivan has served as local counsel and has been involved in all aspects of the case.

- George Hays, a lawyer with over thirty years of experience, most of it related to Clean Air Act litigation, managed the case and took the lead on routine maintenance issues, both as to discovery and motion practice.

- Another experienced Clean Air Act lawyer, David Bender, took the lead on emission increase issues until 2016.

- Naomi Kim Melver provided critical support to both Mr. Hays and Mr. Bender, in discovery matters and with research and writing.

- In 2016, with the birth of Mr. Bender's first child likely to occur during the scheduled trial, Plaintiffs brought in another lawyer, Robert Libman,

to assume Mr. Bender's workload. Mr. Hays shifted his attention to emission increase issues, while Mr. Libman focused on preparing the routine maintenance issue for trial.

- Other lawyers provided critical assistance on various issues as needed. Reed Zars took over management of Plaintiffs' standing issues and defended all of the depositions of Plaintiffs' standing witnesses, ultimately leading to a stipulation resolving that issue.

- David Nicholas focused on electric utility accounting issues, including two depositions.

- Mike Costa reviewed documents possibly responsive to Defendants' Requests for Production for relevance and privilege issues.

- Aubrey Baldwin worked actively on all aspects of the case in its initial stages, including the organization of all issues related to electronic discovery until she left the case to take a new job. She also supervised three law students from Lewis and Clark Law School, who worked on a number of issues requiring research as well as issues related to discovery.

- Joanne Spalding and Andres Restrepo are Sierra Club lawyers who defended Defendants' Rule 30(b)(6) deposition of Sierra Club concerning the topic of EPA's Clean Power Plan.

27

- David Abell is a Sierra Club paralegal who provided critical assistance in responding to Defendants' Requests for Production and in managing the legal discovery automation system.

- Andrea Issod is a Sierra Club lawyer who took on a critical role in negotiating the Consent Decree in this case.

Declarations from each of these individuals discussing their time records have been presented to the Court along with this motion. All of this work was necessary in order to bring this case to a successful conclusion. As laid out above, all of the claims in the case (except for opacity claims that were dropped early on) stemmed from Defendants' apparent pattern of ignoring the requirements of the modification provision contained in the Clean Air Act and the Montana state implementation plan. At each step in the litigation, Plaintiffs conducted tailored discovery and pursued the claims alleged in a manner consistent with the law of the case as it developed. There was tremendous overlap from one claim to another in terms of the application of law and policy. Ultimately the efforts of the litigation team led to outstanding results as discussed above.

The table below summarizes the time spent by each of the attorneys who did work on this case.

| Colstrip Attorneys' Fees | | | | |
|---|---|---|---|---|
| **Attorney** | **Hours** | **Years of Experience** | **2016 Rate** | **Value** |
| George Hays | 2559.6 | 32 | $ 395.00 | $1,011,042.00 |
| Reed Zars | 123.0 | 30 | $ 395.00 | $48,585.00 |
| Roger Sullivan | 169.8 | 31 | $ 395.00 | $67,071.00 |
| Robert Libman | 277.0 | 28 | $ 395.00 | $109,415.00 |
| David Nicholas | 182.0 | 32 | $ 395.00 | $71,890.00 |
| Joanne Spalding | 8.2 | 23 | $ 395.00 | $3,239.00 |
| Mike Costa | 73.3 | 15 | $ 340.00 | $24,922.00 |
| David Bender | 1552.2 | 13 | $ 324.00 | $502,912.80 |
| Andrea Issod | 114.1 | 13 | $ 324.00 | $36,968.40 |
| Aubrey Baldwin | 164.2 | 11 | $ 310.00 | $50,902.00 |
| Naomi Melver | 1513.4 | 5 | $ 285.00 | $431,319.00 |
| Andres Restrepo | 35.2 | 6 | $ 295.00 | $10,384.00 |
| David Abell | 293.2 | Paralegal | $ 112.00 | $32,838.40 |
| Lewis & Clark Law Students | 260 | n/a | $ 112.00 | $29,120.00 |
| **Total** | 7177.3 | | | $2,430,608.60 |

As detailed in the declaration of Andrea Issod, Plaintiffs' total costs in this case are $699,693.26.  Accordingly, the total amount respectfully sought by Plaintiffs through this motion is $3,130,301.86.

## CONCLUSION

For the reasons set forth above, Plaintiffs' respectfully request that Plaintiffs motion should be granted and the Court to award to Plaintiffs the amount of $3,130,301.86 for their reasonable attorneys' fees and costs.

Dated this 6th day of October, 2016

Respectfully submitted,

/s/ Roger Sullivan
Roger Sullivan
McGarvey, Heberling, Sullivan
      & McGarvey, P.C.
345 1st Ave. E.
Kalispell, Montana   59901-5341
(406) 752-5566
RSullivan@McGarveyLaw.com

John Heenan
Bishop & Heenan
3970 Avenue D, Suite A
Billings, Montana    59102
(406) 839-9091
john@bishopandheenan.com

/s/ George E. Hays
George E. Hays (*admitted pro hac vice*)
236 West Portal Avenue, #110
San Francisco, CA   94127
(415) 566-5414
georgehays@mindspring.com

David C. Bender (*admitted pro hac vice*)
Bender Westerberg
10 E. Doty, Ste 800
Madison, WI 53703
 (608) 310−3560

30

bender@mwbattorneys.com

Robert Libman (*admitted pro hac vice*)
Miner, Barnhill & Galland, P.C.
325 N. LaSalle Street
Suite 350
Chicago, IL 60654
(312) 751-1170
Email: rlibman@lawmbg.com

Reed Zars  (*admitted pro hac vice*)
910 Kearney Street,
Laramie, WY 82070
(307) 745-7979
rzars@lariat.org

David Nicholas  (*admitted pro hac vice*)
20 Whitney Road
Newton, Massachusetts  02460
(617) 964-1548

Naomi Kim Melver  (*admitted pro hac vice*)
6005 Auburn Ave.
Oakland, CA 94618
(541) 513-0540
nmelver@gmail.com


*Counsel for Plaintiffs*

31

**CERTIFICATE OF COMPLIANCE**

The undersigned certifies that this Brief complies with the requirements of

District of Montana Local Rule 7.1 regarding word limits.  The total word count is

6291 excluding caption, certificate of compliance, signature block, tables of

contents and authorities, and exhibit index.  The undersigned relies on the word

count of the word processing system used to prepare this document.


/s/ George E. Hays
George E. Hays