IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| SIERRA CLUB and MONTANA ENVIRONMENTAL INFORMATION CENTER, <br><br> Plaintiffs, <br><br> vs. <br><br> TALEN MONTANA, LLC, AVISTA CORPORATION, PUGET SOUND ENERGY, PORTLAND GENERAL ELECTRIC COMPANY, NORTHWESTERN CORPORATION, and PACIFICORP, <br><br> Defendants. | CV 13-32- BLG-DLC-JCL <br><br><br> FINDINGS & RECOMMENDATION |

This environmental litigation over operations at the Colstrip coal-fired electricity generating plant in eastern Montana ended in a Consent Decree entered in September 2016, and the parties have filed cross-motions for an award of attorney fees and costs under § 304(d) of the Clean Air Act, 42 U.S.C. § 7604(d). Plaintiffs Sierra Club and Montana Environmental Information Center ("Plaintiffs") seek attorney fees and costs in excess of $3.1 million, and Defendants Talen Montana LLC, Avista Corporation, Puget Sound Energy, Portland General Electric Company, Northwestern Corporation, and Pacificorp

1

("Defendants") seek nearly $5.5 million in fees and costs.

Because Plaintiffs obtained some success on the merits and Defendants have not shown that Plaintiffs' claims were unreasonable, frivolous, or groundless, Plaintiffs' motion should be granted to the extent set forth below, and Defendants' motion should be denied.

## I.    Legal Standards

Section 304(d) of the Clean Air Act provides that "[t]he court, in issuing any final order in any action brought pursuant to subsection (a) of this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate."[1] With its reference to "any party," § 304(d) makes no distinction between plaintiffs and defendants.  By allowing for fee awards to "any party," Congress sought "to encourage meritorious litigation while discouraging frivolous suits." *Sierra Club v. Khanjee Holding (US) Inc.*, 655 F.3d 699, 708 (7th Cir. 2011).

A court considering whether to award fees under § 304(d) must engage in a two-step inquiry, determining first whether the party seeking fees is entitled to

---

[1] Cases interpreting analogous environmental fee-shifting statutes and their civil rights counterpart, 42 U.S.C. § 1988, are applicable for purposes of interpreting § 304(d).  See *Pennsylvania v. Del. Valley Citizen's Council for Clean Air*, 478 U.S. 546, 560 (1986); *Ruckelshaus v. Sierra Club*, 463 U.S. 680, n.1 (1983); *Marbled Murrelet v. Babbitt*, 182 F.3d 1091, 1095 (9th Cir. 1999).

fees as the prevailing party, and second, whether the requested fees are reasonable. See *Hensley v. Eckerhart*, 461 U.S. 424, 433. At the first step of this inquiry, the court must determine both whether the party seeking fees is a "prevailing party" for purposes of § 304(d), and whether an award of fees is "appropriate." *Saint John's Organic Farm v. Gem County Mosquito Abatement Dist.*, 574 F.3d 1054, 1058 (9th Cir. 2009).

Although § 304(d) does not specify that a party must be prevailing in order to recover fees, courts have effectively read a form of the "prevailing party" requirement into the statute. See *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 691-92 & n. 1 (1983). A plaintiff is a prevailing party for purposes of § 304(d) if it "obtained some success on the merits." *Sierra Club v. Khanjee Holding (US) Inc.*, 655 F.3d 699, 708 (7th Cir. 2011), citing *Ruckelshaus*, 463 U.S. at 682. The Clean Air Act's attorney fee provision "was meant to expand the class of parties eligible for fee awards from prevailing parties to partially prevailing parties – parties achieving some success, even if not major success." *Southern Alliance for Clean Energy v. Duke Energy Carolinas,* LLC, 650 F.3d 401, 406 (4th Cir. 2011) (quoting *Ruckelshaus*, 463 U.S. at 688).

To have achieved "some success," a plaintiff must have "obtained judicially enforceable actual relief on the merits of [its] claim that materially altered the legal

3

relationship between the parties." *Saint John's Organic Farm v. Gem County Mosquito Abatement District*, 574 F.3d 1054, 1058-59 (9th Cir. 2009). In other words, the actual relief achieved "must require defendants to do something they otherwise would not have been required to do." *Saint John's Organic Farm*, 574 F.3d at 1059.

A prevailing plaintiff seeking fees under § 304(d) must also show that a fee award is "appropriate." *Saint John's Organic Farm*, 574 F.3d at 1058. The Ninth Circuit has adopted a "special circumstances" standard for purposes of determining whether a fee award to a prevailing plaintiff is appropriate. *Saint John's Organic Farm*, 574 F.3d at 1061-62. Under this standard, the court may deny fees to an otherwise prevailing plaintiff "where 'special circumstances' would render such an award unjust." *Saint John's Organic Farm*, 574 F.3d at 1062. In making this determination, the court considers whether "(1) awarding the attorney's fees would further the purposes of [the Clean Air Act]; and (2) the balance of equities favors or disfavors the denial of fees." *American Broadcasting Companies v. Miller*, 550 F.3d 786, 788 (9th Cir. 2008). Relevant factors include "the presence of bad faith or obdurate conduct on the part of either party." *Burt v. County of Contra Costa,* 2001 WL 1135433, *9 (N.D. Cal. Aug. 20, 2001). There is a presumption in favor of fee awards to prevailing plaintiffs, however, and the

"denial of fees on the basis of 'special circumstances' is extremely rare." *Borunda*

*v. Richmond*, 885 F.2d 1384, 1392 (9th Cir. 1988).

Fee requests by prevailing defendants are subject to a more stringent

standard. For a defendant to recover fees under § 304(d), it must show that the

plaintiff's claims – individually or as a whole – were "frivolous, unreasonable, or

groundless," or "the plaintiff continued to litigate after [they] clearly became so."

*Christiansburg Garment Co. v. E.E.O.C.,* 434 U.S. 412, 422 (1978). A defendant

may recover "an award of attorney's fees for defending against frivolous claims

even where frivolous and non-frivolous claims are interrelated." *Tutor-Saliba*

*Corp. v. City of Hailey*, 452 F.3d 1055, 1063 (9th Cir. 2006). Frivolous claims "are

those that are 'both baseless and made without a reasonable and competent

inquiry.'" *Idaho Watersheds Project v. Jones*, 253 F.App'x 684, 687 (9th Cir.

2007) (quoting *Buster v. Greisen*, 104 F.3d 1186, 1190 (9th Cir. 1997). A claim

may become frivolous as a case progresses, and an award of fees is appropriate if

the defendant can point to "evidence developed during the course of litigation that

should have put [the plaintiff] on notice that its suit was frivolous." *Idaho*

*Watersheds Project*, 253 F.App'x at 687-88. A court considering whether a

plaintiff's claims were frivolous must guard against the "temptation to engage in

post hoc reasoning by concluding that, because a plaintiff did not ultimately

5

prevail, his action must have been unreasonable or without foundation."

*Christianburg*, 434 U.S. at 421-22.

## III.  Plaintiffs' Motion for Attorney Fees

### A.  Entitlement to Fees and Costs

#### 1.  Prevailing party

Plaintiffs argue they obtained "some success" on the merits as required to support an award of fees under § 304(d) because the court-approved Consent Decree guarantees significant pollutant emissions reductions at the Colstrip plant, thereby achieving the ultimate goal of the litigation.

The Consent Decree by which this case was resolved contains several injunctive relief provisions, the most significant of which requires that two of the Colstrip plant's four electrical generating units cease operation by July 1, 2022.[2] (Doc. 318, at 6-7).  Defendants Talen Montana LLC and Puget Sound Energy are the current owners of the two units targeted for closure.  (Doc. 318, at 2).  The Consent Decree states that by July 1, 2022, Talen and Puget Sound Energy "shall cease combustion of fuel at and permanently cease operation of the Boilers for Colstrip Power Plant Units 1 and 2 and shall not, thereafter, burn any fuel in or

---

[2]Because the parties are familiar with the facts and procedural history, they are included here only as necessary to address the issues raised in the pending motions for attorney fees.

otherwise operate those boilers." (Doc. 318, at 6).

The parties expressly anticipated that the permanent closure of Units 1 and 2 "will result in significant reductions of emissions from the Colstrip Power Plant." (Doc. 318, at 3). According to Plaintiffs' expert Walter Koucky, emissions of sulfur dioxide will be reduced by 48.9% from the Colstrip plant's annual average emissions in 2014 and 2015, emissions of nitrogen oxides will decrease by 42.3%, and emissions of fine particulate matter will decrease by 34.8%. (Doc. 326-1, at 8-10). Koucky has also estimated that shutting down Units 1 and 2 will eliminate about 4.8 million tons per year of carbon dioxide emissions, based on the annual average emitted by the two units in 2014 and 2015. (Doc. 326-1, at 31-32).

Koucky then evaluated what emissions reductions might have resulted had best available control technology (BACT) been required on all four Colstrip units pursuant to prevention of significant deterioriation (PSD) permits. Koucky developed a range of possible outcomes, and compared those outcomes to the emissions reductions that will be achieved through the Consent Decree. Koucky concluded that the emissions reductions expected to result from the Consent Decree fall within the range of options that a BACT determination for all four Colstrip units might have yielded. (Doc. 326-1, at 11-30). According to Plaintiffs, comparing the emissions reductions obtained through the Consent Decree to the

emissions reductions Plaintiffs might have achieved had they prevailed on all of their claims from the outset of the case demonstrates that they at least obtained some success on the merits.

Defendants take issue with Koucky's methodology, however, and argue his conclusion that emissions will be reduced as a result of the Consent Decree is flawed because he did not make the proper comparison. Defendants maintain that to assess the effect of the Consent Decree, Koucky should have compared Colstrip's emissions after July 1, 2022 under the Consent Decree to Colstrip's emissions after July 1, 2022 under a business-as-usual scenario, instead of to Colstrip's annual average emissions in 2014 and 2015. (Doc. 338, at 3; 339, at 3). But even assuming Koucky did not properly calculate the specific amount by which emissions will be reduced as a result of the Consent Decree, there is no dispute that closing Units 1 and 2 as required by the Consent Decree "will result in significant reductions of emissions from the Colstrip Power Plant." (Doc. 318, at 3). That, coupled with the fact that the Consent Decree requires two of the Colstrip plant's four electric generating units to shut down by July 2022, is sufficient to establish that Plaintiffs achieved at least some degree of success on the merits as required to support an award of attorney fees and costs under § 304(d).

Defendants arguments to the contrary are not persuasive. First, Defendants

maintain that Plaintiffs did not prevail for purposes of § 304(d) because they gained nothing by the Consent Decree. For Plaintiffs to have prevailed they must have obtained actual relief that is judicially enforceable, materially alters the legal relationship between the parties, and requires Defendants to do something they would not otherwise be required to do. *Saint John's Organic Farm*, 574 F.3d at 1058-59. There is no dispute that the court-approved Consent Decree entered in this case is judicially enforceable. But Defendants argue the remaining requirements for prevailing party status are not satisfied because Talen and Puget Sound Energy would have retired Units 1 and 2 by mid-2022 anyway, regardless of the Consent Decree, due to economic considerations and environmental regulations.

For evidentiary support, Defendants rely on declarations provided by Talen's general manager for operations, Charles Baker, and its Director of Environmental and Engineering Compliance, Gordon Criswell. (Docs. 338 & 339). According to Baker, Talen concluded before entering into the Consent Decree that Units 1 and 2 would retire by July 2022 based on "multiple variables, including the future viability of coal for use in electricity generation, the price of natural gas, the economics of [the] specific units and the markets they served, and the cost of environmental regulations, which might require expensive retrofitting

9

or force the retirement of generating units." (Doc. 339, at 3). With respect to economic considerations, Baker explains that the price of energy was at a historic low, the volatility of the coal market was problematic, and Units 1 and 2 were not profitable. (Doc. 339, at 4-6). Baker states that those economic concerns were "only made worse by the threat of additional costs imposed by current and anticipated environmental regulations." (Doc. 339, at 6-7). Criswell details the anticipated impact of those regulations, and explains that Talen decided shutting down Units 1 and 2 by 2022 would be a key mechanism for complying with the Clean Power Plan and the Regional Haze Rule. (Doc. 339, at 6-10). Baker likewise confirms that Talen projected based on economic and regulatory concerns that it would have to retire Units 1 and 2 by 2022. (Doc. 339, at 6-7).

As Defendants see it, these declarations are sufficient to show that Units 1 and 2 would have been retired anyway for reasons that had nothing to do with the Consent Decree, which means the Consent Decree did not materially alter the legal relationship of the parties or require Defendants to do something they otherwise would not have had to do. But the declarations standing alone are not sufficient to establish Units 1 and 2 would have been shut down by 2022 for purely economic reasons. For one thing, the declarations only address Talen and say nothing about

whether Puget Sound Energy was also committed to closing the units.[3]  Equally

problematic is the fact that the declarations are not supported by any internal

documents showing that Talen and Puget Sound Energy actually planned on

closing Units 1 and 2 by July 2022.  To the contrary, Plaintiffs point to evidence

suggesting otherwise, including the fact that a $10.1 million economizer

replacement was apparently planned for Unit 2 in 2021, and a $4.2 million

superheater panel replacement and $6.2 million spare generator rotor purchase

were apparently planned for Unit 1 in 2022. (Doc. 326-2, at 52-55).

Even if Defendants planned on retiring Units 1 and 2 by mid-2022 due to

economic concerns, there was no legal requirement that they do so until the

Consent Decree was entered.  The Consent Decree materially altered the legal

relationship between the parties because it makes shutting the units down a legal

---

[3] Six days before oral argument, and after briefing on the cross-motions for attorneys' fees had been completed, Defendants attempted to rectify this deficiency with a "Notice of Testimony Relevant to Cross-Motions for Attorneys' Fees."  Defendants ask the Court to consider prefiled direct testimony submitted by Ronald J. Roberts, the Director of Thermal Resources for Puget Sound Energy, to the Washington Utilities and Transportation Commissioner on January 13, 2017.  (Doc. 351). Defendants contend Roberts' recent testimony supports their argument that Units 1 and 2 would have been closed by July 2022 regardless of the Consent Decree.  Plaintiffs object to Defendants' submission on the ground that it is inadmissible hearsay, and is irrelevant and untimely.  Even if the Court were to consider Roberts' testimony, the result here would be the same.  Roberts' testimony is not sufficient to show that before the parties entered the Consent Decree, there was a plan in place to close Units 1 and 2 by July 2022.

requirement, rather than a voluntary decision. See *Saint John's Organic Farm*, 574 F.3d at 1059 (even if a settlement agreement required the defendant "to do only what it was already doing, it was undisputed that [the defendant's] behavior became legally required rather than voluntary as result of the [a]greement"). The Consent Decree thus requires that Defendants do something they otherwise would not have been legally required to do, as necessary for Plaintiffs to establish prevailing party status under § 304(d).

Second, Defendants argue Plaintiffs did not prevail for purposes of § 304(d) because they lost or abandoned the vast majority of their claims. (Doc. 337 at 15). Plaintiffs filed their initial complaint in March 2013, asserting claims based on 24 projects at the Colstrip plant for which they maintained Defendants should have obtained a PSD permit. (Docs. 1 & 321, at 8). When Plaintiffs filed their first amended complaint in September 2013, they dropped nine of those projects but increased the total number of projects alleged to 64. They alleged nine major modifications for which they claimed Defendants should have obtained a PSD permit, each comprised of several of those 64 individual projects. (Doc. 132). In August 2014, Plaintiffs amended their complaint for a second time to allege claims based on only four projects. (Doc. 132). The Court ultimately recommended that Plaintiffs' claims based on two of those projects be dismissed on summary

judgment. (Docs. 277). That recommendation was awaiting review by presiding Chief Judge Dana L. Christensen when the parties informed the Court just weeks before trial was set to begin that they were in the process of reaching a settlement.

Defendants argue the fact that Plaintiffs initially asserted claims based on 73 projects, but were left with claims based on only two projects, means they abandoned or lost on 95% of their claims and cannot be said to have prevailed for purposes of recovering attorney fees. But Defendants' focus on "the raw number of claims" (doc. 337, at 15) is misleading. Plaintiffs achieved at least some degree of success on the merits through the Consent Decree, which requires that Defendants retire two of the Colstrip plant's four electric generating units by mid-2022 and will result in significant reductions of emissions. (Doc. 318). Because Plaintiffs achieved some success on the merits, they are a prevailing party for purposes of the Clean Air Act's fee shifting provision.

### 2. Appropriateness

Even assuming Plaintiffs are a prevailing party, Defendants take the position that a fee award is not appropriate because special circumstances would render such an award unjust. Defendants begin by arguing special circumstances make it unjust to award fees because Plaintiffs did not obtain any meaningful benefit from the Consent Decree, and lost or abandoned most of their claims. As

discussed above, however, Plaintiffs achieved at least some degree of success on the merits and did in fact obtain a meaningful benefit from the Consent Decree because it guarantees that Units 1 and 2 will be retired by mid-2022 and will result in significant reductions of emissions from the Colstrip plant.

Defendants next argue that special circumstances make a fee award unjust because they had a good faith belief they were following the law by having pre-project PSD compliance mechanisms in place. A defendant's good faith belief that it was following the law is one of several factors that a court may consider in determining whether special circumstances exist. See *Thorsted v. Gregoire*, 841 F.Supp. 1068, 1084 (W.D. Wash. 1994). While the Court has no reason to doubt that Defendants were acting in good faith, the Court finds that alone is not sufficient to establish the special circumstances necessary to overcome the presumption in favor of awarding fees.

Finally, Defendants argue it would not be appropriate to award fees because Plaintiffs engaged in improper conduct by vexatiously pursuing frivolous and unfounded claims. In determining whether to deny fees based on the special circumstances, the court may consider "the presence of bad faith or obdurate conduct on the part of either party." *Burt,* 2001 WL 1135433, *9. As discussed below, however, Defendants have not established that Plaintiffs engaged in any

bad faith conduct while litigating this case.

Because Defendants have not shown that this is one of the extremely rare cases in which it is appropriate to deny fees to the prevailing party based on special circumstances, Plaintiffs are entitled to an award of reasonable attorney fees.

### B.    Amount of Fees and Costs

The lodestar method established by the United States Supreme Court in *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) provides "the most useful starting point for determining the amount of a reasonable fee."  The lodestar calculation involves multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate.  *Hensley*, 461 U.S. at 433.  Once the court has calculated the lodestar, it may adjust the fee upward or downward based on equitable considerations, "including the important factor of the 'results obtained'."  *Hensley*, 461 U.S. at 434.

This factor is particularly crucial where, as here, a plaintiff is deemed a prevailing party even though it has succeeded on only some of its claims for relief. *Hensley,* 461 U.S. at 435.  *Hensley* requires a two-step inquiry in such situations. *Hensley*, 461 U.S. at 435.  First, the court must consider whether the plaintiff failed to prevail on claims that were unrelated to the claims on which it succeeded.

*Hensley*, 461 U.S. at 435. "Claims are unrelated if they are entirely distinct and separate from the claims on which the plaintiff prevailed." *Webb v. Sloan*, 330 F.3d 1158, 1168 (9th Cir. 2003). Claims are related if they share "a common core of facts or are based on related legal theories." *Schwarz v. Secretary of Health and Human Services*, 73 F.3d 895, 903 (9th Cir. 1995). The test for determining whether claims are related "is whether relief sought on the unsuccessful claim is intended to remedy a course of conduct entirely distinct and separate from the course of conduct that gave rise to the injury on which the relief granted is premised." *Schwarz*, 73 F.3d at 903. In other words, "the focus is to be on whether the unsuccessful and successful claims arose out of the same 'course of conduct.'" *Schwarz,* 73 F.3d at 903. If the successful and unsuccessful claims are not related, "the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee." *Hensley*, 461 U.S. at 436.

If the successful and unsuccessful claims are related, however, then the court must proceed to the second part of the inquiry and consider whether the plaintiff achieved "a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award." *Hensley*, 461 U.S. at 435; *Schwarz*, 73 F.3d at 901-02. If the plaintiff "obtained excellent results," counsel "should recover a fully compensatory fee," and "the fee award should not be reduced

simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Hensley*, 461 U.S. at 435. But if the plaintiff "achieved only partial or limited success," full compensation may be excessive. *Hensley*, 461 U.S. at 436. If the court finds that a reduction is appropriate, it "may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." *Hensley*, 461 U.S. at 436-37.

Here, Plaintiffs are requesting $2,430,608.60 in attorney fees and $699,693.26 in costs, for a lodestar amount of $3,130,301.86. The amount of attorney fees sought represents a total of 7,177.3 hours of work at hourly rates ranging from $285 to $395 for attorneys, and an hourly rate of $112 for paralegals and law students. Defendants do not object to the hourly rates sought, or the specific number of hours expended on the litigation. Nor do Defendants challenge any of the costs claimed by Plaintiffs. While Defendants do not object to Plaintiffs' lodestar calculation, they ask the Court to reduce the $3,130,301.86 lodestar amount based on Plaintiffs' limited success.

At the first step of the *Hensley* inquiry, Defendants maintain that any claims on which Plaintiffs succeeded were unrelated to their unsuccessful claims. As discussed above, Plaintiffs achieved some success on their claims as to Units 1 and 2 because the Consent Decree requires that those two units be retired by July

2022.  As Defendants correctly point out, however, Plaintiffs did not achieve any relief whatsoever on their claims as to Units 3 and 4.   Defendants maintain the lack of relatedness between Plaintiffs' successful and unsuccessful claims is further  highlighted by the fact that four of the six Defendants – Avista Corporation, Portland General Electric Company, NorthWestern Corporation, and PacifiCorp –  have no ownership interest in Units 1 and 2.  Because Plaintiffs did not succeed on any of their claims as to Units 3 and 4, Defendants argue there is no conceivable basis on which to charge those four Defendants for Plaintiffs' attorney fees.  Citing Plaintiffs' complete lack of success on their claims as to two of the Colstrip plant's four units, Defendants ask the Court to reduce Plaintiffs' fee request by at least 50%.

While Plaintiffs' successful and unsuccessful claims may have been factually distinct to the extent they arose from activities at different units, they were sufficiently related for purposes of determining reasonable attorney fees.  Plaintiffs' claims all arose from the same general course of conduct and were all based on the same legal theory, namely, that Defendants made major modifications at the Colstrip plant without complying with applicable PSD permitting requirements.  In addition, Plaintiffs' claims all sought the same legal relief and raised many of the same legal issues, such as the applicable emissions test, the

18

selection of a proper baseline period, and the correct legal standard for applying the routine maintenance repair and replacement exclusion.

Moving to step two of the *Hensley* analysis, Defendants urge the Court to to reduce the amount of the fee award sought by anywhere between 50% and 97% because Plaintiffs did not achieve an overall level of success that reasonably justifies the requested fees.  Defendants once again point out that although Plaintiffs initially asserted claims based on 73 projects, by the time the parties entered the Consent Decree, Plaintiffs were left with claims based on only two projects.  Had Plaintiffs not wasted so much time and effort pursuing their unfounded claims, Defendants argue, their fees and costs would have been dramatically less than the $3.1 million they request.  Because Plaintiffs abandoned or lost on 95% of their claims, Defendants take the position that a 75% reduction in Plaintiffs' fee request would be a conservative and reasonable means of accounting for their limited success.

But it is misleading to simply compare the number of successful claims to the number of unsuccessful claims.  Plaintiffs achieved one of their primary goals in this litigation by guaranteeing that emissions from the Colstrip plant will be reduced with the retirement of Units 1 and 2 by mid-2022.   While the Plaintiffs thus achieved some success on the merits, the fact that they abandoned or lost on

the vast majority of their claims reflects that their success was limited. Plaintiffs did not achieve any relief as to the two other Colstrip units, or against four of the six named Defendants.

Plaintiffs' success was further limited because they did not prevail on all of their litigations goals. While reducing emissions at the Colstrip plant was certainly one of Plaintiffs' primary goals, the fact that they sought substantial civil penalties on a myriad of claims reflects that they also filed suit for remedial and deterrent purposes. Plaintiffs sought civil "penalties in amounts up to $27,500 per day for each violation occurring before March 15, 2004, $32,500 per day for each violation occurring after March 15, 2004 but before January 12, 2009, and $37,500 fo reach day after January 12, 2009." (Doc. 1, at 57, 67, at 17). The Consent Decree does not provide for the payment of any civil penalties, which is further indicative of their limited success.

In light of Plaintiffs' limited success, a fully compensatory award for more than seven thousand hours of legal work would be excessive. The Court thus finds that the $3,130,301.86 in attorney fees and costs requested by Plaintiffs should be reduced by 50% to account for Plaintiffs' limited success, for a total award in the amount of $1,565,150.93.

Finally, Defendants argue that even if Plaintiffs are entitled to recover an

award of attorney fees and costs, any amount awarded should be more than fully offset by the fees to which they themselves are entitled.

## IV.    **Defendants' Motion for Attorney Fees**

For Defendants to recover attorney fees under § 304(d), they must show that Plaintiffs' claims were "frivolous, unreasonable, or groundless" from the outset, or that they clearly became so as the litigation progressed and Plaintiffs nevertheless continued to litigate. *Christianburg*, 434 U.S. at 422.  Where, as here, a party has succeeded on some claims but not others, a defendant may recover attorney fees incurred in responding to any unsuccessful claims that are frivolous.  *Hensley*, 461 U.S. at 435 n. 10.   Any award is strictly limited "only to 'the amount of attorneys fees attributable exclusively to' a plaintiff's frivolous claims."  *Harris v. Maricopa County Superior Court*, 631 F.3d 963, 971 (9th Cir. 2011) (citing *Tutor-Saliba Corp.*, 452 F.3d at 1064).  Because fees may be awarded only for frivolous claims, the "defendant bears the burden of establishing that the fees for which it is asking are in fact incurred solely by virtue of the need to defend against those frivolous claims."  *Harris*, 963 F.3d at 971.

Defendants explain that they incurred roughly $18.1 million in fees and costs defending against all of Plaintiffs' claims, but are seeking only the roughly $5.4 million they incurred defending against what they call "six categories of

unfounded claims." (Doc. 320, at 7). Defendants categorize those "unfounded claims" as follows: (1) abandoned claims; (2) turbine claims based on the "actual-to-projected actual" emissions standard; (3) claims based on the "actual-to-potential" emissions standard; (4) Plaintiffs' unit-specific routine maintenance, repair and replacement ("RMRR") argument; (5) Plaintiffs' "baseline" calculation argument, and; (6) Plaintiffs' aggregated project claim. Defendants argue all of these "unfounded claims" or legal arguments were either frivolous from the start, or clearly became so as the litigation progressed.

### 1.  Abandoned claims

Defendants begin by once again focusing on the fact that Plaintiffs ultimately abandoned their claims on 95% of the 73 projects they initially alleged constituted major modifications for which Defendants should have obtained PSD permits. Defendants argue Plaintiffs based their initial claims on the "unsupported assumption" that each capital project undertaken at the Colstrip plant should have been expected to cause a significant emissions increase, and disregarded the fact that Defendants had undertaken a contemporaneous emissions analysis for every project and communicated with the Montana Department Environmental Quality before undertaking the turbine projects. In what can only be characterized as unhelpful rhetoric, Defendants accuse Plaintiffs of "balloon[ing] this case to

unparalleled proportions, cavalierly alleging violations on dozens of projects with no conceivable link to emissions increases," and frivolously adding projects to the litigation and dropping others in "willy-nilly" fashion. (Doc. 320, at 10-11). Defendants maintain that because of Plaintiffs' conduct, they were forced to spend an enormous amount of time and effort responding to claims that were frivolous from the start.

But the fact that Plaintiffs added and then voluntarily dropped many of their claims as the litigation progressed does not mean those claims were frivolous. Plaintiffs have submitted evidence showing that they engaged in an extensive pre-suit investigation that lasted almost three years before initiating their lawsuit. (Doc. 326-3). Plaintiffs explain that as the litigation progressed, they decided to drop certain claims based on information obtained during discovery and from Defendants' expert reports, and based on weaknesses in their own experts' deposition testimony. (Doc. 341, at 29-46). That Plaintiffs decided to drop certain claims based on information they obtained as the case moved forward does not mean those claims were frivolous. See e.g. *Wisconsin Resources Protection Council v. Flambeau Min. Co.*, 2014 WL 465747, at *1 (W.D. Wis. Feb. 5, 2014). To the contrary, the record reflects that Plaintiffs evaluated dozens of potentially significant projects at the Colstrip plant, adding or dropping claims based on

information as it came to light during the litigation process.

2. Turbine claims based on the "actual-to-projected actual" emissions standard

Defendants characterize Plaintiffs' pursuit of claims relating to various turbine projects at the Colstrip plant as "frolic." (Doc. 320, at 13). They note that although Plaintiffs asserted several turbine claims in their initial complaint, they ultimately abandoned all but two of those claims. Defendants take issue with the timing of Plaintiffs' decision to drop some of those claims, noting for example that Plaintiffs dropped their Unit 3 turbine claim just days before Defendants were to submit their initial expert reports, and dropped their Unit 2 turbine claim the day rebuttal expert reports were due. Defendants also complain that Plaintiffs pursued the actual-to-projected-actual aspects of their remaining turbine project claims long after they should have recognized that they lacked evidentiary support based on the testimony of their own expert witnesses. Defendants argue they would have wasted far less time and money if Plaintiffs had made a timely decision to abandon their actual-to-projected-actual arguments and proceed solely under the actual-to-potential emissions test.

While Defendants evidently believe Plaintiffs could have litigated their case more efficiently, they have not shown that the turbine claims Plaintiffs eventually

dropped were frivolous. Plaintiffs explain that they narrowed their turbine claims as the litigation progressed based on information provided by Defendants, and made a tactical decision to pursue their remaining turbine claims based only on the actual-to-potential emissions test. That Defendants believe Plaintiffs never should have alleged many of their turbine claims, or should have abandoned them earlier, does not somehow mean those claims were frivolous.

      3.    <u>Claims based on the "actual-to-potential" emissions standard</u>

Defendants next argue that Plaintiffs vexatiously pursued the frivolous "actual-to-potential" emissions standard, causing Defendants to incur substantial costs and the Court to twice reject Plaintiffs' position. But contrary to Defendants' characterization, Plaintiffs' pursuit of the "actual-to-potential" emissions standard was not frivolous and the Court did not reject the same argument twice. In its May 2014 Findings and Recommendation, the Court rejected Plaintiffs argument that the actual-to-potential emissions test was the only one allowed under Montana's State Implementation Plan, and concluded after a lengthy analysis that an alternative "actual-to-projected-actual" emissions test was also available and might apply depending on how the factual record in the case developed. (Doc. 112, at 42-57). In its December 2015 Findings and Recommendation, the Court considered which of the two tests applied to

25

Plaintiffs' claims. (Doc. 277, at 11-34). The legal issues presented were complicated, and it was only after a lengthy analysis that the Court ultimately rejected Plaintiffs' position. Plaintiffs' claims based on the "actual-to-potential" emissions standard were not frivolous.

### 4. Plaintiffs' unit-specific RMRR argument

Defendants maintain Plaintiffs also pursued a frivolous standard for RMRR, taking the position that it should be assessed based solely on activities taken at the Colstrip units and without regard to evidence of what is considered routine within the electric utility industry at large. Defendants claim they were forced to engage in lengthy and expensive briefing to demonstrate that such a unit-specific standard was improper, only to have Plaintiffs their position at oral argument.

But the situation is not as black and white as Defendants suggest. Plaintiffs' argument regarding the applicable RMRR standard was complicated, and included the question of how much deference should be afforded to an Environmental Protection Agency applicability determination letter, known as the Detroit Edison letter. As the Court recognized in its December 2015 Findings and Recommendation, it appeared based on the summary judgment briefing that the parties fundamentally disagreed on the role of industry evidence in the RMRR inquiry. (Doc. 277, at 60). Plaintiffs clarified their position at oral argument,

however, and the Court adopted a standard for assessing RMRR based on applicable caselaw. The RMRR issue was one among many required considerable discussion, and Plaintiffs' arguments were not frivolous.

5. Plaintiffs' baseline calculation

Defendants similarly contend that Plaintiffs pursued a frivolous "baseline" interpretation, only to capitulate to Defendants' position just before dispositive motions deadline. In particular, Defendants note Plaintiffs initially argued the only baseline for use in calculating emissions was the two year period immediately preceding a project, but later stipulated that any two years within the preceding five years would be presumed representative for use as a baseline.

Plaintiffs explain that they still believed their original position had merit, but entered the stipulation only for tactical reasons and to move the case along. (Doc. 340, at 25). The baseline calculation issues presented were complicated, and the fact that Plaintiffs changed their position on one of the issues as the litigation progressed does not mean that its initial position was frivolous.

6. Plaintiffs' aggregated project claim

Finally, Defendants argue Plaintiffs' claim that two projects should be aggregated and considered a single project for PSD purposes was frivolous because it was without any evidentiary support. This argument is no more

persuasive than the ones discussed above. Although the Court rejected Plaintiffs' theory that the Unit 4 2006 high pressure turbine replacement project should be aggregated with a 2013 reheat safety valve installation project at Unit 4, Plaintiffs' claim was not so baseless as to be considered frivolous. The Court simply disagreed with Plaintiffs argument, and found that Plaintiffs could not prevail on their claim because they did not have the requisite emissions calculations. (Doc. 277, at 55). To hold that Plaintiffs' aggregated project claim was frivolous on this basis would be to engage in the post hoc reasoning *Christianburg* cautioned against.

For the reasons set forth above, the Court finds that Defendants have failed to satisfy the difficult *Christanburg* standard. Defendants have not shown that Plaintiffs' unsuccessful claims were frivolous, or that they vexatiously multiplied proceedings. Because Defendants have not met their burden of proving that Plaintiffs' unsuccessful claims were "frivolous, unreasonable, or groundless" or that Plaintiffs "continued to litigate after [they] clearly became so," they are not entitled to fees under *Christianburg*.

To the extent Defendants argue they are also entitled to fees under 28 U.S.C. § 1927, the Court is not persuaded. Section 1927 provides that a court may required "[a]ny attorney...who so multiplies the proceedings in any case

28

unreasonably and vexatiously...to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  (See Doc. 320, at 8).  Attorney fee awards under this statutory provision "are not frequently made."  *Wight v. Avchieve Human Services, Inc.*, 2012 WL 4359078 (D.Ariz. Sept. 21, 2012).  Any sanctions imposed under § 1927 "must be supported by a finding of subjective bad faith."  *New Alaska Development Corp. v. Guetschow*, 869 F.2d 1298, 1306 (9th Cir. 1989).  "Bad faith is present when an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent." *Estate of Blas v. Winkler*, 792 F.2d 858, 860 (9th Cir. 1986).  Defendants have made no such showing here.  Because Defendants have not shown that Plaintiffs' counsel litigated this case in bad faith, they are not entitled to attorney fees under 28 U.S.C. § 1927.

## V.    <u>Conclusion</u>

For the reasons set forth above, Plaintiffs' motion for attorney fees and costs should be GRANTED in the amount of $1,565,150.93, and Defendants' cross-motion for attorney fees and costs should be DENIED.

DATED this 30th  day of January, 2017

Jeremiah C. Lynch
United States Magistrate Judge